**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>DIGITAL DOMAIN MEDIA GROUP, INC., *et al.*,<br><br>Debtors. [1] | Chapter 11<br><br>Case No.: 12-12568 (___)<br><br>(Joint Administration Requested) |

**MOTION OF DEBTORS FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION FINANCING AND USE CASH COLLATERAL,
(II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL
HEARING, AND (IV) GRANTING CERTAIN RELATED RELIEF**

The debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors") hereby submit this motion (the "Motion") for entry of an interim order (the "Interim

Order"), substantially in the form attached hereto as **Exhibit 1**,[2] and a final order (the "Final

Order," and together with the Interim Order, the "DIP Orders") (a) authorizing the Debtors to

obtain secured postpetition financing in the amount of up to $20,083,000 on a superpriority,

"priming" basis (the "DIP Facility"), of which the sum of $11,789,000[3] would be available on an

interim basis pursuant to the Interim Order and the terms and conditions of that certain *Priming*

*Superpriority Debtor-in-Possession Credit Facility Term Sheet* as the same may be amended,

---

[1]   The Debtors in these proceedings and the last four digits of each Debtor's federal or foreign taxpayer identification number, if any, are as follows: D2 Software, Inc. (5602); DDH Land Holdings, LLC; DDH Land Holdings II, LLC; Digital Domain (8392); Digital Domain Institute, Inc. (6275); Digital Domain International, Inc. (9344); Digital Domain Media Group, Inc. (9505); Digital Domain Productions, Inc. (5757); Digital Domain Productions (Vancouver) Ltd (6450); Digital Domain Stereo Group, Inc. (4526); Digital Domain Tactical, Inc. (6809); Mothership Media, Inc. (2113); Tradition Studios, Inc. (4883); Tembo Productions, Inc. (7634).  The Debtors' mailing address is 10250 SW Village Parkway, Port St. Lucie, Florida 34987.

[2]   The terms of the attached Interim Order have been approved by the DIP Agent (as defined below), subject to non-substantive changes.  Capitalized terms used but not otherwise defined in this Motion shall have the meanings set forth in the DIP Term Sheet (as defined herein) or the Interim Order, as applicable.

[3]   Of the amount requested during the interim period, an aggregate principal amount up to $2,809,000 shall be available solely to fund "payroll and benefits" due on September 26, 2012, solely in the event that the sale contemplated by the DIP Term Sheet (as defined below) has not yet closed by such date.

supplemented, restated or otherwise modified from time to time (the "DIP Term Sheet") attached

as Exhibit A to the Interim Order,[4] by and among Digital Domain Media Group, Inc. in its

capacity as borrower ("DDMG" or the "Borrower") and its Debtor subsidiaries as guarantors

(collectively, the "Guarantors"), Hudson Bay Master Fund Ltd., as agent (the "DIP Agent"), and

the other lenders party thereto (each a "DIP Lender" and collectively, the "DIP Lenders"),[5] (b)

granting the DIP Facility and all obligations owing thereunder to the DIP Agent and the DIP

Lenders first priority security interests in and liens on all of the DIP Collateral (as defined

below), (c) granting allowed superpriority expense claims to the DIP Agent and the DIP Lenders,

(d) authorizing the use of cash collateral of the Initial Senior Noteholders, the PBC Senior

Noteholder, and the Subordinated Noteholders (collectively, the "Prepetition Lenders"), (e)

providing adequate protection for any diminution in value of the Prepetition Collateral (as defined

below) to the Prepetition Lenders (including a roll-up of prepetition debt subject to entry of the

Final Order), (f) scheduling pursuant to Bankruptcy Rule 4001(c)(2) a final hearing (the "Final

Hearing") to consider entry of a final order:

## Jurisdiction

1.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and

1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), in that this is a matter

concerning the administration of the Debtors' estate.  Venue is proper in this district pursuant to

28 U.S.C. §§ 1408 and 1409.

---

[4]  Due to the shortness of time, the parties have agreed to fund loans under the Interim Order pursuant to the DIP Term Sheet.  It is a requirement of the DIP Term Sheet that the Debtors execute definitive documentation with respect to the DIP Facility acceptable to the DIP Lenders by September 18, 2012.

[5]  It is anticipated that the DIP Lenders will consist of each of the existing Initial Senior Noteholders.

2.      The statutory bases for the relief sought herein are sections 105, 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").

### Background

3.      On the date hereof (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Concurrently herewith, the Debtors have filed a motion with this Court requesting joint administration of the Debtors' chapter 11 cases (the "Cases") for procedural purposes only.  The Debtors are operating their business and managing their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or an examiner in these cases, and no official committee has yet been appointed by the Office of the United States Trustee.

4.      The Debtors and their affiliates (collectively, the "Company") comprise an award-winning digital production company.  Since its inception in 1993, the Company has been a leading provider of computer-generated imagery animation and digital visual effects for major motion picture movie studios and advertisers.  The Company, its work, and its employees, have been recognized with numerous entertainment industry awards and nominations, including seven awards issued by the Academy of Motion Picture Arts and Sciences (the "Academy") – three

3

Academy Awards for *Best Visual Effects* and four awards for *Scientific and Technical Achievement*.

5.      The factual background regarding the Debtors, including their current and historical business operations and the events precipitating their chapter 11 filings, are set forth in detail in the *Declaration of Michael Katzenstein in Support of First Day Motions* (the "Katzenstein Declaration") filed concurrently herewith and fully incorporated herein by reference.

### The Debtors' Prepetition Secured Debt

6.      Prior to the commencement of the Debtors' Cases, pursuant to that certain *Securities Purchase Agreement*, dated as of May 6, 2012 (as amended, supplemented or otherwise modified from time to time, together with any associated agreements, the "Senior Note Documents"), by and among DDMG, as borrower, and Hudson Bay Master Fund Ltd., in its capacity as collateral agent (in such capacity, the "Senior Notes Agent"), DDMG initially issued senior secured convertible notes due 2017 in the original principal amount of $35 million to certain buyers (collectively, the "Initial Senior Noteholders," and the notes issued thereto, the "Initial Senior Notes"). The obligations under the Initial Senior Notes are guaranteed by the Guarantors.

7.      Following the issuance of the Initial Senior Notes, DDMG, also acting pursuant to the Senior Note Documents, issued additional senior secured convertible notes due 2017 in the original principal amount of $5 million to PBC Digital Holdings II, LLC ("PBC Senior Noteholder" and the notes issued thereto, the "PBC Senior Notes"), which notes were

4

subordinated to the Initial Senior Notes pursuant to that certain *Agreement Among Buyers*, dated as of August 16, 2012 (the "Agreement Among Buyers"). The obligations under the PBC Senior Notes are guaranteed by the Guarantors.

8.    To secure the Senior Note Obligations, the Debtors granted liens to the Senior Notes Agent for the benefit of the Initial Senior Noteholders and the PBC Senior Noteholder (the "Senior Note Liens") on substantially all of the Debtors' personal property assets, including, without limitation, Accounts, Chattel Paper (whether intangible or electronic), Commercial Tort Claims specified on Schedule VI of the Security and Pledge Agreement, Deposit Accounts, Documents, Equipment, Fixtures, General Intangibles, Goods, Instruments, Inventory, Investment Property, Copyrights, Patents and Trademarks, and Licenses, Letter-of-Credit Rights, Motor Vehicles, Supporting Obligations, and all other tangible and intangible personal property, insurance policies, and the proceeds and products thereof (as each capitalized term in this sentence is defined in that certain *Security and Pledge Agreement*, dated as of May 7, 2012,[6] the "U.S. Collateral" and collectively, with the Canadian Collateral, the "Prepetition Collateral").

9.    Also in conjunction with the Securities Purchase Agreement, pursuant to that certain *Debt Exchange Agreement*, dated as of May 6, 2012 (as amended, supplemented or otherwise modified from time to time, the "Debt Exchange Agreement"), by and between DDMG and Comvest Capital II, L.P. ("Comvest"), pursuant to which DDMG (a) used a portion

---

[6] Pursuant to the Canadian Security and Pledge Agreement, DDMG and DDMG's Canadian subsidiary, Digital Domain Productions (Vancouver) Ltd., granted liens to the Senior Notes Agent on assets, including, but not limited to Accounts, Chattel Paper, Deposit Accounts, Documents of Title, letters of credit, Equipment, Fixtures, Intangibles (other than Trademarks and Trademark Licenses), Goods, Instruments, Inventory, Investment Property, Intellectual Property and Licenses (other than Trademarks and Trademark Licenses), Money, and all other tangible and intangible personal property and the proceeds and products thereof (as each capitalized term in this sentence is defined in the Canadian Security and Pledge Agreement, the "Canadian Collateral").

of the proceeds from the issuance of the Initial Senior Notes totaling approximately $22.5 million to reduce certain outstanding indebtedness to Comvest and (b) issued new secured convertible notes due 2016 in the original principal amount of $8 million (the "Subordinated Notes") to certain holders (the "Subordinated Noteholders"). The Subordinated Notes are subordinate to the Senior Notes pursuant to that certain *Subordination and Intercreditor Agreement*, dated as of May 7, 2012 (the "Subordination Agreement"), entered into by and between Comvest and DDMG. The obligations under the Subordinated Notes are guaranteed by the Guarantors.

10.     All of the obligations owing by the Debtors to the Subordinated Noteholders under the Debt Exchange Agreement and Subordinated Notes (the "Subordinated Note Obligations") are secured by liens (the "Subordinated Note Liens") on the Prepetition Collateral and are subordinated in right of payment to the Senior Note Obligations, and the Subordinated Note Liens are junior and subordinate to the Senior Note Liens, all pursuant to the Subordination Agreement.

### Need for the DIP Facility and Use of Cash Collateral

11.     The Debtors have an immediate and critical need to obtain postpetition financing under the DIP Facility and to use cash collateral in order to effectuate an orderly sale process that will maximize value for creditors. Without access to the DIP Facility and the continued use of cash collateral, the Debtors and their estates would suffer immediate and irreparable harm because they could not continue to operate.

6

12.    The use of cash collateral alone would be insufficient to meet the Debtors' postpetition liquidity needs.  The Debtors are unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of the Debtors' estates under section 364(c)(2) of the Bankruptcy Code and (y) a junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the DIP Lenders on terms more favorable than the terms of the DIP Facility.  The only source of secured credit available to the Debtors, other than the use of cash collateral, is the DIP Facility.  The Debtors require both additional financing under the DIP Facility and the continued use of cash collateral in order to satisfy their postpetition liquidity needs.

13.    The DIP Lenders have indicated a willingness to provide the Debtors with certain financing commitments, but solely on the terms and conditions set forth in the DIP Term Sheet and the Interim Order.  After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Lenders pursuant to the terms of the DIP Term Sheet and the Interim Order represents the best financing presently available to the Debtors.  These funds will be used to maintain the Debtors' assets and knowledge base pending an orderly sale process.

14.    The Debtors have negotiated the DIP Facility and the DIP Term Sheet in good faith and at arm's-length with the DIP Agent.  The Debtors believe that the terms of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment

7

consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The Debtors anticipate that the Prepetition Lenders will consent to the relief requested herein.

**Summary of Principal Terms of the DIP Facility**

15. The following is a summary of the key terms of the DIP Facility:

16. The DIP Facility consists of a postpetition multi-draw term loan facility in an aggregate principal amount of up to $20,083,000 (the "DIP Commitment"), of which an aggregate principal amount of $11,789,000,[7] will be available on an interim basis as set forth in the DIP Term Sheet and the Interim Order.

17. The Debtors' obligations under the DIP Facility (the "DIP Obligations") are to be secured by valid and perfected first priority liens and security interests, subject only to (a) Permitted Priority Liens (as set forth in the DIP Term Sheet), and (b) the Carve-Out (as defined below). The collateral for the DIP Facility is all of the assets of the Debtors' estates, including the Prepetition Collateral and, subject to the entry of the Final Order, Avoidance Actions (collectively with all proceeds and products of any or all of the foregoing, the "DIP Collateral").

18. The following is a summary of the terms of the DIP Facility:[8]

| Borrower: | DDMG |
| --- | --- |
| Guarantor(s): | The remaining Debtors: D2 Software, Inc.; DDH Land Holdings, LLC; DDH Land Holdings II, LLC; Digital Domain; Digital Domain Institute, |

---

[7] Of the amount requested on an interim basis, an aggregate principal amount up to $2,809,000 shall be available solely to fund "payroll and benefits" due on September 26, 2012, solely in the event that the sale contemplated by the DIP Term Sheet has not yet closed by such date.

[8] This summary of the DIP Facility and the Interim Order is provided for the benefit of the Court and other parties in interest. To the extent there are any conflicts between this summary and the Interim Order or the DIP Term Sheet, the terms of the Interim Order or DIP Term Sheet shall govern, as applicable.

Inc.; Digital Domain International, Inc.; Digital Domain Productions, Inc.; Digital Domain Productions (Vancouver) Ltd.; Digital Domain Stereo Group, Inc.; Digital Domain Tactical, Inc.; Mothership Media, Inc.; and Tradition Studios, Inc.; Tembo Productions, Inc.

| | |
|---|---|
| DIP Agent: | Hudson Bay Master Fund Ltd. |
| DIP Lenders: | The Initial Senior Noteholders: Hudson Bay Master Fund Ltd., Tenor Opportunity Master Fund, Ltd., Parsoon Special Situation Ltd., Empery Asset Masters, Ltd., Hartz Capital Investments, LLC. |
| Closing Date: | "Interim Closing Date" means the date on which the "Conditions Precedent to the Interim DIP Loan" set forth under below are satisfied or waived by the DIP Lenders. |
| | "Final Closing Date" means the date on which the conditions precedent to the Final DIP Loan as set forth in the DIP Loan Documentation (including, without limitation, entry of the Final Order (as defined below)) shall have been satisfied or waived. |
| Type and Amount: | A multiple draw term loan facility in an aggregate principal amount, before giving effect to the Roll Up (as defined below), of $20,083,000. |
| Availability: | In accordance with the DIP Term Sheet, to be made available to Borrower as follows: |
| | Interim DIP Loan: A term loan facility to be available in (i) a single drawing on the Interim Closing Date (as defined below) in an aggregate principal amount of $8,980,000 in order to provide sufficient working capital to the Company until the Final Closing Date (as defined below), in accordance with the Approved Budget (as defined below) and subject to the provisions of this Term Sheet, and (ii) at the Borrowers' request, an additional single or multiple drawing in an aggregate principal amount up to $2,809,000, available solely to fund "payroll and benefits" due on September 26, 2012 in the amount of $2,600,000 (or such other amount up to $3,000,000 as agreed by the DIP Lenders) solely in the event that (a) the Sale Order, approving the Sale to the Stalking Horse or such other Successful Bidder approved by the DIP Lenders, is entered on the Bankruptcy Court's docket by no later than September 24, 2012, and (b) such Sale has not yet closed in accordance with the terms of the Successful Bid (both (i) and (ii) together, the "Interim DIP Loan"); and |
| | Final DIP Loan: A term loan facility to be available in multiple draws (but not more frequently than once every two weeks) on and after the Final Closing Date in an aggregate principal amount equal $20,083,000, less the Interim DIP Loan drawn plus the amount of any Roll-Up, in each case subject to the terms and on the conditions set forth in the DIP Loan Documentation (the "Final DIP Loan" and, collectively with the Interim DIP Loan, the "DIP Loans"). |
| Purpose: | DIP Loans will be used for (a) working capital and general corporate purposes of the Debtors, (b) bankruptcy-related costs and expenses (subject to the Carve-Out), (c) costs and expenses related to the Sale, in the case of (a), (b), and (c), in accordance with the Approved Budgets and |

Approved Cash Flow Projections, and (d) for any other purpose agreed upon in the DIP Loan Documentation.

None of the proceeds of the DIP Loans shall be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Lenders (in any capacity), including in connection with the validity of the liens granted to the DIP Lenders (whether under the Securities Purchase Agreement, Initial Senior Notes or otherwise), provided that a statutory committee appointed in the Chapter 11 Cases may incur up to $25,000 conducting an investigation as to the prepetition liens and claims of the Debtors' lenders

**Budget and Projections:**    Use of cash shall be subject to a weekly budget and weekly cash flow projection for the period commencing on the Target Petition Date and ending on the Outside Date, each in form and substance acceptable to the DIP Lenders in their sole and absolute discretion (the "Approved Budget" and "Approved Cash Flow Projection," respectively).

By not later than two (2) business days after the end of the week following the Petition Date, Obligors shall deliver to the DIP Lenders (a) an updated Approved Cash Flow Projection for the remainder of the term of the Approved Budget and (b) a variance report in form and substance acceptable to the DIP Lenders in their sole and absolute discretion (an "Approved Variance Report") showing comparisons of actual results for each line item against such line item in the Approved Budget and Approved Cash Flow Projection, respectively. Thereafter, Obligors shall deliver to the DIP Lenders, by not later than two (2) business days after the close of each weekly period after the Petition Date, an Approved Variance Report for the trailing four (4) week period (or, if fewer than four weeks have lapsed since the Petition Date, then for the trailing one, two or three week period, as applicable).

Each Approved Variance Report shall indicate whether there are any adverse variances that exceed the "Permitted Variances," which means (x) up to 10% on a line-item basis, or (y) 10% in the aggregate for all Cash Receipts and Cash Disbursements.

**Priority:**    All DIP Loans and other liabilities and obligations of the Obligors to the DIP Lenders under or in connection with this Term Sheet, the DIP Loan Documentation, the Interim Order or Final Order (collectively, the "DIP Loan Obligations") shall be:

(i)    pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status in the Chapter 11 Cases of the Debtors with priority over any and all administrative expenses, whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code and including the proceeds of Avoidance Actions (as defined below) only from and after the Final Closing Date and subject to entry of the Final Order (but in all cases subject to the Carve-Out);

10

(ii)     pursuant to sections 364(c)(2), secured by a perfected first-priority lien on the Collateral (as defined below), to the extent that such Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date (but in all cases subject to the Carve-Out);

(iii)    pursuant to section 364(c)(3) of the Bankruptcy Code, secured by a perfected second priority lien on the Collateral, to the extent that such Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties in existence as of the Petition Date (other than the Senior Note Liens and the Subordinated Note Liens, each as defined below) or to valid liens in existence as of the Petition Date that are perfected subsequent to such date as permitted by section 546(b) of the Bankruptcy Code, and to the extent such liens are expressly permitted in writing by the DIP Lenders in their sole and absolute discretion (the "Second Priority DIP Liens") (but in all cases subject to the Carve-Out); and

(iv)    pursuant to section 364(d) of the Bankruptcy Code, secured by a perfected first priority, priming and senior security interest and lien granted to the DIP Lenders (the "Priming DIP Liens") in and on all the Collateral (but in all cases subject to the Carve-Out).  All existing liens, rights and interests granted to or for the benefit of:

a.    the Initial Senior Noteholders under the Securities Purchase Agreement, Initial Senior Notes and other related documents (collectively, the "Initial Senior Note Liens"),

b.    PBC under the Securities Purchase Agreement, the PBC Senior Notes and other related documents (collectively, the "PBC Senior Note Liens," and collectively with the Initial Senior Note Liens, the "Senior Note Liens") (which are junior and subordinate to the Initial Senior Note Liens pursuant to the Agreement Among Buyers), and

c.    the Subordinated Noteholders (as defined below) under the Debt Exchange Agreement (as defined below), Subordinated Notes (as defined below) and other related documents (collectively, the "Subordinated Note Liens") (which are junior and subordinate to the Senior Note Liens pursuant to the Subordination Agreement (as defined below)),

shall be primed and made subject to and subordinate to the Priming DIP Liens (but in all cases subject to the Carve-Out), which shall also prime the (x) Initial Senior Note Adequate Protection Liens (as defined below) (collectively, with the Initial Senior Note Liens, the "Primed Initial Senior Note Liens"), (y) PBC Senior Note Adequate Protection Liens (as defined

11

below) (collectively, with the PBC Senior Note Liens, the "Primed PBC Senior Note Liens") and (z) Subordinated Note Adequate Protection Liens (as defined below) (collectively with the Subordinated Note Liens, the "Primed Subordinated Note Liens").

The Priming DIP Liens shall not be subject to being treated pari passu with or subordinated to any other liens or security interests (whether currently existing or hereafter created), subject in each case only to permitted exceptions to be expressly agreed upon in writing by the DIP Lenders in their sole and absolute discretion or imposed by applicable non-bankruptcy law (collectively, the "Permitted Liens"), and the Priming DIP Liens shall be junior and subordinate to payment of the Carve-Out, as defined below.

Under the proposed Interim Order, the term "Carve-Out" means, collectively: (i) fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Bankruptcy Court (the "Case Administration Fees"), (ii) unpaid professional fees and expenses ("Professional Fees") payable to each legal or financial advisor retained by the Debtors and the Creditors' Committee that are incurred or accrued prior to the date of the occurrence of a Termination Event (as defined below), but subject to the aggregate amount(s) allocated to each such professional in the Approved Budget, and ultimately allowed by the Court pursuant to sections 330, 331 and 503 of the Bankruptcy Code or any order of the Court (whenever such fees may be actually incurred prior to the Termination Event), (iii) accrued and unpaid professional fees and expenses of the Debtors' professionals employed under section 327(e) of the Bankruptcy Code incurred prior to the Petition Date in an aggregate amount not in excess of $200,000, (iv) Case Administration Fees and Professional Fees paid on or after the date of the occurrence of a Termination Event (as defined below) in an aggregate amount not to exceed $75,000, and (v) employee wages, accrued and unpaid up until the occurrence of a Termination Event (as defined below), as expressly set forth in and up to the amounts set forth in the Approved Budget and Approved Cash Flow Projection. Prior to the occurrence of a Termination Event (as defined in the Interim Order), the Debtors shall fund payment of Professional Fees to a trust account held by Debtors' counsel in the amounts and at the times set forth in the Approved Budget, which funds may be released to professionals upon Court approval, provided, however, the funds in the trust account shall not exceed amounts projected for such professionals in the Approved Budget and Approved Cash Flow Projection for a two (2) week period.

Nothing in the DIP Term Sheet is intended, or shall be deemed, to alter the priorities between the (1) Initial Senior Note Liens and the PBC Senior Note Liens as set forth in the Agreement Among Buyers, or (2) Senior Note Liens and Subordinated Note Liens as set forth in that certain Subordination and Intercreditor Agreement, dated as of May 7, 2012, by and among Hudson Bay Master Fund Ltd., Comvest Capital II, L.P. ("Comvest") and DDMG (the "Subordination Agreement").

| | |
|---|---|
| Roll-Up of Initial Senior Notes: | Subject to the entry of the Final Order, on the Final Closing Date and from time to time thereafter in the event all or any portion of the Additional Commitment is made available, indebtedness of Obligors under, in connection with, or with respect to the Securities Purchase Agreement and Initial Senior Notes and all related documents, whether for borrowed money, fees, expenses, or otherwise (including, without limitation, the Event of Default Redemption Price (as defined in the Initial Senior Notes)) accrued and outstanding as of the Petition Date (collectively, the "Initial Senior Note Obligations") shall be converted into DIP Loans (the "Roll-Up"), subject to customary challenge rights in favor of creditors or any statutory committee. The amount of Initial Senior Note Obligations that will be subject to the Roll-Up shall be equal to two (2) times the maximum committed amount under the DIP Loan Facility provided from time to time by the DIP Lenders and available for borrowing by the Obligors, subject to the terms and conditions of the DIP Loan Documentation. |

All DIP Loans, whether in respect of amounts advanced for working capital purposes or in connection with the Roll-Up shall be of equal stature and entitled to identical treatment, subject only to application of the priorities set forth under "Mandatory Prepayments" below. Notwithstanding the foregoing, if any obligation of the Obligors owing to a DIP Lender in respect of the DIP Loans as a result of such Roll-Up is avoided, disallowed, set aside, or otherwise invalidated, in whole or in part, in any judicial proceeding or otherwise, the aggregate principal amount of Initial Senior Notes held by such DIP Lender prior to the Roll-Up, to the extent theretofore avoided, disallowed, set aside, or otherwise invalidated, shall be reinstated in full force and effect and all guarantees and security in respect thereof shall be restored

| | |
|---|---|
| Adequate Protection: | *For Initial Senior Noteholders.* Solely in the context of this DIP Credit Facility being provided to Borrower by the Initial Senior Noteholders, the Initial Senior Noteholders will agree to accept the following adequate protection package with respect to that portion of the Initial Senior Note Obligations that are not subject to the Roll-Up: (i) replacement liens (the "Initial Senior Note Adequate Protection Liens") and adequate protection pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code, in respect of the Initial Senior Note Liens, which shall be junior only to the claims and liens of the DIP Lenders as described under "Priority" above, but which shall be senior to the Primed PBC Senior Note Liens and Primed Subordinated Note Liens (but in all cases subject to the Carve-Out); and (ii) payment of current interest at the contractual non-default rate on the Initial Senior Notes and the fees and expenses of counsel. |

*For PBC Senior Noteholders.* PBC Senior Noteholders shall receive for adequate protection, replacement liens in respect of the PBC Senior Note Liens (the "PBC Senior Note Adequate Protection Liens"), which shall be junior to all claims and liens of the DIP Lenders and Primed Initial Senior Note Liens, but senior to the Subordinated Note Adequate Protection Liens, all as described under "Priority" above (but in all cases subject to the Carve-Out).

13

*For Subordinated Noteholders.* Holders ("Subordinated Noteholders") of the secured convertible notes due 2016 (the "Subordinated Notes") issued pursuant to that certain Debt Exchange Agreement, dated as of May 6, 2012 (as amended, supplemented or otherwise modified prior to the date hereof, the "Debt Exchange Agreement") entered into by and between DDMG and Comvest, shall receive for adequate protection, replacement liens in respect of the Subordinated Note Liens (the "Subordinated Note Adequate Protection Liens"), which shall be junior to all claims and liens of the DIP Lenders, the Primed Senior Note Liens, and the Primed PBC Senior Note Liens, as described under "Priority" above (but in all cases subject to the Carve-Out).

| | |
|---|---|
| Collateral | "Collateral" means, collectively, all now owned or hereafter acquired assets and property of each Debtor and its respective chapter 11 estate, whether real or personal, tangible or intangible, or otherwise, and any and all proceeds therefrom, including, without limiting the generality of the foregoing, all cash, accounts, accounts receivable, inventory, property, plant and equipment, real estate, leaseholds, avoidance actions under chapter 5 of the Bankruptcy Code ("Avoidance Actions") (from and after the Final Closing Date and subject to entry of the Final Order), all intercompany claims, any and all proceeds arising from insurance policies (including, without limitation, policies for the benefit of directors and officers of Borrower (collectively, "D&O Insurance Policies"), all claims and causes of action of each Obligor or its respective estate and any and all proceeds therefrom, all intellectual property, and the equity interests of each direct and indirect subsidiary of each Obligor, which "Collateral," for the avoidance of doubt, shall include, without limiting the generality of the foregoing, all assets of each Obligor that is secured pursuant to the Security Documents |
| Origination Fee | A fee (the "Origination Fee") equal to (i) 5% multiplied by (ii) the full aggregate principal amount of the DIP Loans, including, without limitation, DIP Loans subject to the Roll-Up, shall be (x) fully earned on the date of entry of the Interim Order and (y) due and payable to the DIP Lenders on the Maturity Date (as defined below). |
| Exit Fee | Borrower shall pay, in connection with any optional, mandatory or other payment or prepayment of DIP Loans, in whole or in part, on any date when the DIP Loans are so paid or prepaid, an amount equal to 5% of the amount so paid or prepaid (the "Exit Fee") (net of the existing Initial Senior Note Obligations subject to the Roll-Up). |
| Interest Rate: | 12% per annum, to be paid in kind with such interest added to the principal amount of the DIP Loans compounded monthly in arrears on the last day of each month. Interest shall begin to accrue on the Interim DIP Loan on the Interim Closing Date and on the Final DIP Loan from and after the Final Closing Date. |
| Default Interest: | At all times while a default exists, principal, interest and other amounts shall bear interest at a rate per annum equal to 2% in excess of the interest rate set forth under "Interest Rate" above. |

| | |
|---|---|
| Maturity Date: | The DIP Loans shall mature on the earliest to occur of the following (such date, the "Maturity Date"): |

       (i)     December 31, 2012 (the "Outside Date");

      (ii)    the acceleration of any of the DIP Loans and the termination of the commitments to make the DIP Loans in accordance with the terms of this Term Sheet or the DIP Loan Documentation, as applicable (including, without limitation, the non-satisfaction of any Chapter 11 Milestone (as defined in Exhibit A to the DIP Term Sheet) by the applicable Specified Deadline and the non-waiver of such non-satisfaction by the DIP Lenders); and

     (iii)   the filing of a motion by the Debtors seeking dismissal of any of the Chapter 11 Cases, dismissal of any of the Chapter 11 Cases, the filing of a motion by the Debtors seeking to convert of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code.

| | |
|---|---|
| Optional Prepayments: | The Borrowers may prepay the DIP Loans in whole or in part at any time. |
| Mandatory Prepayments: | Customary provisions to repay debt in the event of asset dispositions outside the ordinary course. |
| Representations and Warranties: | Customary and appropriate for financings of this type. |
| Conditions Precedent | Customary and appropriate for financings of this type, including without limitation, retention of Michael Katzenstein as chief restructuring officer, satisfaction of certain Chapter 11 Milestones, no material adverse changes, title to properties, implementation of acceptable cash management system, existence of adequate insurance, no liens, perfection and priority of liens securing the DIP Facility and superpriority status, and continued effectiveness of financing. |
| Covenants: | Customary and appropriate affirmative, negative and financial covenants for financings of this type, including without limitation, satisfaction of certain financial covenants and the delivery of certain notices and financial statements, including without limitation rolling weekly financial reporting. |
| Events of Default: | Customary Events of Default, including without limitation failure to make payments when due, defaults under other agreements or instruments of indebtedness, noncompliance with covenants, breaches of representations and warranties, judgments in excess of specified amounts, impairment of security interests in collateral, failure to meet the Chapter 11 Milestones, the Interim Order shall have been stayed, amended, modified, reversed or otherwise determined not to be a binding or valid obligation of the Borrower or the Guarantors, a default under the terms of the Interim Order, or a default by the stalking horse bidder shall have occurred and be continuing. |

Remedies Upon
Default:

Upon the occurrence and during the continuance of any Event of Default, subject to three (3) business days' notice to the Debtors and an opportunity to seek an expedited hearing before the Bankruptcy Court (at which hearing the sole issue shall be limited to whether or not an Event of Default has occurred), the DIP Lenders may take all or any of the following actions without further order of or application to the Bankruptcy Court, and notwithstanding the automatic stay:

(i)    declare the principal of, and accrued interest on, any outstanding DIP Loans to be immediately due and payable;

(ii)    terminate any further commitment to lend to the Borrower;

(iii)    set-off any amounts held as cash collateral (including, without limitation, in any cash collateral account held for the benefit of the DIP Lenders); or

(iv)    without application or motion to, or further orders from, the Bankruptcy Court or any other court, and without interference from any Debtor or any other party in interest, take any other action or exercise any other right or remedy (including, without limitation, with respect to the Priming DIP Liens and Collateral) permitted under this Term Sheet, in the DIP Loan Documentation or under applicable law, including, without limitation, exercising any and all rights and remedies with respect to the Collateral or any portion thereof.

Other Bankruptcy
Matters:

All reasonable out-of-pocket costs and expenses of the DIP Lenders and the DIP Agent relating to the DIP Credit Facility (including, without limitation, reasonable fees and disbursements of counsel and of third-party appraisers and consultants advising the DIP Lenders and the DIP Agent, expenses in connection with the appraisal and monitoring of the Collateral, syndication, enforcement of rights and other miscellaneous disbursements) shall be payable by the Borrower promptly upon written demand (together with summary backup documentation supporting such reimbursement request) and without the requirement for Bankruptcy Court approval in the event the transactions contemplated hereby are consummated. A copy of the summary invoice shall be provided by the Debtors to the Office of the U.S. Trustee and counsel for any statutory committee.

The Borrower shall indemnify, pay and hold harmless the DIP Lenders and the DIP Agent (and their respective directors, officers, employees and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction).

The DIP Loan Documentation shall contain releases and exculpations for the DIP Lenders and the DIP Agent in respect of any matters arising prior to the Petition Date, subject to customary challenge rights in favor of

16

creditors or any statutory committee.

In the event that Mr. Katzenstein resigns, dies, or becomes incapacitated or otherwise can no longer fulfill his duties as chief restructuring officer of the Debtors, the DIP Lenders shall have ten (10) business days thereafter to confer with the Debtors and, after discussion with the Debtors, provide the Debtors with the names of three individuals who would be acceptable to the DIP Lenders in the role of chief restructuring officer (the "Acceptable CRO List"). Within five (5) business days of Debtors' receipt of the Acceptable CRO List, the Debtors shall select the replacement chief restructuring officer from the Acceptable CRO List. In the event that the DIP Lenders do not timely provide the Acceptable CRO List, the Debtors shall select the chief restructuring officer.

| | |
|---|---|
| Governing Law and Jurisdiction | The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern this Term Sheet and the DIP Loan Documentation, except with respect to conflicts of laws. |
| | The DIP Loan Documentation will provide that the Obligors shall submit to the exclusive jurisdiction of the Bankruptcy Court and shall waive any right to trial by jury. |
| Pre-Final Order Sale | If a sale to the Stalking Horse (or Successor Bid at the Auction) is consummated prior entry of the Final Order (a "Pre-Final Order Sale") and the sale proceeds cannot for any reason be distributed on the closing of the sale in the order of priority of payments as described in this term sheet, then (i) the sale proceeds from such Pre-Final Order Sale (the "Pre-Final Order Sale Proceeds") shall constitute Cash Collateral; (ii) the Debtors shall be authorized, with the prior consent of the DIP Lenders, to use such Cash Collateral subject to this Interim Order and in accordance with the Approved Budget; and (iii) any Pre-Final Sale Order Proceeds used by the Debtors shall reduce, on a dollar-for-dollar basis, the Interim DIP Loan and if such Maximum Borrowing shall be reduced to zero, the remaining Pre-Final Sale Order Proceeds shall reduce the Final DIP Loan. |

## Relief Requested

19.    The Debtors seek entry of the DIP Orders granting the following relief:

(a)    authorizing the Debtors to execute and deliver the DIP Term Sheet and obtain up to $11,789,000[9] of secured postpetition loans, advances, and other financial accommodations pursuant to the Interim Order;

(b)    granting allowed superpriority expense claims to the DIP Agent and the DIP Lenders pursuant to section 364(c)(1) of the Bankruptcy Code;

---

[9]    Of the amount requested on an interim basis, an aggregate principal amount up to $2,809,000 shall be available solely to fund "payroll and benefits" due on September 26, 2012, solely in the event that the sale contemplated by the DIP Term Sheet has not yet closed by such date.

DOCS_SF:81227.4 18455-001

(c)     granting the DIP Facility to the DIP Agent and the DIP Lenders first priority security interests in, and liens on, all of the DIP Collateral pursuant to section 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code;

(d)     approval of the form and manner of adequate protection to be provided to the DIP Lenders and the Prepetition Lenders pursuant to sections 361(a) and 363(c) of the Bankruptcy Code;

(e)     authorizing the Debtor to use the Cash Collateral pursuant to sections 361 and 363 of the Bankruptcy Code; and

(f)     modifying the automatic stay to the extent necessary to effectuate the provisions of the DIP Orders.

## Basis for Relief

**I.      The Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) and 364(d)(1) of the Bankruptcy Code.**

20.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section, 503(b)(l) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).  In addition, section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by "priming" liens, provides that the Court, after notice and a hearing, may:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if --
>
> (A)     the [debtor] is unable to obtain credit otherwise; and
>
> (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(l).

21.     In evaluating proposed postpetition financing under sections 364(c) and (d) of the

Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors,

including whether:

> (a)     unencumbered credit or alternative financing without
> superpriority status is available to the debtor;
>
> (b)     the credit transactions are necessary to preserve assets of
> the estate;
>
> (c)     the terms of the credit agreement are fair, reasonable, and
> adequate;
>
> (d)     the proposed financing agreement was negotiated in good
> faith and at arm's-length and entry thereto is an exercise of sound
> and reasonable business judgment and in the best interest of the
> debtors' estate and its creditors; and
>
> (e)     the proposed financing agreement adequately protects
> prepetition secured creditors.

*See, e.g.*, *In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors

in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr.

E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003)

(applying all factors in making a determination under section 364(d)).

22.     For the reasons discussed below, the Debtors satisfy the standards required to

access postpetition financing on a secured superpriority and priming lien basis under sections

364(c) and 364(d) of the Bankruptcy Code.

**A.      The Debtors Were Unable to Obtain Financing On More Favorable Terms.**

23.     The Debtors face severe liquidity restraints and were forced to file these Chapter

11 Cases to preserve the value of their assets.  The Debtors have solicited alternative financing

19

proposals from outside parties without success.  Indeed, without the agreement of the Debtors'

existing Initial Senior Noteholders to provide the Debtors with postpetition financing, the

Debtors would have been unable to continue to fund payroll and meet other ordinary course

obligations, resulting in an immediate shutdown of all business operations, the termination of all

employees, and the forced liquidation of all assets.  Instead, with the DIP Facility in place and

access to Cash Collateral, the Debtors intend to implement an orderly sale process that will

maximize the value of estate assets.

24.    The Debtors respectfully submit that their efforts to obtain postpetition financing

therefore satisfy the standard required under Section 364(c).  *See, e.g.*, *In re Simasko Production

Co.*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing stipulation where

debtor's best business judgment indicated financing was necessary and reasonable for benefit of

estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to

postpetition credit, courts "permit debtors in possession to exercise their basic business judgment

consistent with their fiduciary duties"); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D.

Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be

unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for

financing").

**B.     The DIP Facility is Necessary to Preserve the Assets of the Debtors' Estates.**

25.    As debtors in possession, the Debtors have a fiduciary duty to protect and

maximize their estates' assets.  *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325,

339 (3d Cir. 2004).  As noted above, the Debtors require access to working capital in the form of

20

postpetition financing to conduct a sale process. Absent additional working capital, the Debtors would be forced to a hard-stop liquidation.

**C.    The Terms of the DIP Facility Are Fair, Reasonable, and Appropriate Given the Circumstances.**

26.    In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

27.    The DIP Facility was negotiated in good faith and at arm's-length between the Debtors and the DIP Lenders, culminating in an agreement designed to permit the Debtors to maximize the value of their assets through an orderly sale process. *See, e.g., Bray v. Shenandoah Fed. Sav. And Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender, particularly when "time is of the essence to preserve a vulnerable seasonal enterprise"); *In re Western Pacific Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Colo. 1997) (authorizing postpetition financing to preserve value of aircraft leaseholds where to hold otherwise would result in the elimination of their value and the "immediate collapse of the Debtor as a going concern").

**D.    Entry Into the DIP Facility Reflects the Debtors' Sound Business Judgment.**

28.    A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g., Trans World*

21

*Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D.

Del. 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and

prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y.

1990) (financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's

business judgment).

29.    Bankruptcy courts routinely accept a debtor's business judgment on many

business decisions, including the decision to borrow money. *See, e.g., Group of Inst.*

*Investors v. Chicago, Mil., St. P. & Pac.*, 318 U.S. 523, 550 (1943) (holding that decisions

regarding assumption or rejection of leases are left to the business judgment of the debtor); *In re*

*Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to

the board room and not to this Court"). Further, one court has noted that "[m]ore exacting

scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate

and increase its cost, interfere with the Bankruptcy Code's provision for private control of

administration of the estate, and threaten the court's ability to control a case impartially."

*Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

30.    Bankruptcy courts generally will defer to a debtor in possession's business

judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary

and capricious, *In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); *see*

*also Trans World Airlines, Inc.*, 163 B.R. at 974 (approving interim loan, receivables facility

and asset-based facility based upon prudent business judgment of the debtor), and

generally will not second-guess a debtor in possession's business decisions involving "a business

22

judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley,* 14 B.R. at 513-14 (footnotes omitted).

31.     As described above, the Debtors have exercised sound business judgment in determining the appropriateness of the DIP Facility and submit they have satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the DIP Facility. The Debtors believe that the DIP Facility contains terms that are the best available under the circumstances.

32.     The funds provided by the DIP Facility are essential to enable the Debtors to avoid irreparable harm to the Debtors' assets and business by effectuating an orderly sale process.

33.     Accordingly, pursuant to sections 364(c) and (d)(1) of the Bankruptcy Code, the Debtors respectfully submit that they should be granted authority to enter into the DIP Facility and obtain funds from the DIP Lenders on the secured and administrative superpriority basis described herein.

II.     **The Debtors' Request To Use Cash Collateral and the Proposed Adequate Protection Being Provided to Prepetition Lenders is Appropriate and Meets the Required Standard.**

34.     In exchange for the Debtors' use of the Prepetition Collateral, including Cash Collateral, and their priming of the prepetition liens, the Debtors propose to provide the Prepetition Lenders with adequate protection in accordance with sections 364(d) and 361 of the Bankruptcy Code. To that end, the Debtors request that the Court approve and authorize the Debtors' proposed adequate protection of the Prepetition Lenders' interest in each of their respective Prepetition Collateral in respect of any diminution in value resulting from (i) use of the Cash Collateral, (ii) the

use, sale, or lease of the Prepetition Collateral, (iii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, and (iv) the implementation of the DIP Facility and the priming of the prepetition liens.

35.     The Interim Order provides adequate protection of the interests of the Prepetition Lenders in the Prepetition Collateral against any diminution in value of such interests resulting from the priming of their liens by the DIP Facility, in the form of valid, binding, enforceable, non-avoidable and automatically perfected replacement security liens.  The Debtors will also grant the Initial Senior Noteholders current interest at the non-default rate and payment of certain fees and expenses set forth in the Interim Order.

36.     The Debtors believe that such adequate protection is fair and reasonable.  In reliance upon such adequate protection, the Debtors expect that the Prepetition Lenders will consent (or have consented pursuant to applicable intercreditor agreements) to the priming of their prepetition liens. The consent of the Prepetition Lenders permits the Debtors to avoid potentially time consuming and unpredictable priming litigation. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (requiring a substantial evidentiary foundation to be laid in connection with the debtors' request to grant a priming lien and finding there was not adequate protection of a prepetition lenders' interest in collateral where there was a projected increase in the value of such collateral). The Prepetition Lenders' consent to the priming of their Prepetition Liens thus permits the Debtors to save considerable resources, not to mention avoid a delay, in obtaining postpetition financing. And, importantly, the proposed adequate protection shall only be provided to the extent there is a diminution in value to the Prepetition Lenders' interest in the Prepetition Collateral.  Accordingly,

based upon the foregoing, the Debtors respectfully request that the Court authorize the Debtors to provide the above described adequate protection to the Prepetition Lenders in accordance with the terms set forth in the DIP Order and DIP Facility.

### III.    The Debtors are Authorized to Use Cash Collateral.

37.    In addition to the need for the DIP Facility, the Debtors have a critical need for the immediate use of Cash Collateral.  The Debtors require use of the Cash Collateral to pay present operating expenses including payroll.  If unable to use the Cash Collateral pending the Final Hearing, the Debtors will be unable to effectuate an orderly sale process designed to maximize value.

38.    Under section 363(c)(2) of the Bankruptcy Code, the Debtors may not use Cash Collateral without the consent of the Prepetition Lenders or authority granted by the Court.  As noted above, the Debtors expect to have consent of the Prepetition Lenders to the continued use of Cash Collateral and therefore the Debtors have satisfied the requisite standards.

### IV.    Provisions To Be Highlighted Pursuant to Local Rule 4001-2.

39.    Local Rule 4001-2 requires the Debtors to affirmatively advise the Court of any deviations from certain proscribed provisions to be included in financing and cash collateral orders.  The Interim Order deviates from Local Rule 4001-2 by virtue of the following provisions:

(i)    subject to the entry of the Final Order, granting liens and superpriority claims in favor of the DIP Lenders and the Prepetition Lenders on proceeds of avoidance actions (paragraphs 7, 8 and 10 of the Interim Order);

25

(ii) subject to the entry of the Final Order, granting a roll-up of the obligations under the Initial Senior Notes and PBC Senior Notes up to two (2) times the amount committed under the DIP Facility;

(iii) granting the DIP Agent and the DIP Lenders a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code and, subject to the entry of the Final Order, a waiver of the provisions of section 506(c) of the Bankruptcy Code (paragraphs 20, 22 of the Interim Order); and

(iv) providing for various stipulations by the Debtors in favor of the Prepetition Lenders as to their prepetition liens and claims, subject to the challenge rights of a committee, or if none is appointed, any party in interest (Recital G and paragraph 15 of the Interim Order); and

(v) providing disparate treatment for the professionals retained by a creditors' committee with respect to a professional fee carve-out by budgeting lower amounts for such professionals than for the Debtors' professionals (Exhibit B to Interim Order).

40. The Debtors submit that the DIP Facility is the best available under the circumstances and that entry into the DIP Facility is in the best interest of the Debtors and their estates. Substantially all of the Debtors' personal property assets are encumbered by the liens and security interests of the Prepetition Lenders. The Debtors are confident that no other lender was willing to extend credit on a junior priority basis.

41.     Courts in this district and elsewhere have supported the granting of liens on avoidance action proceeds at the final hearing. *See In re ACG Holdings, Inc.*, Case No. 08-11467 (Bankr. D. Del. July 16, 2008) (approving the granting of liens on avoidance actions to postpetition lenders); *In re Tropicana Entm't, LLC*, Case No. 08-10856 (KJC) (Bankr. D. Del. June 5, 2008) (approving the granting of liens on avoidance actions to postpetition lenders); *In re Silver Cinemas Int'l, Inc.*, No. 00-1978 (Bankr. D. Del. Aug. 11, 2000) (same); *In re Trans World Airlines*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving the granting of liens on avoidance actions to postpetition lenders); *In re Movie Gallery, Inc.*, No. 07-33849 (Bankr. E.D. Va. Nov. 16, 2007) (secured lenders' collateral includes proceeds and property that is the subject of successful avoidance actions); *In re NTELOS Inc.*, No. 03-32094 (DOT) (Bankr. E.D. Va. Mar. 24, 2003) (same); *In re Enron Corp.*, No. 01-16034 (Bankr. S.D.N.Y. July 2, 2002) (granting secured lenders liens on avoidance action proceeds); *In re AMF Bowling Worldwide, Inc.*, No. 01-61119 (Bankr. E.D. Va. Aug. 8, 2001) (secured lenders' collateral includes avoidance actions and proceeds); *In re Ellingsen MacLean Oil Co.*, 98 B.R. 284, 291-92 (Bankr. W.D. Mich. 1989). Accordingly, the Debtors believe that granting liens on the Avoidance Actions subject to entry of the Final Order is appropriate.

42.     Finally, in light of the DIP Agent's and the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out and to finance the Debtors' Chapter 11 Cases, the section 506(c) and 552(b) waivers are justified.

## V.    Modification of the Automatic Stay is Warranted.

43.    The proposed Interim Order provides certain circumstances under which the automatic stay could be vacated without further order of the Court. Specifically, the proposed Interim Order provides that upon the occurrence of an Event of Default or upon a default of the terms of the Interim Order, but subject to three (3) business days prior written notice, the automatic stay is modified or vacated to allow for the termination of the commitments under the DIP Term Sheet, declare all DIP Obligations immediate due and payable and/or take any actions necessary to foreclose or otherwise enforce their security interests in or liens on any or all of the DIP Collateral.

44.    The Debtors submit that such stay modification is in the best interests of the Debtors and their estates and is the best attainable under the circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Facility and the proposed DIP Orders.

## VI.    Interim Approval of Borrowings Should Be Granted.

45.    It is essential that the Debtors immediately stabilize their operations and cash flow, which will maximize the potential for a sale of their business. Accordingly, the Debtors are seeking interim approval to access $11,789,000 of the DIP Facility to meet their working capital needs, including making payments to employees and suppliers.

46.    The Debtors submit that this Court also should grant the Debtors' request for immediate authority to use the Cash Collateral to prevent immediate and irreparable harm to the Debtors' estates pending a final hearing on the Motion pursuant to Bankruptcy Rule 4001(c).

28

The ability of the Debtors to finance their operations and the availability to the Debtors of sufficient working capital and liquidity through the use of the Cash Collateral is vital to the preservation and maintenance of the value of the Debtors' estates. The Debtors, therefore, seek authority to use the Cash Collateral.

47.    Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

48.    In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g., Ames Dep't Stores,* 115 B.R. at 36; *Simasko,* 47 B.R. at 449. Under this standard, the Debtors' request for entry of the DIP Orders, in the time periods and for the financing amounts requested herein, is appropriate. Moreover, courts in this jurisdiction have granted similar relief in other chapter 11 cases. *See e.g., In re Tropicana Entm't, LLC,* Case No. 08-10856 (Bankr. D. Del. May 7, 2008) (allowing interim access to $20 million of the debtors total DIP facility); *In re Sharper Image Corp.,* Case No. 08-10322 (Bankr. D. Del. Feb. 20, 2008) (allowing interim access to $35 million of the debtors' $60 million DIP facility); *In re American LaFrance LLC,* Case No. 08-10178 (Bankr. D. Del. Jan. 30, 2008) (allowing interim access to $30 million of a $285 DIP facility that was approved on a final basis); *In re Pope & Talbot, Inc.,* Case No. 07-11738 (Bankr. D. Del. Nov.

21, 2007) (allowing interim access to $68 million of the debtors' aggregate DIP facility of $89 million).

49.     The Debtors believe that, under the circumstances, the terms and conditions set forth herein are fair and reasonable for the use of cash collateral and the approval of the proposed adequate protection.

### Request for Final Hearing

50.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the final hearing that is as soon as practicable, but in no event later than twenty-eight days following the entry of the Interim Order, and fix the time and date prior to the final hearing for parties to file objections to the Motion.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

51.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### No Prior Request

52.     No prior motion for the relief requested herein has been made to matter.

### Notice

53.     The Debtors have provided notice of this Motion to the following parties or, in lieu thereof, to their counsel, if known: (a) the Debtors' twenty largest unsecured creditors on a consolidated basis, (b) counsel to the DIP Lenders and the Senior Notes Agent, (c) any parties that have filed a notice of appearance in these Chapter 11 Cases pursuant to Bankruptcy Rule

30

2002, (d) all of the landlords of the Debtors' commercial real properties, (e) all known holders of liens upon the Debtors' assets, (f) the United States Attorney for the District of Delaware, (g) the Internal Revenue Service, and (h) the United States Trustee for the District of Delaware. As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m). In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

WHEREFORE, the Debtors respectfully request entry of the Interim Order, substantially in the form attached hereto as **Exhibit 1** (a) authorizing the Debtors to obtain secured postpetition financing on a superpriority administrative claim and first priority priming lien basis, (b) authorizing the Debtors' use of cash collateral, (c) granting adequate protection to the prepetition secured lenders for the priming of their existing liens, (d) setting the final hearing on the Motion, and (e) granting such other and further relief as the Court deems appropriate.

Dated: September 11, 2012       PACHULSKI STANG ZIEHL & JONES LLP

Debra I. Grassgreen (CA Bar No. 169978)
Robert J. Feinstein (NY Bar No. RF-2836)
Maxim B. Litvak (CA Bar No. 215852)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email: dgrassgreen@pszjlaw.com
      rfeinstein@pszjlaw.com
      mlitvak@pszjlaw.com
      tcairns@pszjlaw.com

[Proposed] Counsel to the Debtors and Debtors in Possession