## EXHIBIT 1

### Interim Order

### (including Priming Superpriority Debtor-in-Possession Credit Facility Term Sheet attached as Exhibit A and Approved Budget attached as Exhibit B)

DOCS_SF:81227.4  18455-001

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>DIGITAL DOMAIN MEDIA GROUP, INC., *et al.*,<br><br>Debtors. [1] | Chapter 11<br><br>Case No.: (__)-_____ (__)<br><br>(Joint Administration Requested)<br><br>**Related Docket No. ___** |

## INTERIM ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING AND USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING FINAL HEARING, AND (IV) GRANTING CERTAIN RELATED RELIEF

Upon the motion dated September 11, 2012 (the "Motion"), seeking entry of (I) an

interim order (this "Interim Order"), *inter alia,*

(a)    authorizing Digital Domain Media Group, Inc. ("DDMG") and its affiliated debtors (collectively with DDMG, the "Debtors") to obtain secured postpetition superpriority financing (the "DIP Facility") on an interim basis pursuant to the terms and conditions of that certain "Priming Superpriority Debtor-in-Posssession Credit Facility Term Sheet" dated as of September 11, 2012, by and among the Debtors and each lender party thereto (collectively, the "DIP Lenders"), and Hudson Bay Master Fund Ltd. in its capacity as agent (in such capacity, the "DIP Agent") on behalf of the DIP Lenders, attached hereto as Exhibit A (as amended, supplemented, restated or otherwise modified from time to time in accordance therewith, the "DIP Term Sheet," and together with the other documents, agreements and instruments delivered pursuant thereto or executed or filed in connection therewith, all as may be reasonably requested by the DIP Lenders (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "DIP Term Sheet Documentation");[2]

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal or foreign taxpayer identification number, if any, are as follows: D2 Software, Inc. (5602); DDH Land Holdings, LLC; DDH Land Holdings II, LLC; Digital Domain (8392); Digital Domain Institute, Inc. (6275); Digital Domain International, Inc. (9344); Digital Domain Media Group, Inc. (9505); Digital Domain Productions, Inc. (5757); Digital Domain Productions (Vancouver) Ltd (6450); Digital Domain Stereo Group, Inc. (4526); Digital Domain Tactical, Inc. (6809); Mothership Media, Inc. (2113); Tradition Studios, Inc. (4883); Tembo Productions, Inc. (7634). The Debtors' mailing address is 10250 SW Village Parkway, Port St. Lucie, Florida 34987.

[2]    Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the DIP Term Sheet.

(b)     authorizing the Debtors to execute the DIP Term Sheet Documentation, and to perform such other acts as may be necessary or desirable in connection therewith,

(c)     granting to the DIP Agent, for itself and for the ratable benefit of the DIP Lenders first priority security interests in and liens on all of the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Term Sheet Documentation and DIP Loan Documentation, as applicable, and this Interim Order and Final Order, as applicable (collectively, the "DIP Loan Obligations");

(d)     granting allowed superpriority administrative expense claims to the DIP Agent and the DIP Lenders;

(e)     authorizing the Debtors to use Cash Collateral (as defined below);

(f)     authorizing the Debtors to grant adequate protection to (i) Hudson Bay Master Fund Ltd., in its capacity as collateral agent (in such capacity, the "Senior Notes Agent") on behalf of the holders (collectively, the "Senior Noteholders") of the senior secured convertible notes due 2017 (collectively, the "Senior Notes") issued (x) on or about May 6, 2012 to certain Buyers (as defined below) (collectively, the "Initial Senior Noteholders," and the Senior Notes issued thereto, the "Initial Senior Notes"), and (y) on or about August 16, 2012 to PBC Digital Holdings II, LLC ("PBC Senior Subordinated Noteholder," and the Senior Notes issued thereto on a subordinated basis to the Initial Senior Notes pursuant to that certain Agreement Among Buyers, dated as of August 16, 2012 (the "Agreement Among Buyers"), the "PBC Senior Subordinated Notes"), all pursuant to that certain Securities Purchase Agreement, dated as of May 6, 2012, entered into by and among DDMG and the buyers party thereto (collectively, "Buyers") (as amended, supplemented or otherwise modified from time to time prior to the date hereof, including, without limitation, by that certain Third Amendment Agreement, dated as of August 16, 2012 (the "Third Amendment"), the "Securities Purchase Agreement," and together with all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination agreements, instruments, amendments, and any other agreements delivered pursuant thereto or in connection therewith, including, without limitation, the Transaction Documents (as defined in the Securities Purchase Agreement), the "Senior Note Documents")), and (ii) holders (the "Subordinated Noteholders") of the secured convertible notes due 2016 (the "Subordinated Notes") issued pursuant to that certain Debt Exchange Agreement, dated as of May 6, 2012 (as amended, supplemented or otherwise modified from time to time prior to the date hereof, the "Debt Exchange Agreement"), entered into by and between DDMG and Comvest Capital II, L.P. ("Comvest"), which Subordinated Notes are subordinate to the Senior Notes pursuant to that certain Subordination and Intercreditor Agreement, dated as of May 7, 2012 (the "Subordination Agreement"), entered into by and between Comvest and DDMG; and

(g)    scheduling a hearing (the "Final Hearing"), pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to consider entry of a final order (the "Final Order"), *inter alia*, approving and authorizing the DIP Facility (including, without limitation, the advance of the Interim DIP Loan pursuant to this Interim Order) on a final basis pursuant to DIP Loan Documentation to be executed on terms and conditions contemplated by the DIP Term Sheet Documentation and acceptable to each of the DIP Lenders in its sole and absolute discretion; and the interim hearing on the Motion (the "Interim Hearing") having been held on September [●], 2012; and upon all of the pleadings filed with the Court and the evidence proffered or adduced at the Interim Hearing;

and the Court having heard and resolved or overruled any and all objections to the interim relief requested in the Motion; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, and creditors; and upon the record herein; and after due deliberation thereon, and good and sufficient cause appearing therefor:

**IT IS HEREBY FOUND AND DETERMINED THAT:**[3]

A.    Petition Date.  On September [●], 2012 (the "Petition Date"), the Debtors commenced their chapter 11 cases (these "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").  The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner, or official committee of creditors holding unsecured claims (a "Creditors' Committee") has been appointed in any of these Chapter 11 Cases.

B.    Jurisdiction; Venue.  The Court has jurisdiction over these Chapter 11 Cases, the parties, and the Debtors' property pursuant to 28 U.S.C. § 1334.  This is a core

---

[3]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as applicable, pursuant to Bankruptcy Rule 7052.

proceeding pursuant to 28 U.S.C. §157(b)(2)(D). The Court is a proper venue of these Chapter 11 Cases and the Motion under 28 U.S.C. §§ 1408 and 1409.

             C.      <u>Notice</u>. Notice of the Motion, the relief requested therein and the Interim Hearing (the "<u>Notice</u>") has been served pursuant to Federal Rule of Bankruptcy Procedure 4001(c)(2) and was served by the Debtors on (i) the Debtors' twenty largest unsecured creditors on a consolidated basis, (ii) counsel to the DIP Lenders, the DIP Agent, and the Senior Notes Agent, (iii) any parties that have filed a notice of appearance in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002, (iv) all of the landlords of the Debtors' commercial real properties, (v) all known holders of liens upon the Debtors' assets, (vi) the United States Attorney for the District of Delaware, (vii) the Internal Revenue Service, and (viii) the United States Trustee for the District of Delaware. Under the circumstances, the Notice constitutes good and sufficient notice of the relief requested, and no further notice of the relief sought at the Interim Hearing and the relief granted by this Interim Order is necessary or shall be required.

             D.      <u>Senior Note Obligations</u>. For purposes of this Interim Order, the term "<u>Senior Note Obligations</u>" shall mean all aggregate indebtedness of DDMG (and each direct and indirect subsidiary of DDMG that is a guarantor of DDMG's obligations under the Senior Notes) under, in connection with, or with respect to the Securities Purchase Agreement and Senior Notes and all related documents, whether for borrowed money, fees, expenses, or otherwise (including, without limitation, the Event of Default Redemption Price (as defined in the Senior Notes Documents) as measured, for the Initial Senior Note Obligations, as of August 21, 2012, the date of the default and redemption notices delivered to DDMG by the Initial Senior Noteholders) accrued and outstanding as of the Petition Date, owed to the Senior Noteholders under the Senior Note Documents.

4

E.    <u>Senior Note Liens</u>.  To secure the Senior Note Obligations, the Debtors granted to the Senior Notes Agent, for itself and for the ratable benefit of the Senior Noteholders liens (the "<u>Senior Note Liens</u>") on all of the Debtors' personal property, including, without limitation, Accounts, Chattel Paper (whether intangible or electronic), Commercial Tort Claims specified on Schedule VI of the Security and Pledge Agreement, Deposit Accounts, Documents, Equipment, Fixtures, General Intangibles (including all Payment Intangibles), Goods, Instruments (including all Promissory Notes and each Certificated Security), Inventory, Investment Property, Copyrights, Patents and Trademarks, and Licenses, Letter-of-Credit Rights, Motor Vehicles, Supporting Obligations, and all other tangible and intangible personal property, insurance policies, in each case as further described in that certain Security and Pledge Agreement, dated as of May 7, 2012 (the "<u>Security and Pledge Agreement</u>"), as well as certain real property and other assets of the Debtors as set forth in certain mortgages and other security documents and instruments, and, in all instances, the proceeds and products thereof (as each capitalized term in this sentence is defined in the Security and Pledge Agreement or in such mortgages and other security documents and instruments (collectively, the "<u>Senior Collateral Documents</u>"),[4] the "<u>U.S. Collateral</u>" and collectively, with the Canadian Collateral, the "<u>Prepetition Collateral</u>").

F.    <u>Subordinated Note Obligations</u>.  All of the obligations owing by the Debtors to the Subordinated Noteholders under the Debt Exchange Agreement and Subordinated

---

[4]    Pursuant to the Canadian Security and Pledge Agreement, DDMG and DDMG's Canadian subsidiary, Digital Domain Productions (Vancouver) Ltd. granted to the Senior Notes Agent for the benefit of the Senior Noteholders Senior Note Liens, including, but not limited to Accounts, Chattel Paper, Deposit Accounts, Documents of Title, letters of credit, Equipment, Fixtures, Intangibles (other than Trademarks and Trademark Licenses), Goods, Instruments, Inventory, Investment Property, Intellectual Property and Licenses (other than Trademarks and Trademark Licenses), Money, and all other tangible and intangible personal property and the proceeds and products thereof (as each capitalized term in this sentence is defined in the Canadian Security and Pledge Agreement, the "<u>Canadian Collateral</u>").

Notes (the "<u>Subordinated Note Obligations</u>") are secured by liens (the "<u>Subordinated Note</u>

<u>Liens</u>") on the Prepetition Collateral and are subordinated in right of payment to the Senior Note

Obligations, and the Subordinated Note Liens are junior and subordinate to the Senior Note

Liens, all pursuant to the Subordination Agreement.

    G. <u>Debtors' Acknowledgments and Stipulations</u>.  In requesting the DIP

Facility, and in exchange for and as a material inducement to the DIP Lenders to agree to provide

the DIP Facility, the Debtors acknowledge, represent, stipulate, and agree, subject to the

challenge rights set forth in paragraph 15 herein, that:

    (i) Upon approval of this Interim Order by the Court, the Debtors

have obtained all authorizations, consents and approvals required to be obtained from, and have

made all filings with and given all notices required to be given to, all federal, state and local

governmental agencies, authorities and instrumentalities in connection with the execution,

delivery, validity and enforceability of the DIP Term Sheet Documentation and the use of Cash

Collateral to which any Debtor is a party;

    (ii) until such time as all DIP Loan Obligations are indefeasibly paid in

full in cash, the Debtors shall not in any way prime or seek to prime (or otherwise cause to be

subordinated in any way) the liens provided to the DIP Agent, for itself and for the ratable

benefit of the DIP Lenders by offering a subsequent lender or any party-in-interest a superior or

*pari passu* lien or claim with respect to the DIP Collateral pursuant to section 364(d) of the

Bankruptcy Code, or otherwise, except with respect to (a) permitted exceptions to be expressly

agreed upon in writing by each of the DIP Lenders in its sole and absolute discretion ("<u>Permitted</u>

<u>Liens</u>") and (b) the Carve-Out (as defined below);

(iii)    until such time as all DIP Loan Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way or at any time permit to exist an administrative expense claim against the Debtors of any kind or nature whatsoever, including, without limitation, claims for any administrative expenses (a) on account of any break-up fee and expense reimbursement authorized to be paid to any person or entity, or (b) of the kind specified in, or arising or ordered under sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726, 1113 and 1114 of the Bankruptcy Code, that is superior to or *pari passu* with the DIP Superpriority Claim (as defined below) provided herein, except with respect to the Carve-Out;

(iv)    the Senior Notes Agent, the Initial Senior Noteholders, the PBC Senior Subordinated Noteholder, and the Subordinated Noteholders are entitled, pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral (a) in exchange for their consent to allow the Debtors' use of such Prepetition Collateral and (b) for any diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of Cash Collateral and any other Prepetition Collateral, the priming of the Senior Note Liens, the PBC Senior Subordinated Note Liens and the Subordinated Note Lien by the DIP Agent and DIP Lenders pursuant to this Interim Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code;

(v)    as of the Petition Date, (a) the aggregate amount of the Senior Note Obligations owed to the Initial Senior Noteholders (collectively, the "Initial Senior Note Obligations") is $70,262,882.08 (which is (a) the product of the Redemption Premium equal to 115% (as defined in the Senior Note Documents) and the sum of (x) principal of $35,000,000.00

(y) accrued and unpaid interest of $910,000.00 through but not including August 21, 2012, and

(z) the Make-Whole Amount (as defined in the Senior Note Documents) as of August 21, 2012

of $ 24,733,333.33, plus (b) accrued and unpaid interest of $523,048.75 from but excluding

August 21, 2012 and through and including the Petition Date),which does not include fees,

expenses and other amounts which are chargeable or otherwise reimbursable under the Senior

Note Documentation or any amounts under or in respect of any document or instrument other

than the Senior Notes, or any amount payable to the Senior Notes Agent in its capacity as such,

(b) all of the Initial Senior Note Obligations are unconditionally owing by the Debtors to the

Initial Senior Noteholders, and (c) the Initial Senior Note Obligations are not subject to any

avoidance, reductions, set-off, offset, recharacterization, subordination (whether equitable,

contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under

the Bankruptcy Code or any applicable law or regulation by any person or entity, except as set

forth in paragraph 15 herein;

        (vi)      as of the Petition Date, (a) the aggregate amount of the Senior Note

Obligations owed to the PBC Senior Subordinated Noteholder (the "PBC Senior Subordinated

Note Obligations") is $5,000,000, (b) all of the PBC Senior Subordinated Note Obligations are

unconditionally owing by the Debtors to PBC Senior Subordinated Noteholder, and (c) the PBC

Senior Subordinated Note Obligations are not subject to any avoidance, reductions, set-off,

offset, recharacterization, subordination (whether equitable, contractual or otherwise),

counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any

applicable law or regulation by any person or entity, except as set forth in paragraph 15 herein;

        (vii)     the Senior Note Liens constitute valid, binding, enforceable, and

perfected liens with priority over any and all other liens and are not subject to any challenge or

defense, including, without limitation, respectively, avoidance, reductions, recharacterization, subordination (whether equitable, contractual or otherwise), claims, counterclaims, cross-claims, offsets, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity, except as set forth in paragraph 15 herein;

(viii)    the Debtors have waived, discharged and released any right they may have to challenge the Senior Note Obligations, and the Senior Note Liens on the Prepetition Collateral, and to assert any offsets, defenses, claims, objections, challenges, causes of action and/or choses of action against the Senior Notes Agent or the Senior Noteholders, with respect to the Senior Note Obligations, the Senior Note Liens, or the Prepetition Collateral;

(ix)    any payments made on account of the Senior Note Obligations before the Petition Date were (a) payments out of the Prepetition Collateral, and/or (b) made in the ordinary course of business and did not diminish any property otherwise available for distribution to unsecured creditors;

(x)    all of the Debtors' cash, including the cash in their deposit accounts and other accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral (as defined below); and

(xi)    none of the DIP Agent, the DIP Lenders, the Senior Notes Agent, or the Initial Senior Noteholders is a control person or insider of the Debtors by virtue of any of the actions taken by them in respect of or in connection with the DIP Loans or the Initial Senior Note Obligations.

(xii)    the Senior Notes Agent (on behalf of itself and the Initial Senior Noteholders) and the PBC Senior Subordinated Noteholder are parties to the Agreement Among Buyers, which sets forth subordination and other provisions governing the relative priorities and

9

rights of the Initial Senior Note Obligations and the Initial Senior Noteholders' Liens, on the one

hand, and the PBC Senior Subordinated Note Obligations and the PBC Senior Subordinated

Noteholder's Liens, on the other hand, which priorities and rights shall remain in effect

notwithstanding any challenge under paragraph 15 herein. The Senior Notes Agent (on behalf of

itself and the Senior Noteholders) and the Subordinated Noteholders are parties to the

Subordination Agreement, which sets forth subordination and other provisions governing the

relative priorities and rights of the Senior Note Obligations and the Senior Note Liens, on the one

hand, and the Subordinated Note Obligations and the Subordinated Noteholder's Liens, on the

other hand. The Debtors admit, stipulate, and agree that the each of (i) the Agreement Among

Buyers and (ii) the Subordination Agreement was entered into in good faith and is fair and

reasonable to the parties thereto and enforceable in accordance with the terms thereof.

      H.    Cash Collateral. For purposes of this Interim Order, the term "Cash

Collateral" shall mean and include all "cash collateral," as defined in section 363 of the

Bankruptcy Code, in or on which the Senior Notes Agent has for itself or for the ratable benefit

of the Senior Noteholders, or in or on which the Subordinated Noteholders have, a lien, security

interest or other interest (including, without limitation, any adequate protection liens or security

interests) whether existing on the Petition Date, arising pursuant to this Interim Order, or

otherwise and shall include, without limitation:

      (i)    all cash proceeds arising from the collection, sale, lease or other

disposition, use or conversion of any property, insurance policies (including, without limitation,

policies for the benefit of directors and officers of the Debtors), or in or on which the

Subordinated Noteholders have, a lien or a replacement lien, whether as part of the Prepetition

Collateral or pursuant to an order of the Court or applicable law or otherwise, and whether such

property has been converted to cash, existed as of the commencement of this Chapter 11 Case, or arose or was generated thereafter;

(ii)    all of the respective deposits, refund claims and rights in retainers of the Debtors on which the Senior Notes Agent holds for itself or for the ratable benefit of the Senior Noteholders, or in or on which the Subordinated Noteholders have, a lien or replacement lien, whether as part of the Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise;

(iii)   the proceeds of any sale of DIP Collateral or Prepetition Collateral in connection with any sale consummated prior to entry of the Final Order.

I.     <u>Adequate Protection</u>.  The Senior Notes Agent, the Senior Noteholders and the Subordinated Noteholders are each entitled, pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral, in exchange for the Debtors' use of such Prepetition Collateral, to the extent of the diminution in value, if any, of the Prepetition Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of Cash Collateral and any other Prepetition Collateral, the priming of the liens on and security interests of Senior Notes Agent, for itself and for the ratable benefit of the Senior Noteholders, in the Prepetition Collateral by the DIP Agent or the DIP Lenders, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

J.     <u>Purpose and Necessity of Financing</u>.  As discussed in the Motion, the Debtors require the Interim DIP Loan (i) to maximize and preserve the value of their businesses pending the sale of substantially all of their assets, and satisfy payroll obligations and other

11

working capital and general corporate purposes of the Debtors consistent with the terms set forth
in the DIP Term Sheet Documentation, the Approved Budget and the Approved Cash Flow
Projection (as defined in below), (ii) to pay fees and expenses related to the DIP Term Sheet
Documentation and these Chapter 11 Cases, and (iii) for such other purpose as set forth in the
DIP Term Sheet Documentation. If the Debtors do not obtain authorization to borrow under the
DIP Term Sheet Documentation, they will suffer immediate and irreparable harm. The Debtors
are unable to obtain adequate unsecured credit allowable as an administrative expense under
section 503 of the Bankruptcy Code, or other sufficient financing under sections 364(c) or (d) of
the Bankruptcy Code, on equal or more favorable terms than those set forth in the DIP Term
Sheet Documentation, based on the totality of the circumstances. A loan facility in the amount
provided by the DIP Term Sheet Documentation is not available to the Debtors without granting
the DIP Agent, for itself and for the ratable benefit of the DIP Lenders, superpriority claims,
liens, and security interests, pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of
the Bankruptcy Code, as provided in this Interim Order and the DIP Term Sheet Documentation.
After considering all alternatives, the Debtors have concluded, in the exercise of their sound
business judgment, that the DIP Facility, including, without limitation, the Interim DIP Loan,
represents the best financing available to them at this time.

        K.    <u>Good Cause Shown</u>.  Good cause has been shown for entry of this Interim
Order. The ability of the Debtors to obtain sufficient working capital and liquidity under the DIP
Term Sheet Documentation is vital to the Debtors' estates and creditors. The liquidity to be
provided under the DIP Term Sheet Documentation will enable the Debtors to preserve the value
of the Debtors' businesses pending the sale of substantially all of their assets. Among other
things, entry of this Interim Order is necessary to maximize the value of the Debtors' assets and

to avoid immediate and irreparable harm to the Debtors and their estates, and, accordingly, is in the best interests of, the Debtors, their estates and their creditors.

    L.  <u>Sections 506(c) And 552(b) Waivers</u>.  In light of (i) the DIP Agent's and the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out, and in exchange for and as a material inducement to the DIP Lenders to agree to provide the DIP Facility and (ii) the Senior Notes Agent and the Initial Senior Noteholders' agreement to subordinate their liens and superpriority claims to the Carve-Out and the DIP Liens, and to permit the use of their Cash Collateral for payments made in accordance with the Approved Budget, the Approved Cash Flow Projection and the terms of this Interim Order, the DIP Agent, the DIP Lenders, the Senior Notes Agent and the Initial Senior Noteholders are each entitled to (1) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (2) subject to entry of the Final Order, a waiver of the provisions of section 506(c) of the Bankruptcy Code.

    M.  <u>Good Faith</u>.  The terms of the DIP Term Sheet Documentation are more favorable to the Debtors than those available from alternative sources.  Based upon the record before the Court, the DIP Term Sheet Documentation have been negotiated in good faith and at arm's-length among the Debtors, the DIP Agent, and the DIP Lenders.  Any DIP Loans and other financial accommodations made to the Debtors by the DIP Agent or the DIP Lenders pursuant to the DIP Term Sheet Documentation and this Interim Order shall be deemed to have been extended by the DIP Agent and the DIP Lenders, respectively, in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and the DIP Agent and DIP Lenders shall be entitled to all protections and benefits afforded thereby.

13

N.    <u>Fair Consideration and Reasonably Equivalent Value</u>.  All of the Debtors have received and will receive fair consideration and reasonable value in exchange for access to the DIP Loans and all other financial accommodations provided under the DIP Term Sheet Documentation and this Interim Order.  The terms of the DIP Term Sheet Documentation are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

O.    <u>Immediate Entry of Interim Order</u>.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).  The permission granted herein to enter into the DIP Term Sheet Documentation and to obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtors.  This Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for access to the financing necessary to sustain the continued operations of the Debtors and further enhance the Debtors' prospects of a reorganization or for a successful sale of substantially all of their assets.  Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    <u>Disposition</u>.  The Motion is granted on an interim basis on the terms set forth in this Interim Order.  Any objection to the interim relief sought in the Motion that has not previously been withdrawn or resolved is hereby overruled on its merits.  The term of this Interim Order, the DIP Term Sheet Documentation, and the use of Cash Collateral authorized hereunder shall expire, and the DIP Loans made pursuant to the this Interim Order and the DIP Term Sheet Documentation will mature, and together with all interest thereon and any other obligations accruing under the DIP Term Sheet Documentation, will become due and payable

14

(unless such obligations become due and payable earlier pursuant to the terms of the DIP Term

Sheet Documentation and this Interim Order by way of acceleration or otherwise) on the earlier

of (a) October 1, 2012 if the Final Order has not been entered by the Court prior to such date, and

(b) upon the occurrence of a Termination Event (as defined below).

## AUTHORIZATION FOR DIP FINANCING AND USE OF CASH COLLATERAL

      2.      Authorization For DIP Financing And Use of Cash Collateral.

          (a)    The Debtors are hereby authorized to use Cash Collateral and to incur the

DIP Obligations subject to the terms of the Approved Budget (as defined below) and

Approved Cash Flow Projections (as defined below), the DIP Term Sheet Documentation and

this Interim Order, with interim borrowings under the DIP Facility limited to the aggregate

principal amount of up to maximum amount of $11,789,000 (the "Maximum Borrowing")

payable as set forth in the DIP Term Sheet Documentation.

          (b)    Approved Budget and Approved Cash Flow Projection.  The Debtors have

delivered to the DIP Lenders a weekly budget that has been approved by each of the DIP

Lenders and the DIP Agent (the "Approved Budget") and weekly cash flow projection that has

also been approved by each of the DIP Lenders and the DIP Agent (the "Approved Cash Flow

Projection"), in each case, for the time period from and including the Petition Date through

December 31, 2012.  A copy of the Approved Budget is attached hereto as Exhibit B.  The

Debtors shall provide to the DIP Agent and each of the DIP Lenders updates to the Approved

Budget and the Approved Cash Flow Projection and financial reporting with respect to the

Debtors in accordance with the terms of the DIP Term Sheet Documentation.  Funds borrowed

under the DIP Term Sheet Documentation and DIP Collateral used under this Interim Order

shall be used by the Debtors in accordance with this Interim Order.  The consent of the DIP

Lenders, the DIP Agent, the Senior Notes Agent, or the Senior Noteholders to the Approved Budget and the Approved Cash Flow Projection shall not be construed as a commitment to provide DIP Loans or to permit the use of Cash Collateral after the occurrence of a Termination Event (as defined below), regardless of whether the aggregate funds shown on the Approved Budget and/or the Approved Cash Flow Projection have been expended.

(c)    By not later than two (2) business days after the end of the week following the Petition Date, Debtors shall deliver to the DIP Lenders (a) an updated Approved Cash Flow Projection for the remainder of the term of the Approved Budget and (b) a variance report in form and substance acceptable to the DIP Lenders in their sole and absolute discretion (an "Approved Variance Report") showing comparisons of actual results for each line item against such line item in the Approved Budget and Approved Cash Flow Projection, respectively.  Thereafter, Debtors shall deliver to the DIP Lenders, by not later than two (2) business days after the close of each weekly period after the Petition Date, an Approved Variance Report for the trailing four (4) week period (or, if fewer than four weeks have lapsed since the Petition Date, then for the trailing one, two or three week period, as applicable). Each Approved Variance Report shall indicate whether there are any adverse variances that exceed the "Permitted Variances," which means (x) up to 10% on a line-item basis, or (y) 10% in the aggregate for all Cash Receipts and Cash Disbursements.

(d)    Any amendments, supplements or modifications to the Approved Budget, Approved Cash Flow Projection or an Approved Variance Report, must be consented to in writing by each of the DIP Lenders in its sole discretion prior to the implementation thereof and shall not require further notice, hearing, or court order.

(e)    The DIP Agent, the DIP Lenders, the Senior Notes Agent and the Initial Senior Noteholders (i) may assume the Debtors will comply with the Approved Budget and the Approved Cash Flow Projection, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the DIP Collateral or Prepetition Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to the Approved Budget and the Approved Cash Flow Projection, except the Carve-Out.  All advances and extensions of credit shall be based upon the terms and conditions of the DIP Term Sheet Documentation, as the same may be adjusted from time to time with written consent of each of the DIP Lenders in its sole discretion.

(f)    To the extent any court order is entered directing disgorgement of any payments (including, but not limited to, Pre-Final Order Sale Proceeds (as defined below)) made by the Debtors to the Senior Notes Agent or the Initial Senior Noteholders, either before or after the Petition Date, all proceeds recovered by the Debtors' estates in connection with such order(s) directing disgorgement shall be applied first to repayment of the DIP Loan Obligations until the DIP Loan Obligations are indefeasibly paid in full in cash.

3.    <u>Authority to Execute and Deliver Necessary Documents</u>.

(a)    Each of the Debtors is authorized to negotiate, prepare, enter into, and deliver the DIP Term Sheet Documentation, including, without limitation, to any UCC financing statements, pledge and security agreements, and mortgages or deeds of trust encumbering all of the DIP Collateral and securing all of the Debtors' obligations under the DIP Term Sheet Documentation, each as may be reasonably requested by the DIP Agent for itself of on behalf of the DIP Lenders.

17

(b)   Each of the Debtors is further authorized to negotiate, prepare, enter into and deliver the DIP Loan Documentation, as contemplated by the DIP Term Sheet, subject to approval of the Court and entry of the Final Order.

(c)   Each of the Debtors is further authorized to perform all of its obligations and acts required under the DIP Term Sheet Documentation, and such other agreements as may be required by the DIP Term Sheet Documentation to give effect to the terms of the financing provided for therein, and in this Interim Order.

4.      Valid and Binding Obligations.  All obligations under the DIP Term Sheet Documentation shall constitute valid and binding obligations of each of the Debtors, enforceable against each of them and each of their successors and assigns, in accordance with their terms and the terms of this Interim Order, and no obligation, payment, transfer, or grant of a lien or security interest under the DIP Term Sheet Documentation or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code) or subject to any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity.

5.      Authorization for Payment of DIP Financing Fees and Expenses.  All reasonable fees paid and payable, and costs and/or expenses reimbursed or reimbursable (including, without limitation, all reasonable fees, costs and expenses referred to in the DIP Term Sheet Documentation and the DIP Agent's and DIP Lenders' reasonable attorneys' fees and expenses), as set forth in the DIP Term Sheet Documentation, by the Debtors to the DIP Agent and the DIP Lenders are hereby approved.  The Debtors are hereby authorized and directed to pay all such

fees, costs, and expenses in accordance with the terms of the DIP Term Sheet Documentation

and this Interim Order, without any application, pleading, notice, or document with the Court for

approval or payment of such reasonable fees, costs, or expenses.  The Debtors shall pay all

reasonable prepetition and postpetition out of pocket costs and expenses of the DIP Agent and

the DIP Lenders (including all reasonable fees, expenses and disbursements of outside counsel,

including local counsel, and consultants) in connection with these Chapter 11 Cases and any

Successor Case (as defined below), including, without limitation, (a) preparation, execution, and

delivery of the DIP Term Sheet Documentation, DIP Loan Documentation, this Interim Order,

and any Final Order, and the funding of all DIP Loans under the DIP Facility; (b) the

administration of the DIP Facility and any amendment or waiver of any provision of the DIP

Term Sheet Documentation, DIP Loan Documentation, this Interim Order, and any Final Order;

and (c) the enforcement or protection of any of their respective or collective rights and remedies

under the DIP Term Sheet Documentation, DIP Loan Documentation, this Interim Order, and

any Final Order.  Notwithstanding anything to the contrary herein, the fees, costs and expenses

of the DIP Agent and the DIP Lenders, whether incurred before or after the Petition Date,

including, without limitation, all fees referred to in the DIP Term Sheet Documentation and DIP

Loan Documentation, and all attorneys' fees and expenses, shall be deemed fully earned and

non-refundable as of the date of this Interim Order.  None of the DIP Agent's or DIP Lenders'

attorneys, financial advisors and accountants' fees and disbursements shall be subject to the prior

approval of this Court or the guidelines of the Office of the United States Trustee for this region

(the "U.S. Trustee"), and no recipient of any such payment shall be required to file with respect

thereto any interim or final fee application with this Court.  Any such fees, costs and expenses

shall be paid within ten (10) business days of delivery of a summary invoice (redacted for

privilege) to the Debtors (with a copy of each such invoice (also redacted for privilege) to be delivered by the Debtors to the U.S. Trustee and any Creditors' Committee and without the need for further application to or order of the Court.

6.     Amendments, Consents, Waivers, and Modifications. The Debtors, with the express written consent of the DIP Lenders, may enter into any non-material amendments, consents, waivers or modifications to the DIP Term Sheet Documentation without the need for further notice and hearing or any order of this Court. Material amendments, consents, waivers, and modifications of the DIP Term Sheet Documentation shall require the express written consent of the DIP Agent and each of the DIP Lenders affected by the applicable consents, waivers, or modifications, provided that material amendments, consents, waivers, and modifications with respect to the DIP Collateral, including any enforcement of remedies in respect of, or collection from, the DIP Collateral, shall require the express written consent only of the DIP Agent (as directed by the Required DIP Lenders).

## DIP LIENS AND DIP SUPERPRIORITY CLAIMS

7.     DIP Lenders' Lien Priority.

(a)     To secure the DIP Loan Obligations, the DIP Agent, on behalf of itself and for the ratable benefit of the DIP Lenders, is hereby granted, pursuant to sections 364(c)(2), 364(c)(3) (solely as to the Permitted Liens), and 364(d)(1), valid, enforceable and fully perfected, first priority priming liens on and senior security interests in (collectively, the "DIP Liens") all of the property, assets or interests in property or assets of each Debtor, and all "property of the estate" (within the meaning of the Bankruptcy Code) of each Debtor, of any kind or nature whatsoever, real or personal, tangible or intangible or mixed, now existing or hereafter acquired or created, including, without limitation, all of each Debtor's now owned or

hereafter acquired right title, and interest in and to all cash, accounts, accounts receivable,

inventory, property, plant and equipment, real estate, leaseholds avoidance actions under

chapter 5 of the Bankruptcy Code ("Avoidance Actions") (subject to entry of the Final Order),

all intercompany claims, all claims, and causes of action of each Debtor or its respective estate

(including, without limitation, all commercial tort claims of every kind and description,

whether described in specificity in the DIP Term Sheet or not) and any and all proceeds

therefrom, any and all proceeds arising from insurance policies (including, without limitation,

policies for the benefit of and related to claims against or losses in connection with directors

and officers of the Debtors), all intellectual property, and the equity interests of each direct and

indirect subsidiary of each Debtor, which for the avoidance of doubt, shall include, without

limiting the generality of the foregoing, all assets of each Debtor that is secured pursuant to the

Senior Note Documents, and all other property and assets including, without limitation, Cash

Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions,

offspring and profits of any of the collateral described above (collectively, the "DIP

Collateral"), subject only to (A) the Permitted Liens, and (B) the Carve-Out.

      (b)   The DIP Liens shall be effective immediately upon the entry of this

Interim Order and shall not at any time be made subject or subordinated to, or made *pari passu*

with, any other lien, security interest or claim existing as of the Petition Date, or created under

sections 363 or 364(d) of the Bankruptcy Code or otherwise, other than (i) the Permitted

Liens; and (ii) the Carve-Out.

      (c)   The DIP Liens shall be and hereby are deemed fully perfected liens and

security interests, effective and perfected upon the date of this Interim Order, without the

necessity of execution by the Debtors of mortgages, security agreements, pledge agreements,

financing agreements, financing statements or any other agreements or instruments, such that
no additional actions need be taken by the DIP Agent, the DIP Lenders, or any other person or
entity to perfect such interests.  Any provision of any lease, loan document, easement, use
agreement, proffer, covenant, license, contract, organizational document, or other instrument
or agreement that requires the consent or approval of one or more landlords, licensors or other
parties, or requires the payment of any fees or obligations to any governmental entity, non-
governmental entity or any other person, in order for any of the Debtors to pledge, grant,
mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds
thereof or other collateral, is and shall be deemed to be inconsistent with the provisions of the
Bankruptcy Code, and shall have no force or effect with respect to the transactions granting
the DIP Agent, for itself and for the ratable benefit of the DIP Lenders, a first priority security
interest in such fee, leasehold or other interest or other collateral or the proceeds of any
assignment, sale or other transfer thereof, by any of the Debtors in favor of the DIP Agent, on
its own behalf and for the ratable benefit of the DIP Lenders, in accordance with the terms of
the DIP Term Sheet Documentation.

      8.    DIP Lenders' Superpriority Claim.  The DIP Lenders are hereby granted an
allowed superpriority administrative expense claim (the "DIP Superpriority Claim") pursuant to
section 364(c)(1) of the Bankruptcy Code in each of the Debtor's Chapter 11 Cases and in any
successor cases under the Bankruptcy Code (including any case or cases under chapter 7 of the
Bankruptcy Code, the "Successor Cases") for all DIP Loan Obligations, having priority over any
and all other claims against the Debtors, now existing or hereafter arising, of any kind
whatsoever, including, without limitation, all administrative expenses of the kinds specified in or
arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a),

507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the Debtors and all proceeds thereof including, without limitation, upon entry of a Final Order, any proceeds or property recovered in connection with the pursuit of Avoidance Actions. The DIP Superpriority Claim granted in this paragraph shall be subject and subordinate in priority of payment only to payment of the Carve-Out. Except as set forth herein, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases or in any Successor Case. The DIP Superpriority Claim shall be senior in all respects to any superpriority claims granted in these Chapter 11 Cases including, without limitation, on account of any break-up fee or expense reimbursement that may be granted by the Court in connection with the sale of the Debtors' assets.

9.    <u>Survival of DIP Liens and DIP Superpriority Claim</u>. The DIP Liens, DIP Superpriority Claim, and other rights and remedies granted under this Interim Order to the DIP Agent and the DIP Lenders, shall continue in this and any Successor Cases and shall be valid and enforceable against any trustee appointed in any or all of the Debtors' Chapter 11 Cases and/or upon the dismissal of any or all of the Debtors' Chapter 11 Cases or any Successor Cases and such liens and security interests shall maintain their first priority as provided in this Interim Order until all the DIP Loan Obligations have been indefeasibly paid in full in cash and the DIP Lenders' commitments have been terminated in accordance with the DIP Term Sheet Documentation.

**ADEQUATE PROTECTION**

10.    <u>Adequate Protection for Initial Senior Noteholders</u>.  As adequate protection in respect of any diminution in the value of the Prepetition Collateral, the incurrence of the DIP Loan Obligations, the use of Cash Collateral, the granting of the DIP Liens and the DIP Superpriority Claim or otherwise (the "<u>Initial Senior Noteholders' Diminution Claim</u>"), the Senior Notes Agent (for itself and the ratable benefit of the Initial Senior Noteholders) is hereby granted the following ((a) through (f) below shall be referred to collectively as the "<u>Initial Senior Noteholders' Adequate Protection Obligations</u>"):

(a)    <u>Initial Senior Noteholders' Replacement Liens</u>.  To secure the Initial Senior Noteholders' Diminution Claim, the Senior Notes Agent for itself and for the ratable benefit the Initial Senior Noteholders, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, and other agreements or instruments) valid, perfected, postpetition security interests in and liens (the "<u>Initial Senior Noteholders' Replacement Liens</u>") on all of the DIP Collateral, <u>provided</u>, <u>however</u>, that, notwithstanding anything to the contrary, the Initial Senior Noteholders' Replacement Liens shall only be and remain subject and subordinate to (i) the DIP Liens and/or payment of any DIP Loan Obligations on account thereof, (ii) the Permitted Liens, and (iii) the Carve-Out.

(b)    <u>Initial Senior Noteholders' Adequate Protection Superpriority Claim</u>.  As further adequate protection for the Initial Senior Noteholders' Diminution Claim, the Senior Notes Agent, for itself and for the ratable benefit of the Initial Senior Noteholders, is hereby granted a superpriority claim with priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind

24

specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 and any other provision of the Bankruptcy Code (the "Initial Senior Noteholders' Superpriority Claim"), provided, however, that, solely for the purposes of this Interim Order, the Initial Senior Noteholders' Superpriority Claim shall not attach to any proceeds from Avoidance Actions. The Initial Senior Noteholders' Superpriority Claim will be deemed to constitute Prepetition Collateral under the Senior Note Documents for all purposes, including, without limitation, such that any proceeds or consideration derived from the Initial Senior Noteholders' Superpriority Claim shall be deemed to constitute proceeds of such "Collateral" as defined in the Senior Note Documents. The Initial Senior Noteholders' Superpriority Claim shall be subordinate only to (i) the DIP Superpriority Claim and/or payment of any DIP Loan Obligations on account thereof, and (ii) the Carve-Out.

(c) <u>Fees, Expenses And Interest</u>. As further adequate protection under sections 361, 363(e), and 364(d) of the Bankruptcy Code for the use of the Prepetition Collateral (including Cash Collateral) by the Debtors, the incurrence of DIP Loans, the grant of the DIP Liens and the DIP Superpriority Claim, the Senior Notes Agent and the Initial Senior Noteholders shall receive, as applicable, from the Debtors:

(i) <u>Fees and Expenses</u>. Immediate payment in cash of all accrued and unpaid reasonable fees, costs and expenses (including reasonable legal and professional fees and expenses) in respect of the Initial Senior Note Obligations and all other accrued and unpaid reasonable fees, costs and disbursements, accrued (whether before or after the Petition Date) under any of the Senior Note Documents, as applicable, as of such date. The Senior Notes Agent and the Initial Senior Noteholders shall also receive current cash payment of their reasonable

fees, costs and expenses (including those incurred prior to the Petition Date which remain unpaid

as of the Petition Date), including, all reasonable fees and disbursements of its counsel and such

other professionals or consultants retained by the Initial Senior Noteholders with services

performed prior to and during these Chapter 11 Cases. Any such fees, costs and expenses shall

be paid within ten (10) business days of delivery of a summary invoice (redacted for privilege) to

the Debtors (with a copy of each such invoice (also redacted for privilege) to be delivered by the

Debtors to the U.S. Trustee and any Creditors' Committee and without the need for further

application to or order of the Court.  Notwithstanding anything to the contrary herein, (x) any

and all such fees, costs and expenses (including the fees and expenses of counsel and other

professionals for the Senior Notes Agent and the Initial Senior Noteholders), shall be deemed

fully earned and non-refundable as of the date of this Interim Order and (y) the payment of any

and all such fees shall not be subject to challenge, recharacterization or reduction pursuant to

paragraph 15 hereof or otherwise.

     (ii) <u>Interest</u>.  The Debtors shall accrue and pay, in accordance with the

Senior Note Documents, interest on the Initial Senior Note Obligations including the Make-

Whole (as defined in the Senior Note Documents at the non-default contractual rate until such

time as the Initial Senior Note Obligations are indefeasibly paid in full in cash.

    (d) <u>Consent to Priming and Adequate Protection</u>.  The Senior Notes Agent

and the Initial Senior Noteholders consent to use of Cash Collateral and the priming provided

for herein; <u>provided</u>, <u>however</u>, that the Senior Notes Agent's and the Initial Senior

Noteholders' consent to the priming, the use of Cash Collateral, and the sufficiency of the

adequate protection provided for herein is expressly conditioned upon the entry of this Interim

Order (in form and substance satisfactory to the Senior Notes Agent) relating to the DIP Term

26

Sheet Documentation and DIP Loans set forth herein and such consent shall not be deemed to extend to any other replacement financing or debtor in possession financing other than the DIP Loans provided under the DIP Term Sheet Documentation; provided, further, that such consent shall be of no force and effect in the event this Interim Order is not entered or is vacated or is modified in any respect without the consent of the DIP Agent for the DIP Lenders and the DIP Term Sheet Documentation and DIP Loans as set forth herein and therein are not approved.

(e)    Right to Credit Bid.  The DIP Agent, on behalf of the DIP Lenders, and the Senior Notes Agent, on behalf of the Senior Noteholders, shall each have the right to "credit bid" the respective claims it represents up to the full amount of (x) for the Senior Notes Agent, the Initial Senior Note Obligations and (y) for the DIP Agent, the DIP Loan Obligations, during any sale of all or any portion of the DIP Collateral or Prepetition Collateral, as applicable, or any deposit in connection with such sale, including, without limitation, any sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any reorganization plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.  The DIP Agent and the Senior Notes Agent  shall each have the absolute right to assign, sell, or otherwise dispose of its respective right to credit bid in connection with any credit bid by or on behalf of the DIP Lenders and the Senior Noteholders, respectively or any acquisition entity or joint venture formed in connection with such bid.

(f)    Further Adequate Protection.  Nothing in this Interim Order shall, or shall be deemed to, limit, abridge or otherwise affect the rights of the Senior Notes Agent or the Initial Senior Noteholders to request at any time that the Court provide additional or further protection of their interests in the Prepetition Collateral (including the Cash Collateral), or to

seek further or additional adequate protection in the event the adequate protection provided herein proves to be inadequate.

11.    <u>Adequate Protection for PBC Senior Subordinated Noteholder</u>.  As adequate protection in respect of any diminution in the value of the Prepetition Collateral, the incurrence of the DIP Loan Obligations, the use of Cash Collateral and the granting of the DIP Liens, the granting of the Initial Senior Noteholders' Replacement Liens, the subordination of the PBC Senior Subordinated Note Liens thereto, the granting of the DIP Superpriority Claim and the Initial Senior Noteholders' Superpriority Claim or otherwise (the "<u>PBC Senior Subordinated Noteholder's Diminution Claim</u>"), the Senior Notes Agent (for the benefit of the PBC Senior Subordinated Noteholder) is hereby granted the following:

(a)    <u>PBC Senior Subordinated Noteholder's Replacement Liens</u>.  To secure the PBC Senior Subordinated Noteholder's Diminution Claim, the PBC Senior Subordinated Noteholder is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, and other agreements or instruments) valid, perfected, postpetition security interests in and liens (the "<u>PBC Senior Subordinated Noteholder's Replacement Liens</u>") on all of the DIP Collateral, <u>provided</u>, <u>however</u>, that, notwithstanding anything to the contrary, the PBC Senior Subordinated Noteholder's Replacement Liens shall be and remain subject and subordinate to (i) the DIP Liens and/or payment of any DIP Loan Obligations on account thereof, (ii) the Permitted Liens, (iii) the Carve-Out, (iv) the Initial Senior Noteholders' Replacement Liens and/or any payment of any Initial Senior Note Obligation on account thereof, (v) the Initial Senior Noteholders' Liens and/or any payment of any Initial Senior Note Obligation on account thereof.

(b)   PBC Senior Subordinated Noteholder's Adequate Protection Superpriority Claim. As further adequate protection for the PBC Senior Subornated Noteholders' Diminution Claim, the Senior Notes Agent, for itself and for the benefit of the PBC Senior Subordinated Noteholder, is hereby granted a superpriority claim with priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 and any other provision of the Bankruptcy Code (the "PBC Senior Subordinated Noteholders' Superpriority Claim"), provided, however, that, solely for the purposes of this Interim Order, the PBC Senior Subordinated Noteholder's Superpriority Claim shall not attach to any proceeds from Avoidance Actions. The PBC Senior Subordinated Noteholder's Superpriority Claim will be deemed to constitute Prepetition Collateral under the Senior Note Documents for all purposes, including, without limitation, such that any proceeds or consideration derived from the PBC Senior Subordinated Noteholder's Superpriority Claim shall be deemed to constitute proceeds of such "Collateral" as defined in the Senior Note Documents. The PBC Senior Subordinated Noteholder's Superpriority Claim shall be subordinate only to (i) the DIP Superpriority Claim and/or payment of any DIP Loan Obligations on account thereof, (ii) the Carve-Out, (iii) the Initial Senior Noteholders' Superpriority Claim, (iv) payment of any Initial Senior Noteholders' Adequate Protection Obligations, and (v) payment of any Initial Senior Note Obligations.

12.    Adequate Protection for Subordinated Noteholders. As adequate protection in respect of any diminution in the value of the Prepetition Collateral, the incurrence of the DIP

Loan Obligations, the use of Cash Collateral and the granting of the DIP Liens, the granting of

the Initial Senior Noteholders' Replacement Liens and the PBC Senior Subordinated

Noteholder's Replacement Lien and the subordination of the Subordinated Note Liens thereto,

the granting of the DIP Superpriority Claim, the Initial Senior Noteholders' Superpriority Claim,

the PBC Senior Subordinated Noteholder's Superpriority Claim, or otherwise (the "Subordinated

Noteholders' Diminution Claim" and, collectively, with the Initial Senior Noteholders'

Superiority Claim, PBC Senior Subordinated Noteholder's Diminution Claim, the "Adequate

Protection Claims"), the Subordinated Noteholders are hereby granted the following:

        (a)   Subordinated Noteholders' Replacement Liens.  To secure the

Subordinated Noteholders' Diminution Claim, the Subordinated Noteholders is hereby granted

(effective and perfected upon the date of this Interim Order and without the necessity of

execution by the Debtors of mortgages, security agreements, pledge agreements, financing

statements, and other agreements or instruments) valid, perfected, postpetition security

interests in and liens (the "Subordinated Noteholders' Replacement Liens", and collectively

with the Initial Senior Noteholders' Replacement Liens and the PBC Senior Subordinated

Noteholder's Replacement Liens, the "Replacement Liens") on all of the DIP Collateral,

provided, however, that, notwithstanding anything to the contrary, the Subordinated

Noteholders' Replacement Liens shall only be and remain subject and subordinate to (i) the

DIP Liens and/or payment of any DIP Loan Obligations on account thereof, (ii) the Permitted

Liens, (iii) the Carve-Out, (iv) the Initial Senior Noteholders' Replacement Liens and/or

payment of any Initial Senior Note Obligation on account thereof, and (v) the PBC Senior

Subordinated Noteholder's Replacement Liens and/or payment of any PBC Senior

Subordinated Note Obligations on account thereof.

(b)    Subordinated Noteholders, Adequate Protection Superpriority Claim.  As

further adequate protection for the Subornated Noteholder's Diminution Claim, the

Subordinated Noteholders are hereby granted a superpriority claim with priority over all

administrative expense claims and unsecured claims against the Debtors or their estates, now

existing or hereafter arising, of any kind or nature whatsoever, including, without limitation,

administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328,

330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted

by law), 1113 and 1114 and any other provision of the Bankruptcy Code (the "PBC Senior

Subordinated Noteholders' Superpriority Claim"), provided, however, that, solely for the

purposes of this Interim Order, the PBC Senior Subordinated Noteholder's Superpriority

Claim shall not attach to any proceeds from Avoidance Actions.  The PBC Senior

Subordinated Noteholder's Superpriority Claim will be deemed to constitute Prepetition

Collateral under the Senior Note Documents for all purposes, including, without limitation,

such that any proceeds or consideration derived from the PBC Senior Subordinated

Noteholder's Superpriority Claim shall be deemed to constitute proceeds of such "Collateral"

as defined in the Senior Note Documents.  The PBC Senior Subordinated Noteholder's

Superpriority Claim shall be subordinate only to (i) the DIP Superpriority Claim (ii) the Carve-

Out, (iii) the Initial Senior Noteholders' Superpriority Claim, (iv) and payment of any Initial

Senior Noteholders' Adequate Protection Obligations, (v) payment of any Initial Senior Note

Obligations, and (vi) payment of any PBC Senior Subordinated Note Obligations.

## CARVE-OUT; RESTRICTIONS ON USE OF FUNDS

13.    Carve-Out.

31

(a)    The DIP Liens, the DIP Superpriority Claim, the Replacement Liens, and Adequate Protection Claims shall be subject, in accordance with the priority as set forth herein and subordinate only to: (i) fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Bankruptcy Court (the "Case Administration Fees"), (ii) unpaid professional fees and expenses ("Professional Fees") payable to each legal or financial advisor retained by the Debtors and the Creditors' Committee that are incurred or accrued prior to the date of the occurrence of a Termination Event (as defined below), but subject to the aggregate amount(s) allocated to each such professional in the Approved Budget, and ultimately allowed by the Court pursuant to sections 330, 331 and 503 of the Bankruptcy Code or any order of the Court (whenever such fees may be actually incurred prior to the Termination Date), (iii) accrued and unpaid professional fees and expenses of the Debtors' professionals employed under section 327(e) of the Bankruptcy Code incurred prior to the Petition Date in an aggregate amount not in excess of $200,000, (iv) Case Administration Fees and Professional Fees paid on or after the date of the occurrence of a Termination Event (as defined below) in an aggregate amount not to exceed $25,000, and (v) employee wages, accrued and unpaid up until the occurrence of a Termination Event (as defined below), as expressly set forth in and up to the amounts set forth in the Approved Budget and Approved Cash Flow Projection (collectively, the "Carve-Out").  Subject to the immediately preceding sentence, so long as a Termination Event (as defined below) has not occurred, the Debtors shall be permitted to pay Case Administration Fees and Professional Fees allowed and payable under Bankruptcy Code sections 330, 331 and 503, in accordance with the Approved Budget. Prior to the occurrence of a Termination Event (as defined below), the Debtors shall fund payment of Professional Fees to a trust account held by Debtors' counsel in the amounts and at

the times set forth in the Approved Budget, which funds may be released to professionals upon Court approval; provided, however, the funds in the trust account shall not exceed amounts projected for such professionals in the Approved Budget and Approved Cash Flow Projection for a two (2) week period.  After the occurrence of a Termination Event (as defined below) the payment of reasonable allowed professional fees and disbursements incurred by each professional of the Debtors (excluding any incurred and unpaid professional fees and expenses of the DIP Agent and the DIP Lenders payable pursuant to the Interim Order or the Final Order), and any statutory committees appointed in these Chapter 11 Cases in an aggregate amount not in excess of the amounts set forth for each such professional in the Approved Budget, shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  The DIP Lenders' obligation to permit the use of their Cash Collateral to fund or to otherwise pay the Carve-Out expenses may be reserved against borrowing availability under the DIP Term Sheet Documentation and shall be added to and made part of the DIP Loan Obligations and secured by the DIP Collateral and otherwise entitled to the protections granted under this Interim Order, the DIP Term Sheet Documentation, the Bankruptcy Code and applicable law, as applicable.  The Carve-Out shall not include, apply to, or be available for any success fee or similar payment to any professionals or other persons payable in connection with a restructuring or asset disposition with respect to any of the Debtors or otherwise, except as set forth in the Approved Budget.

(b)   Nothing contained in this Interim Order shall be construed:  (i) to exempt those persons hereafter receiving interim compensation payments or reimbursement of expenses pursuant to any such Bankruptcy Court-approved procedure from the applicable provisions of bankruptcy law, including the requirements that such compensation or

33

reimbursement be allowed on a final basis after the filing of appropriate fee applications, and, if applicable, any subsequent order of this Court requiring that such payments be disgorged, and/or (ii) as consent to the allowance of any fees and expenses referred to above, and shall not affect any right of the DIP Agent or the DIP Lenders to object to the reasonableness of such amounts.

    14.    <u>Restrictions on Use of Funds.</u>

        (a)    Notwithstanding anything to the contrary, no proceeds of the DIP Facility, any DIP Collateral or Prepetition Collateral (including, without limitation, Cash Collateral) or any portion of the Carve-Out may be used to pay, any claims for services rendered by any of the professionals retained by the Debtors, any creditor or party in interest, any committee, any trustee appointed under these Chapter 11 Cases or any Successor Cases, or any other party to (i) request authorization to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than from the DIP Lenders in accordance with the DIP Term Sheet Documentation; or (ii) investigate (except as set forth in paragraph 15 below), assert, join, commence, support or prosecute any action or claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, the DIP Agent, the DIP Lenders, the Senior Notes Agent and the Initial Senior Noteholders, or any of their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, or action, including, without limitation, (A) any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code; (B) any action relating to any act, omission or aspect of the relationship between the any of the DIP Agent, the DIP Lenders

34

and the Initial Senior Noteholders, on the one hand, and the Debtors or any of their affiliates, on the other; (C) any action with respect to the validity and extent of the DIP Loan Obligations or the Initial Senior Note Obligations, or the validity, extent, and priority of the Priming DIP Liens, the Senior Note Liens or the Replacement Liens; (D) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the Priming DIP Liens, the Senior Note Liens or the Replacement Liens; and/or (E) except to contest the occurrence or continuance of any Termination Event (as defined below) as permitted in paragraph 15, any action that has the effect of preventing, hindering or delaying (whether directly or indirectly) the DIP Agent, the DIP Lenders, the Senior Notes Agent or the Initial Senior Noteholders in respect of their liens and security interests in the Collateral, Cash Collateral or the Prepetition Collateral; and/or (F) pay any Claim of a Creditor (as such terms are defined in the Bankruptcy Code) without the prior written consent of the DIP Lenders or the Senior Notes Agent; (G) pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in any of the Debtors without the prior written consent of the DIP Lenders; or (H) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral, unless otherwise permitted hereby, without the consent of the DIP Lenders.

(b)    Up to $25,000 in the aggregate of the Carve-Out, any DIP Collateral, any Prepetition Collateral, any Cash Collateral or proceeds of the DIP Facility may be used by the Creditors' Committee (to the extent such committee is appointed) to investigate (but not prosecute) the extent, validity, and priority of the Initial Senior Note Obligations, the Senior Note Liens, or any other claims against the Initial Senior Noteholders so long as such investigation occurs within the Challenge Period (as defined below).

15.    <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims.</u>

(a)   The Debtors' acknowledgements and stipulations set forth in Paragraph G

(the "Debtors' Stipulations") above shall be binding upon the Debtors in all circumstances

upon entry of this Interim Order.  The Debtors' Stipulations shall be binding upon each other

party in interest, including the Creditors' Committee, if any, unless such Creditors' Committee

or any other party in interest other than the Debtors (or if the Cases are converted to cases

under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter

7 trustee in such Successor Case), first, commences, by the earlier of (x) with respect to any

Creditors' Committee, sixty (60) calendar days from the formation of any Creditors'

Committee, and (y) solely if no Creditors' Committee is formed, with respect to other parties

in interest with requisite standing other than the Debtors or any Creditors' Committee,

seventy-five (75) calendar days following the date of entry of the Interim Order (such time

period established by the earlier of clauses (x) and (y), shall be referred to as the "Challenge

Period," and the date that is the next calendar day after the termination of the Challenge Period

in the event that either (i) no Challenge (as defined below) is properly raised during the

Challenge Period or (ii) with respect only to those parties who properly file a Challenge (as

defined below), such Challenge is fully and finally adjudicated, shall be referred to as the

"Challenge Period Termination Date"), (A) a contested matter, adversary proceeding, or other

action or "claim" (as defined in the Bankruptcy Code) challenging or otherwise objecting to

the admissions, stipulations, findings, or releases included in the Debtors' Stipulations, or (B)

a contested matter, adversary proceeding, or other action against any or all of the Senior Notes

Agent or the Initial Senior Noteholders in connection with or related to the Senior Note

Obligations, or the actions or inactions of any of the Senior Notes Agent or the Initial Senior

Noteholders arising out of or related to the Senior Note Obligations or otherwise, including,

without limitation, any claim against the Senior Notes Agent or any or all of the Initial Senior

Noteholders in the nature of a "lender liability" cause of action, setoff, counterclaim, or

defense to the Senior Note Obligations (including, but not limited to, those under sections 506,

544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code (but excluding, solely for the

purpose of this Interim Order, those under 506(c)) or by way of suit against any of the

Prepetition Secured Parties) ((A) and (B) collectively, the "Challenges" and, each individually,

a "Challenge"), and second, obtains a final, non-appealable order in favor of such party in

interest sustaining any such Challenge in any such timely-filed contested matter, adversary

proceeding, or other action.

        (b)   Upon the Challenge Period Termination Date and for all purposes in these

Cases and any Successor Cases, (i) all payments made to or for the benefit of the Senior Notes

Agent or the Initial Senior Noteholders pursuant to, or otherwise authorized by, this Interim

Order or otherwise (whether made prior to, on, or after the Petition Date) shall be indefeasible

and not be subject to counterclaim, set-off, subordination, recharacterization, defense, or

avoidance, (ii) any and all such Challenges by any party in interest shall be deemed to be

forever released, waived, and barred (iii) the Initial Senior Note Obligations shall be deemed

to be a fully allowed secured claim within the meaning of section 506 of the Bankruptcy Code

(which claim and liens shall have been deemed satisfied in full by the repayment of the Initial

Senior Note Obligations), (iv) the Initial Senior Note Obligations shall be deemed to be a fully

allowed claim, and (v) the Debtors' stipulations in paragraph G and the releases in paragraph

17 shall be binding on all parties in interest, including any Creditors' Committee.

      16.   <u>Prohibition on Granting of Additional Liens and Interests</u>.  No liens, claims,

interests or priority status, other than the Carve-Out and the Permitted Liens (as defined in the

DIP Term Sheet Documentation), having a lien or administrative priority superior to, *pari passu* with, or junior to that of the DIP Liens, the Initial Senior Noteholders' Superpriority Claim, or the Replacement Liens granted by this Interim Order, shall be granted while any portion of the DIP Loan Obligations or Initial Senior Note Obligations remain outstanding, or any commitment under the DIP Term Sheet Documentation or Senior Note Documents remains in effect, without the prior written consent of the DIP Lenders and the Initial Senior Noteholders.

17.    Release. The release, discharge, waivers, settlements, compromises, and agreements set forth in this paragraph 17 shall be deemed effective upon entry of this Interim Order and subject only to the rights set forth in paragraph 15 above. The Debtors forever and irrevocably (i) release, discharge, and acquit the Senior Notes Agent and the Initial Senior Noteholders, and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, including, without limitation, any claims arising from any actions relating to any aspect of the relationship between the Initial Senior Noteholders or the Senior Notes Agent and the Debtors and their affiliates including any equitable subordination claims or defenses, with respect to or relating to the Initial Senior Note Obligations, the Senior Note Liens, the Senior Note Documents, the Debtors' attempts to restructure the Initial Senior Note Obligations, any and all claims and causes of action arising under title 11 of the United States Code, and any and all claims regarding the validity, priority, perfection or avoidability of the liens or secured claims of the Initial Senior Noteholders; and (ii) waive any and all defenses (including, without

limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and non-avoidability of the Initial Senior Note Obligations and the Senior Note Liens.

## TERMINATION; REMEDIES; MODIFICATION OF AUTOMATIC STAY

18.    <u>Termination</u>.  Upon the occurrence an Event of Default (as defined in the DIP Term Sheet Documentation), the Maturity Date (as defined in the DIP Term Sheet Documentation), or default by the Debtors of any of their obligations under this Order unless waived in writing by all of the DIP Lenders, each in its sole discretion (the "<u>Termination Event</u>") (i) the Debtors' to use Cash Collateral shall immediately and automatically terminate and (ii) the DIP Loan Obligations shall be immediately due and payable.

19.    <u>Remedies and Stay Modification.</u>

(a)    Subject to paragraph 19(c) below, the automatic stay provisions of Section 362 of the Bankruptcy Code are vacated and modified without the need for further Court order to permit the DIP Agent, for itself and on behalf of the DIP Lenders, or the DIP Lenders, as applicable, upon the occurrence of a Termination Event, and without any interference from the Debtors or any other party interest but subject to three (3) business days' prior written notice (which may be delivered by electronic mail) (the "<u>Remedies Notice Period</u>") to the Debtors, their counsel, counsel to any Creditors' Committee and counsel to the U.S. Trustee, to exercise all rights and remedies provided for in the DIP Term Sheet Documentation, this Interim Order or under other applicable bankruptcy and non-bankruptcy law including, without limitation, the right to terminate the commitments under the DIP Term Sheet Documentation, (i) cease making DIP Loans and/or suspend or terminate the commitments under the DIP Term Sheet Documentation; (ii) declare all DIP Obligations immediately due and payable; (iii) in the case of the DIP Agent, take any actions reasonably calculated to preserve or safeguard the DIP

Collateral or to prepare the DIP Collateral for sale; (iv) in the case of the DIP Agent, foreclose or otherwise enforce their Priming DIP Lien or Replacement Liens on any or all of the DIP Collateral and/or the Prepetition Collateral; (v) exercise any other default-related rights and remedies under the under the DIP Term Sheet Documentation or this Interim Order.

(b)    Immediately upon the occurrence of a Termination Event or a default by any of the Debtors of any of their obligations under this Interim Order, the DIP Agent, for itself and the ratable benefit of the DIP Lenders, may charge interest at the default rate set forth in the DIP Term Sheet Documentation without being subject to the Remedies Notice Period.

(c)    The automatic stay of Section 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated without the necessity of any further action by the Court in the event that the Debtors, the Creditors' Committee, if any, and/or the U.S. Trustee have not obtained an order from this Court to the contrary prior to the expiration of the Remedies Notice Period.   The Debtors, the Creditors' Committee, if any, and/or the U.S. Trustee shall have the burden of proof at any hearing on any request by them to reimpose or continue the automatic stay of Section 362(a) of the Bankruptcy Code or to obtain any other injunctive relief, and the sole issue at any hearing to re-impose the automatic stay or to obtain any other injunctive or other relief shall be limited to whether or not a Termination Event has occurred.

(d)    If either of the DIP Agent or the Senior Notes Agent is entitled, and has elected in accordance with the provisions hereof, to enforce its respective liens or security interests or exercise any other default-related remedies following expiration of the Remedies Notice Period, the Debtors shall cooperate with the DIP Agent, the DIP Lenders, the Senior

40

Notes Agent or the Senior Noteholders (as applicable) in connection with such enforcement by, among other things, (i) providing at all reasonable times access to the Debtors' premises to representatives or agents of the DIP Agent, the DIP Lenders, the Senior Notes Agent or the Senior Noteholders (including any collateral liquidator or consultant), (ii) providing the DIP Agent, the DIP Lenders, the Senior Notes Agent and the Senior Noteholders and their representatives or agents, at all reasonable times access to the Debtors' books and records and any information or documents requested by the DIP Agent, the DIP Lenders, the Senior Notes Agent or the Senior Note Lenders or their respective representatives, (iii) performing all other obligations set forth in the DIP Loan Documents, and (iv) taking reasonable steps to safeguard and protect the DIP Collateral, and the Debtors shall not otherwise interfere with or actively encourage others to interfere with the DIP Agent's, the DIP Lenders', the Senior Notes Agent's or the Senior Noteholders' enforcement of rights.

(e)    Upon the occurrence and during the continuance of Termination Event and the expiration of any Remedies Notice Period, the DIP Lenders shall have no further obligation to provide financing under the DIP Loan Documents and the DIP Agent, the DIP Lenders, the Senior Notes Agent and the Senior Noteholders shall have no obligation to permit the continued use of Cash Collateral.

(f)    Upon the occurrence and during the continuance of a Termination Event and the expiration of the Remedies Notice Period, the DIP Agent, for itself and on behalf of the DIP Lenders, may at all times continue to collect and sweep cash as provided in paragraph 23(c) herein.

(g)    Neither Section 105 of the Bankruptcy Code nor any other provision of the Bankruptcy Code or applicable law shall be utilized to prohibit the exercise, enjoyment and

41

enforcement of any rights, benefits, privileges and remedies set forth in this paragraph 19 regardless of any change in circumstances.

(h)    This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Interim Order and relating to the application, re-imposition or continuance of the automatic stay of Section 362(a) of the Bankruptcy Code or other injunctive relief requested.

## MISCELLANEOUS

20.    <u>Limitation on Section 506(c) Claims</u>.  Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in these Chapter 11 Cases or any Successor Case at any time shall be surcharged against, and no person may seek to surcharge any costs or expenses of administration against the DIP Agent or DIP Lenders, any of their respective claims, the Carve-Out, or the DIP Collateral, pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent, as applicable, of the DIP Agent or the DIP Lenders.  No action, inaction or acquiescence by the DIP Agent or the DIP Lenders shall be deemed to be or shall be considered evidence of any alleged consent to a surcharge against the DIP Agent or the DIP Lenders, any of their respective claims, the Carve-Out, or the DIP Collateral.

21.    <u>No Marshaling</u>.  The DIP Agent, the DIP Lenders, the Senior Notes Agent and the Initial Senior Noteholders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral. Without limiting the generality of the immediately preceding sentence, no party shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of the DIP Collateral after a Termination Event.

42

22.    <u>Equities of the Case Waiver</u>.  The DIP Agent, the DIP Lenders, the Senior Notes Agent and the Initial Senior Noteholders shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code.  No person may assert an "equities of the case" claim under section 552(b) of the Bankruptcy Code against the DIP Agent, the DIP Lenders, the Senior Notes Agent or the Initial Senior Noteholders with respect to proceeds, product, offspring or profits of any of the DIP Collateral or the Prepetition Collateral.

23.    <u>Additional Perfection Measures</u>.  The DIP Liens and the Replacement Liens shall be perfected by operation of law immediately upon entry of this Interim Order.  None of the Debtors, the DIP Agent, the DIP Lenders, the Senior Notes Agent or the Initial Senior Noteholders shall be required to enter into or obtain landlord waivers, mortgagee waivers, bailee waivers, warehouseman waivers or other waiver or consent, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including, trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property, or filings with any other federal agencies/authorities), or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and to perfect the DIP Liens or the Replacement Liens.

(a)    If the DIP Lenders, in their sole discretion, choose to take any action to obtain consents from any landlord, licensor or other party in interest, to file mortgages, financing statements, notices of lien or similar instruments, or to otherwise record or perfect such security interests and liens, such DIP Lenders are hereby authorized, but not directed to, take such action or to request that Debtors take such action on their behalf (and Debtors are hereby authorized and directed to take such action) and:

43

(i)      any such documents or instruments shall be deemed to have been recorded and filed as of the time and on the date of entry of this Interim Order; and

(ii)      no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder.

(b)   In lieu of obtaining such consents or filing any such mortgages, financing statements, notices of lien or similar instruments, the DIP Agent may, in its sole discretion, choose to file a true and complete copy of this Interim Order in any place at which any such instruments would or could be filed, together with a description of collateral, and such filing by the DIP Agent shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Interim Order.

(c)   _Application of Collateral Proceeds._  After a Termination Event and the expiration of the Remedies Notice Period, the Debtors are hereby authorized and directed to remit to the DIP Agent, for itself and for the ratable benefit of the DIP Lenders, as the case may be, one-hundred percent (100%) of all collections on, and proceeds of, the DIP Collateral, and the automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to permit the DIP Agent and the DIP Lenders to retain and apply all collections, remittances, and proceeds of the DIP Collateral in accordance with the DIP Term Sheet Documentation except to the extent otherwise provided herein.  In furtherance of the foregoing, (a) all cash, securities, investment property and other items of any Debtor deposited with any bank or other financial institution shall be subject to a perfected, first priority security interest in favor of the DIP Agent (or its designee), (b) upon the occurrence and during the continuance of a Termination Event and the expiration of the remedies Notice Period, each bank or other

44

financial institution with an account of any Debtor is hereby authorized and instructed to (i) comply at all times with any instructions originated by the DIP Agent (or its designee) to such bank or financial institution directing the disposition of cash, securities, investment property and other items from time to time credited to such account, without further consent of any Debtor, including, without limitation, any instruction to send to the DIP Agent (or its designee) by wire transfer (to such account as the DIP Agent (or its designee) shall specify, or in such other manner as the DIP Agent (or its designee) shall direct) all such cash, securities, investment property and other items held by it, and (ii) waive any right of set off, banker's lien or other similar lien, security interest or encumbrance as against the DIP Agent (or its designee) and (c) any deposit account control agreement executed and delivered by any bank or other financial institution, any Debtor and the Senior Notes Agent prior to the Petition Date in connection with the Senior Note Documents shall establish co-control in favor of the DIP Agent of any and all accounts subject thereto and any and all cash, securities, investment property and other items of any Debtor deposited therein to secure the DIP Obligations (provided that primary control rights shall vest in the DIP Agent), and all rights thereunder in favor of the Senior Notes Agent shall inure also to the benefit of, and shall be exercisable exclusively by, the DIP Agent, until all of the DIP Loan Obligations have been indefeasibly paid in full, at which time exclusive control shall automatically revert to the Senior Notes Agent.

24.    Cash Management Systems.  Subject to the Debtors' cash management order entered by the Court, the Debtors are authorized and directed to maintain their cash management system in a manner consistent with the DIP Term Sheet Documentation, this Interim Order, and the order of this Court approving the maintenance of the Debtors' cash management system;

45

provided, however, that such order is and remains at all times on terms and conditions acceptable to each of the DIP Lenders and such order is not inconsistent with the terms specified herein or the DIP Term Sheet Documentation.

25.    Delivery of Documentation.  The Debtors (and/or their legal or financial advisors) shall deliver to the DIP Agent, counsel to the DIP Agent ,the DIP Lenders, counsel to the DIP Lenders, and any financial advisors to the DIP Agent or the DIP Lenders, all financial reports, budgets, forecasts, and all other legal or financial documentation, pleadings, and/or filings that are either (i) required to be provided (by the Debtors and/or their legal or financial advisors) to the DIP Agent and the DIP Lenders, and/or the DIP Agent's and the DIP Lenders' legal and financial advisors pursuant to the DIP Term Sheet Documentation, or (ii) reasonably requested by the DIP Agent or the DIP Lenders (or their legal and financial advisors).

26.    Access to Books and Records.  The Debtors (and/or their legal and financial advisors) will (a) keep proper books, records and accounts in accordance with GAAP in which full, true and correct entries shall be made of all dealings and transactions in relation to their business and activities, (b) cooperate, consult with, and provide to the DIP Agent and the DIP Lenders all such information as required or allowed under the DIP Term Sheet Documentation, the provisions of this Interim Order or that is afforded to the Creditors' Committee and/or the Creditors' Committee's respective legal or financial advisors, (c) permit, upon one (1) business day's notice, representatives of the DIP Agent and the DIP Lenders to visit and inspect any of their respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations and

accounts with their respective officers, employees and independent public accountants as often as may reasonably be desired, and (d) permit representatives of the DIP Agent and the DIP Lenders to consult with and advise the Debtors' management on matters concerning the general status of the Debtors' business, financial condition and operations.

27.    <u>Lenders Not Responsible Persons</u>.  In (a) making the decision to make the DIP Loans; (b) administering the DIP Loans; (c) extending other financial accommodations to the Debtors under the DIP Term Sheet Documentation; (d) making the decision to make the loans and financial accommodations under the Senior Note Documents; (e) administering the loans and financial accommodations extended under the Senior Note Documents; (f) extending other financial accommodations to the Debtors under the Senior Note Documents; and (g) making the decision to collect the indebtedness and obligations of the Debtors, none of the DIP Agent, the DIP Lenders, the Senior Notes Agent nor the Initial Senior Noteholders shall be considered to be exercising control over any operations of the Debtors or acting in any way as a responsible person, or as an owner or operator under any applicable law, including without limitation, any environmental law (including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. 6901, *et seq.*, as either may be amended from time to time, or any similar federal or state statute).

28.    <u>Successors and Assigns</u>.  The DIP Term Sheet Documentation and the provisions of this Interim Order shall be binding upon the Debtors, the DIP Agent, the DIP Lenders, the Senior Notes Agent, the Initial Senior Noteholders, and each of their respective successors and assigns, and shall inure to the benefit of the Debtors, the DIP Agent, the DIP Lenders, the Senior Notes Agent and the Initial Senior Noteholders, and each of their respective successors and

assigns including, without limitation, any trustee, examiner with expanded powers, responsible

officer, estate administrator or representative, or similar person appointed in a case for any

Debtor under any chapter of the Bankruptcy Code.  The terms and provisions of this Interim

Order shall also be binding on all of the Debtors' creditors, equity holders, and all other parties

in interest, including, but not limited to a trustee appointed under chapter 7 or chapter 11 of the

Bankruptcy Code.

29.    <u>Binding Nature of Agreement</u>.  The DIP Term Sheet Documentation to which the

Debtors are a party shall constitute legal, valid, and binding joint and several obligations of the

Debtors party thereto, enforceable in accordance with its terms.  The DIP Term Sheet

Documentation has been or will be properly executed and delivered to the DIP Agent and the

DIP Lenders by the Debtors.  Unless otherwise consented to in writing, the rights, remedies,

powers, privileges, liens, and priorities of the DIP Agent, the DIP Lenders, the Senior Notes

Agent, and the Initial Senior Noteholders provided for in this Interim Order, the DIP Term Sheet

Documentation, or otherwise shall not be modified, altered or impaired in any manner by any

subsequent order (including a confirmation or sale order), by any plan of reorganization or

liquidation in these Chapter 11 Cases, by the dismissal or conversion of these Chapter 11 Cases

or in any subsequent case under the Bankruptcy Code unless and until the DIP Loan Obligations

have first been indefeasibly paid in full in cash and completely satisfied and the commitments

terminated in accordance with the DIP Term Sheet Documentation.

30.    <u>Subsequent Reversal or Modification</u>.  This Interim Order is entered pursuant to

section 364 of the Bankruptcy Code, and Bankruptcy Rules 4001(b) and (c), granting the DIP

Lenders all protections and benefits afforded by section 364(e) of the Bankruptcy Code.  Any

financial accommodations made to the Debtor by the DIP Agent or the DIP Lenders pursuant to

this Interim Order and the DIP Term Sheet Documentation shall be deemed to have been made
by the DIP Agent and the DIP Lenders in good faith, as such term is used in section 364(e) of the
Bankruptcy Code.  If any or all of the provisions of this Interim Order are hereafter reversed,
modified, vacated or stayed, that action will not affect (i) the validity of any obligation,
indebtedness or liability incurred hereunder by any of the Debtors to the DIP Agent, the DIP
Lenders, the Senior Notes Agent and the Initial Senior Noteholders, prior to the date of receipt
by the DIP Agent and the Senior Notes Agent of written notice of the effective date of such
action or (ii) the validity and enforceability of any lien or priority authorized or created under
this Interim Order or pursuant to the DIP Term Sheet Documentation.  Notwithstanding any such
reversal, stay, modification or vacatur, any postpetition indebtedness, obligation or liability
incurred by any of the Debtors to the DIP Agent, the DIP Lenders, the Senior Notes Agent and
the Initial Senior Noteholders prior to written notice to the DIP Agent and the Senior Notes
Agent of the effective date of such action, shall be governed in all respects by the original
provisions of this Interim Order, and the DIP Agent, the DIP Lenders, the Senior Notes Agent
and the Initial Senior Noteholders, shall be entitled to all the rights, remedies, privileges, and
benefits granted herein and in the DIP Term Sheet Documentation with respect to all such
indebtedness, obligations or liability.

      31.    <u>Collateral Rights</u>.  If any party who holds a lien or security interest in DIP
Collateral or Prepetition Collateral that is junior and/or subordinate to the DIP Liens, the
Replacement Liens or the Senior Note Liens in such DIP Collateral or Prepetition Collateral
receives or is paid the proceeds of such DIP Collateral or Prepetition Collateral, or receives any
other payment with respect thereto from any other source, prior to the indefeasible payment in
full in cash and the complete satisfaction of (a) all DIP Loan Obligations under the DIP Term

Sheet Documentation and termination of the commitment in accordance with the DIP Term

Sheet Documentation, and (b) the Initial Senior Note Obligations under the Senior Note

Documents, such junior or subordinate lienholder shall be deemed to have received, and shall

hold, the proceeds of any such DIP Collateral or Prepetition Collateral in trust for the DIP

Lenders and the Initial Senior Noteholders and shall immediately turn over such proceeds to the

DIP Agent for application to repay the DIP Loan Obligations and to the Senior Notes Agent for

application to repay the Initial Senior Note Obligations in accordance with the DIP Term Sheet

Documentation, the Senior Note Documents and this Interim Order until indefeasibly paid in

full.

32.    Injunction.  Except as provided in the DIP Term Sheet Documentation, and this

Interim Order, the Debtors shall be enjoined and prohibited from, at any time during these

Chapter 11 Cases, granting liens on the DIP Collateral, the Prepetition Collateral or any portion

thereof to any other parties, pursuant to section 364(d) of the Bankruptcy Code or otherwise,

which liens are senior to, *pari passu* with or junior to the liens granted to the DIP Agent, for

itself and the ratable benefit of the DIP Lenders, and the Senior Notes Agent, for itself and the

ratable benefit of the Initial Senior Noteholders, except in accordance with the DIP Term Sheet

Documentation, the Senior Note Documents and this Interim Order.

33.    No Waiver.  This Interim Order shall not be construed in any way as a waiver or

relinquishment of any rights that the DIP Agent or DIP Lenders, Senior Notes Agent or Initial

Senior Noteholders may have to bring or be heard on any matter brought before this Court.

34.    Sale/Conversion/Dismissal.

(a)    The Debtors shall not seek or support entry of any order that provides for

either the sale of the ownership of the stock of the Debtors or the sale of all or substantially all

of the assets of the Debtors under section 363 of the Bankruptcy Code to any party unless, in connection with such event, the order approving such sale, provided that the sale proceeds shall be distributed in the order of priority of payments as described in the DIP Term Sheet Documentation on the closing of such sale; provided however, if such a sale is consummated prior the entry of the Final Order (a "Pre-Final Order Sale") and the sale proceeds cannot for any reason be distributed in the order of priority of payments as described in the DIP Term Sheet Documentation on the closing of such sale then (i) the sale proceeds from such Pre-Final Order Sale (the "Pre-Final Order Sale Proceeds") shall constitute Cash Collateral; (ii) the Debtors shall be authorized, with the prior consent of the DIP Lenders, to use such Cash Collateral subject to this Interim Order and in accordance with the Approved Budget; and (iii) any Pre-Final Sale Order Proceeds used by the Debtors shall reduce, on a dollar-for-dollar basis, the Maximum Borrowing and if such Maximum Borrowing shall be reduced to zero, the remaining Pre-Final Sale Order Proceeds shall be used to repay the DIP Loan Obligations.

(b)    If an order dismissing or converting any of these Chapter 11 Cases under sections 305 or 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide that (a) the DIP Liens, the DIP Superpriority Claim, the Replacement Liens and the Adequate Protection Claims granted hereunder and in the DIP Term Sheet Documentation shall continue in full force and effect, remain binding on all parties-in-interest, and maintain their priorities as provided in this Interim Order and the DIP Term Sheet Documentation until all DIP Loan Obligations are indefeasibly paid in full in cash and completely satisfied and the commitments under the DIP Term Sheet Documentation are terminated in accordance with the DIP Term Sheet Documentation and (b) this Court shall retain jurisdiction, notwithstanding

such dismissal, for purposes of enforcing the DIP Liens, the DIP Superpriority Claim, the Replacement Liens and the Adequate Protection Claims.

35.     <u>Limits on Lenders' Liability</u>.  Nothing in this Interim Order or in any of the DIP Term Sheet Documentation or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent or the DIP Lenders of any liability for any claims arising from any and all activities by the Debtors or any of their subsidiaries or affiliates in the operation of their businesses or in connection with their restructuring efforts.

36.     <u>Priority of Terms</u>.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Term Sheet Documentation, the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" "as set forth in" or "as more fully described in" the DIP Term Sheet Documentation (or words of similar import), the terms and provisions of this Interim Order shall govern.

37.     <u>No Third Party Beneficiary</u>.  Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

38.     <u>Survival</u>.  Except as otherwise provided herein, (a) the protections afforded under this Interim Order, and any actions taken pursuant thereto, shall survive the entry of an order (i) dismissing any of these Chapter 11 Cases or (ii) converting any of these Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code, and (b) the DIP Liens, the Replacement Liens, the DIP Superpriority Claim and the Adequate Protection Claims shall continue in these Chapter 11 Cases, in any such successor case or after any such dismissal.  Except as otherwise

52

provided herein, the DIP Liens, the Replacement Liens, the DIP Superpriority Claim and the Adequate Protection Claims shall maintain their priorities as provided in this Interim Order, the Final Order, and the DIP Term Sheet Documentation, and not be modified, altered or impaired in any way by any other financing, extension of credit, incurrence of indebtedness (except with respect to any additional financing to be provided by the DIP Agent or the DIP Lenders in accordance with the Final Order), or any conversion of any of these Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code or dismissal of any of these Chapter 11 Cases, or by any other act or omission until (i) all DIP Loan Obligations are indefeasibly paid in full in cash and completely satisfied, and the commitments under the DIP Term Sheet Documentation are terminated in accordance therewith, and (ii) the Initial Senior Note Obligations has been or is deemed to have been satisfied in accordance with the Bankruptcy Code.

39.    <u>Adequate Notice/Scheduling of Final Hearing</u>.  The notice given by the Debtors of the Interim Hearing was given in accordance with Bankruptcy Rules 2002 and 4001(c) and the local rules of this Court and, under the circumstances, was adequate and sufficient.  No further notice of the request for the relief granted at the Interim Hearing is required.  The Debtors shall promptly mail copies of this Interim Order and notice of the Final Hearing to any known party affected by the terms of this Interim Order and/or Final Order and any other party requesting notice after the entry of this Interim Order.  Any objection to the relief sought at the Final Hearing shall be made in writing setting forth with particularity the grounds thereof, and filed with the Court and served so as to be *actually received* no later than seven (7) days prior to the Final Hearing at 4:00 p.m. (Eastern) by the following: (a) counsel to the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19801 (Attn: Debra I. Grassgreen, Robert J. Feinstein and Timothy P. Cairns); (b) counsel to the DIP Lenders,

Schulte Roth & Zabel LLP, 919 Third Avenue, New York, NY 10022 (attn: Adam Harris and David Hillman) and Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, DE 19801 (attn: Adam G. Landis); (b) counsel to the DIP Agent, Wilmer Cutler Pickering Hale and Dorr LLP, 7 World Trade Center, 250 Greenwich Street, New York, NY 10007 (attn: George W. Shuster, Jr.) and Morris James LLP, 500 Delaware Avenue, Suite 1500, Wilmington, DE 19801 (attn: Brett D. Fallon); (d) counsel to the Subordinated Noteholders, [_____] (attn. [_____]); and (e) the Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801. The Court shall conduct a Final Hearing on the Motion commencing on [_____] at [_____] a.m. (Eastern).

40.    Immediate Binding Effect; Entry of Interim Order.  This Interim Order shall not be stayed and shall be valid and fully effective immediately upon entry, notwithstanding the possible application of Bankruptcy Rules 6004(h), 7062, and 9014, or otherwise, and the Clerk of the Court is hereby directed to enter this Interim Order on the Court's docket in these Chapter 11 Cases.

41.    Proofs of Claim.  Neither the Senior Notes Agent nor any of the Senior Noteholders shall not be required to file proofs of claim in any of the Cases or Successor Cases for any claim allowed herein. The Debtors' Stipulations shall be deemed to constitute a timely filed proof of claim for the Senior Notes Agent and the Senior Noteholders upon approval of this Interim Order, the Senior Notes Agent and the Senior Noteholders shall be treated under section 502(a) of the Bankruptcy Code as if they each have filed a proof of claim. Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of these Cases 11 Cases or Successor Cases to the contrary, the Senior Notes Agent and each of the Senior Noteholders, are hereby authorized and entitled, each in its sole discretion, but not required, to

file (and amend and/or supplement, as they see fit) a proof of claim and/or aggregate proofs of claim in each of these Chapter 11 Cases or Successor Cases for any claim allowed herein.

42.    <u>Retention of Jurisdiction</u>.  This Court shall retain exclusive jurisdiction over all matters pertaining to the implementation, interpretation, and enforcement of this Interim Order.

Dated:  Wilmington, Delaware
         September __, 2012

_____
HONORABLE
UNITED STATES BANKRUPTCY JUDGE