IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>DIGITAL DOMAIN MEDIA GROUP, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No.: 12-*12568*(___)<br><br>(Joint Administration Requested) |

## MOTION FOR AN ORDER: (I) APPROVING AGREEMENT OF SALE AND AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS PURSUANT TO SECTIONS 363(B), (F) AND (M) OF THE BANKRUPTCY CODE; (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the

"Debtors") file this *Motion for an Order: (I) Approving Purchase Agreement and Authorizing*

*the Sale of Substantially All of the Debtors' Assets; (II) Authorizing the Sale of Assets Free and*

*Clear of All Liens, Claims, Encumbrances and Interests Pursuant to Sections 363(a), (f) and (m)*

*of the Bankruptcy Code, (III) Authorizing the Assumption and Assignment of Certain Executory*

*Contracts and Unexpired Leases; and (IV) Granting Related Relief* (the "Sale Motion").  The

Sale Motion seeks authority to sell certain of the Debtors' assets to VFX Holdings, LLC (the

"Buyer"), including the acquisition of Digital Domain Media Group, Inc.'s ("DDMG") visual

---

[1]  The Debtors in these proceedings and the last four digits of each Debtor's federal or foreign taxpayer identification number, if any, are as follows: D2 Software, Inc. (5602); DDH Land Holdings, LLC; DDH Land Holdings II, LLC; Digital Domain (8392); Digital Domain Institute, Inc. (6275); Digital Domain International, Inc. (9344); Digital Domain Media Group, Inc. (9505); Digital Domain Productions, Inc. (5757); Digital Domain Productions (Vancouver) Ltd. (6450); Digital Domain Stereo Group, Inc. (4526); Digital Domain Tactical, Inc. (6809); Mothership Media, Inc. (2113); Tradition Studios, Inc. (4883); Tembo Productions, Inc. (7634). The Debtors' mailing address is 10250 SW Village Parkway, Port St. Lucie, Florida 34987; Tembo Productions, Inc. (7634). The Debtors' mailing address is 10250 SW Village Parkway, Port St. Lucie, Florida 34987.

effects, virtual performance business and the Debtors' rights to receive amounts owed to them from the motion pictures *Titanic* and *Ender's Game*, as well as the other assets set forth in the Purchase Agreement (the "Acquired Assets"), all as set forth in that certain *Asset Purchase Agreement*, dated as of September 10, 2012 (the "Purchase Agreement"), executed by and among Digital Domain Media Group, Inc. and certain of its subsidiaries, the Buyer, and, solely with respect to Article 14 of the Purchase Agreement, Searchlight Capital, L.P.. A copy of the Purchase Agreement is annexed hereto as **Exhibit A.**

As set forth in the *Declaration of Michael Katzenstein in Support of First Day Motions* filed concurrently with this Sale Motion and discussed below, the Debtors must immediately consummate the sale of the Acquired Assets to the Buyer in order to avoid the immediate cessation of their operations and the loss of approximately 700 jobs, as well as to preserve the value of their business. In support of this Sale Motion, the Debtors respectfully state as follows:

## Jurisdiction

1.    This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334. This proceeding is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (M), (N) and (O).

2.    Venue of these proceedings and this Sale Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory predicates for the relief sought herein are sections 105, 363, 365, 1107 and 1108 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"),

Rules 2002(a)(2), 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Rules 2002-1(b) and 9006-1 of the Local Rules of Bankruptcy Practice

and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules").

### Relief Requested

4.      The Debtors request that this Court, *inter alia*, (i) authorize the sale of the

Acquired Assets to the Buyer pursuant to the Purchase Agreement free and clear of all liens,

claims, encumbrances or other interests, other than the Assumed Liabilities, pursuant to sections

363(b), (f) and (m) and 365 of the Bankruptcy Code, with such liens, claims, rights, interests and

encumbrances (collectively, the "Interests") to attach to the sale proceeds of the Acquired Assets

with the same validity (or invalidity), priority and perfection as existed immediately prior to such

sale; (ii) approve the assumption and assignment of the Assumed Executory Contracts under

Bankruptcy Code section 365, subject to, and at the time of, closing under the Purchase

Agreement (or, in certain instances, post-closing); and (iii) grant such other relief as may be

necessary or appropriate.

### Background

5.      On the date hereof (the "Petition Date"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code and a motion to

procedurally consolidate their chapter 11 cases (the "Chapter 11 Cases") for administrative

purposes only.  The Debtors are continuing to operate their businesses and manage their

properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.  No request has been made for the appointment of a trustee or examiner and no official

committee of creditors has been appointed in these Chapter 11 Cases.

### The Need for the Immediate Sale of the Acquired Assets

6.    The Debtors acknowledge (and are prepared to put on testimony and

provide evidence at a hearing) that the proposed sale procedures they are asking this Court to

approve contemplate a very quick sale of the Acquired Assets to be sold.  However, as set forth

below, the Debtors believe that under the unique circumstances of this case, the immediate

approval of these sale procedures is the only way to save nearly 700 jobs in the United States and

Canada and preserve the value of their business.

7.    The Debtors' Florida studio was shut down prepetition.  The Debtors'

remaining business -- headquartered in California and Vancouver, Canada -- provide digital

content services to a small number of motion picture studios to whom the Debtors deliver special

effects of feature films, commercials, and other productions.  As set forth in the Katzenstein

Declaration, the Debtors' provision of digital content production services for feature films

comprises the largest component of their business and is responsible for approximately 80% of

the Debtors' revenues.

8.    The film studios with whom the Debtors currently have arrangements

(collectively, the "Studios") are dependent upon the Debtors to provide continuous work on

ongoing films that cost tens and sometimes hundreds of millions of dollars to produce prior to

carefully selected release dates, such that any actual or threatened interruption to the delivery of

work product by the Debtors – such as by virtue of the Debtors' ongoing severe liquidity

problems – would have potentially devastating and certainly very costly financial impact. As a result of the Debtors' well publicized financial setbacks, a number of Studios for whom the Debtors are currently providing digital production services (under, in some cases, at-will arrangements) have made repeated demands that the Debtors provide them with <u>immediate</u> assurances of the Debtors' financial ability to perform on these arrangements. Given the costs and disruption associated with a cessation of the Debtors' business operations, as set forth in the Katzenstein Declaration, if immediate assurance that the Debtors can fulfill their obligations throughout the production schedule for the films is not provided, there is a material risk that the Studios will immediately pull their work from the Debtors and find alternative digital production suppliers in order to ensure that their films and other projects are not interrupted. This dynamic is the predicate for the urgent nature of the relief requested. A more protracted sale process and the attendant uncertainty about the future of the Debtors' business would run the material risk that the value of the Debtors' business would be eroded, if not completely destroyed, if Studios re-sourced their work to other providers absent immediate demonstration that the Debtors' business will be carried on by a well-capitalized purchaser.

9.      Also contributing to the urgency of the situation, the Debtors' senior secured lenders (collectively, the "<u>Initial Senior Noteholders</u>") have indicated that they will not continue to fund the Debtors' business other than for a short period of time in chapter 11 in order to bridge the proposed sale, based on the same risk of erosion in value that would stem from the Studios' pull-out if they were not made comfortable immediately about the continuity of work on their films and other projects.

10.     Thus, approval of the proposed sale procedures is essential to avoid the risk of losing the Studios' confidence and business and the re-sourcing of their projects to digital content competitors.  The Debtors are aware that certain of their competitors are actively soliciting the Debtors' clients for projects on which the Debtors are currently working.  In short, the only way to avoid the loss of the Debtors' enterprise value and preserve over 700 jobs is to foster the sale of the Debtors' assets immediately to a credit-worthy new owner and to complete the Debtors' obligations on these Studio projects.  Notwithstanding the abbreviated sale timetable these circumstances permit, the Debtors have concluded that the only way to avoid a disastrous outcome is to effectuate the sale of the Acquired Assets to the Buyer, subject to higher and better offers, in a highly expedited sale process.

11.     The Buyer is an established and well-known player in a small, tight-knit and highly competitive industry and has long standing relationships with the Studios.  As a result, the Buyer is particularly well-positioned to address any concerns about the Debtors' ability to fulfill their responsibilities under their current arrangements.  Indeed, several current senior members of the Buyer have preexisting and extensive relationships with key executives at the same Studios with whom the Debtors conduct business.  Thus, the Debtors have been advised that if the Studios know that this Buyer will immediately acquire the Debtors' assets, they will likely remain convinced that the Debtors will have the wherewithal to timely provide the necessary production services to the Studios.  As noted above, all of the Studios have already raised serious concerns about the Debtors' financial viability and their ability to complete the requirements under the existing contracts.  The Studios will not delay the completion of the films

and the projects on which the Debtors are currently working to wait several weeks for the

Debtors to consummate a sale on a more standard time frame. Rather, the Studios will likely

immediately attempt to terminate their arrangements with the Debtors and line up alternative

suppliers in order to avoid any risks or delays with respect to the completion of the feature films

and projects that the Studios must release.

12.     The loss of the work with the Studios would effectively end the Debtors'

ability to continue operations because they would be forced to immediately shut down their

operations, resulting in the loss of substantially all of Debtors' revenues and approximately 700

jobs. The only way for the Debtors to continue their operations and to secure the commitment of

the Studios to continue to do business with the Debtors is to approve the immediate sale of the

Acquired Assets to the Buyer.

## Business Operations

13.     DDMG leverages its expertise in digital visual effects ("VFX") and

computer-generated ("CG") animation across a group of interrelated businesses. At its

foundation is Digital Domain Productions, Inc. ("DDP"), an award-winning digital production

company founded in 1993. DDP, as a leading provider of visuals, has contributed to more than

ninety (90) major motion pictures, including *Titanic*, the *Transformers* series, *Pirates of the

Caribbean: At World's End*, and *TRON: Legacy*. Mothership Media, Inc. ("Mothership"), a

DDP subsidiary, focuses on creating advertising, entertainment, and branded content, from

concept to completion, across multiple media platforms, and recently created the virtual likeness

of rapper Tupac Shakur at the Coachella Valley Music Festival.

14.     As part of its prepetition initiative to refocus its resources on its core business in California and Vancouver, on September 7, 2012, the Company began the cessation of its Port St. Lucie operations by reducing virtually its entire Port St. Lucie workforce, retaining approximately 20 employees.[2]  The Digital Domain Institute ("DDI"), based in West Palm Beach, continues to operate.

15.     The Company and its employees have been recognized with numerous film industry awards and nominations, including seven awards issued by the Academy of Motion Picture Arts and Sciences -- three Academy Awards® for *Best Visual Effects* and four awards for *Scientific and Technical Achievement*.  The Company also participates as a co-producer in major productions and is currently co-producing the upcoming live-action sci-fi feature film *Ender's Game*, as well as virtual likenesses for Elvis Presley that will be jointly owned by CORE Media Group and DDMG.  The Company also holds several patents with respect to the conversion of two-dimensional (2D) imagery to three-dimensional (3D) imagery.  Prior to the Petition Date, the Company also applied its CG expertise to convert existing and newly made films from 2D to 3D, and to produce an original, family-friendly animated feature film at its subsidiary Tradition Studios, Inc. ("Tradition Studios").

16.     DDI, the Company's education subsidiary, has a public-private partnership with The Florida State University College of Motion Picture Arts ("FSU").

---

[2]  In addition, on September 7, 2012, John C. Textor resigned from his positions as Chief Executive Officer and Chairman of the Board of Directors of DDMG and from all other positions as officer and director of DDMG's subsidiaries.

17.     DDP operates out of Los Angeles, San Francisco, and Vancouver and DDI operates its educational institute in West Palm Beach.  DDMG has a global VFX production partnership in India and China and arrangements that may lead to establishing studios in Abu Dhabi.

## Corporate Structure

18.     Digital Domain, DDP, and D2 Software, Inc. ("D2 Software") are incorporated under the laws of the State of Delaware.  DDMG, DDI, DDH Land Holdings, LLC, DDH Land Holdings II, LLC, Digital Domain Stereo Group, Inc. ("DDSG"), Digital Domain International, Inc., Digital Domain Tactical, Inc., and Tradition Studios are incorporated under the laws of the State of Florida.  Mothership is incorporated under the laws of the State of California.  Digital Domain Productions (Vancouver) Ltd. ("DDP Vancouver") is organized under the laws of British Columbia, Canada.  A chart setting forth the Debtors' corporate structure is attached as Exhibit A to this declaration.

19.     As indicated on Exhibit A, DDMG is the direct parent of nine (9) wholly-owned subsidiaries.  DDMG's indirect subsidiaries, Mothership, D2 Software, Digital Domain Productions (Sydney) Pty Ltd. (a non-debtor), and DDP Vancouver are wholly owned by DDP, which itself is wholly owned by Digital Domain.  DDMG owns an 86.9% interest in DDP.  The remaining 13.1% interest in Digital Domain is owned by various minority shareholders.

## Domestic Business Operations

20.     Prior to the Petition Date, the Company consisted of three core business segments:  (i) digital production; (ii) animated feature film production; and (iii) education.  On

September 7, 2012, with the termination of substantially all employees who worked at Tradition Studios, the Debtors effectively exited the business of producing original animated feature films.

## A.   **Digital Production**

21.   The Company is one of the leading digital production companies, offering its clients innovative, end-to-end solutions across multiple media platforms spanning the entire content production process from idea generation and pre-production to design, directing, live-action production, and post-production.  The Company has two key digital production business units: DDP -- VFX for feature films and advertising; and Mothership -- digital advertising and marketing solutions.  Until September 7, 2012, with the termination of substantially all its employees who worked at Tradition Studios, DDSG engaged in the creation and conversion of 3D content.

### a.   **Digital Domain Productions**

22.   DDP provides digital content production services for feature films and commercials and currently represents the largest component of the Company's business. Through DDP, the Company is one of the largest end-to-end providers of digital content production services in the entertainment industry.  DDP also runs a leading-edge virtual production studio which combines virtual cinematography, award-winning facial animation and capture, Simulcam, and one of the largest motion capture sound stages in the world. Services of the studio are available not only to Digital Domain feature film, advertising and videogame clients, but to outside projects as well.

23.    In the feature film realm, DDP typically is hired by a major motion picture studio, often at the recommendation of a producer or director, to provide digital effects for a film project in the development stage.  DDP's revenues from a large feature film project range in size from several million dollars to more than $70 million, and such projects can take from as short as three months to more than two years to complete.  In the advertising realm, DDP typically is hired by an advertising production company, advertising agency, brand directly, videogame developer or videogame distributor, to provide digital visual effects for advertising and videogame projects.

24.    Recently, the Company has leveraged its role as a provider of visual effects for live-action feature film projects of major film studios and leading filmmakers to co-produce *Ender's Game*, a large-scale live-action feature film. The Company invested in the film's overall production budget and is also creating digital visual effects for the film.

**b.    Mothership**

25.    Mothership is the Company's digital advertising and marketing business, founded in 2010, which provides end-to-end creative services focused on the development, creation, production and implementation of marketing solutions for brand advertisers, advertising agency clients, videogame developers, videogame distributors and entertainment companies. Mothership's in-house talent and creative teams include directors, designers, writers, strategists, digital artists and technologists.  Mothership creates content across multiple media platforms, referred to as "cross-platform" advertising, which includes television, online, print, mobile, and other forms of interactive media.  It is currently working with CORE Media to create and co-own

virtual likenesses of Elvis Presley, and created the "virtual Tupac" performance for Dr. Dre that garnered worldwide attention for this completely new form of entertainment.

### c.    Digital Domain Stereo Group

26.    The Company formed DDSG in November 2010 to acquire the business of In-Three, Inc., the pioneer of proprietary Dimensionalization® solutions for the conversion of 2D content into high quality 3D stereo imagery, including the patents and proprietary technology related thereto. The Company's Dimensionalization® solutions were used in 3D work on *Transformers: Dark of the Moon*, *The Smurfs*, *Alice in Wonderland*, and *G-Force*. The Company's cessation of its Port St. Lucie operations includes those of DDSG, but as of the Petition Date the Company continues to provide limited 2D to 3D conversion capabilities to studios as part of its operations in California.

### B.    Animation

### a.    Tradition Studios

27.    The Company created Tradition Studios, a feature film animation studio, to focus on the development of original full-length, family-oriented CG animated feature films. As described above, immediately prior to the Petition Date, the Company began the cessation of its Port St. Lucie operations, including those of Tradition Studios.

### C.    Education

### a.    Digital Domain Institute

28.    In October 2010, the Company founded DDI, a for-profit post-secondary educational institution, in partnership with FSU. In April 2011, the Company entered into

agreements with FSU establishing a first-of-its-kind public-private education partnership

whereby DDI graduates will receive fully-accredited four-year Bachelor of Fine Arts degrees

from FSU. Working closely with FSU's College of Motion Picture Arts and the Florida

Department of Education, the Company designed a curriculum for DDI that is intended to

produce workforce-ready graduates possessing both traditional motion picture arts and state-of-

the-art technical animation and VFX skills. DDI commenced the first classes for its Digital Arts

Essential Skills Program in the first calendar quarter of 2012.

        29.    To assist with the establishment of DDI, in December 2010, the City of

West Palm Beach granted the Company (i) title to approximately 2.5 acres of land for DDI's

headquarters and primary campus facility (the "DDI Campus"), conditioned on development of

the property, and (ii) a $10 million cash grant (discussed more fully below). Located on the

primary thoroughfare into downtown West Palm Beach, the DDI Campus is intended to house

(i) FSU's new degree program in Animation and Digital Arts, (ii) a working digital production

facility, (iii) FSU's Torchlight Program (which focuses on post-production film marketing), and

(iv) FSU's "applied digital media research center," which will pursue government and industry

funded digital media research. DDI recently entered into a lease for temporary space adjacent to

the DDI Campus to temporarily house FSU's Torchlight Program and DDI's first class of

students.

### International Operations

**D.**     **China - Digital Domain-Galloping Horse Studio Joint Venture**

30.     On March 30, 2012, DDMG entered into a joint venture agreement with Beijing Galloping Horse Film Co., Ltd. ("GH"), pursuant to which DDMG and GH have agreed to form a joint venture company for the purpose of creating, owning and operating a VFX studio to be located in China (the "China Studio").

31.     Pursuant to the joint venture agreement, GH is to fund construction of the China Studio, in an amount not to exceed $50,000,000, and DDMG is to (i) grant to the joint venture an exclusive, royalty-free license to use the Company's VFX intellectual property rights and (ii) design and supervise the build-out of the China Studio.

**E.**     **India and Abu Dhabi - Joint Marketing VFX Services Agreement**

32.     On July 8, 2011, DDP entered into a three-year joint marketing agreement (the "Joint Marketing Agreement") with RelianceMediaWorks Limited ("RMW"), a film and entertainment services company headquartered in Mumbai, India, pursuant to which RMW is responsible for creating and staffing studio facilities in both Mumbai and London for use by DDP.

33.     On August 1, 2012, RMW and DDP revised the Joint Marketing Agreement to include a contract for RMW to train Indian VFX professionals to staff the new production studio that DDMG is developing in Abu Dhabi.  Additionally, under the revised Joint Marketing Agreement, RMW licensed DDMG's technology patents covering 2D-to-3D conversion for $3.2 million.

**F.      Vancouver Operations**

34.      In January 2010, DDP Vancouver opened a 30,000 sq. ft. digital

production studio in Vancouver, British Columbia, which is integrated with the Company's Los

Angeles-based production facility.

## Prepetition Financing Efforts

35.      Prior to the Petition Date, the Debtors undertook efforts to recapitalize

their business.  In August 2012, the Debtors retained various investment firms to assist in

obtaining potential debt or equity investors.  While the Debtors' professionals contacted several

potential parties and received certain expressions of interest, the Debtors and Initial Senior

Noteholders were ultimately unable to agree to acceptable arrangements with these potential

investors.  In addition to the Debtors' attempts to recapitalize their business prepetition, the

Debtors also negotiated with various parties in order to sell portions of their assets, including

certain of the Debtors' patents, minority share interests in the Debtors' VFX subsidiary, the sale

of the Debtors' investment in the *Enders' Game* feature, the Company's *Virtual Performance*

business, the sale of certain of the Debtors' real property in West Palm Beach, Florida, as well as

the potential sale of their education business.  However, despite these efforts, the Debtors were

unable to consummate any of these proposed sales prior to the Petition Date.

## The Terms of the Purchase Agreement[3]

36.      The terms of the Buyer's offer to purchase the Acquired Assets are set

forth in the Purchase Agreement, a copy of which is annexed hereto as **Exhibit A**, and are

---

[3]  Unless otherwise noted, capitalized terms have the same meanings used in the Purchase Agreement.

summarized below. The descriptions below only summarize certain provisions of the Purchase Agreement, and the terms of the Purchase Agreement control in the event of any inconsistency.

      **a.**    **Purchase Price.** The purchase price under the Purchase Agreement (the "Purchase Price") shall be an amount in cash equal to $15,000,000 plus the aggregate amount of Post-Sale Order Operating Expenses..

      **b.**    **Assets.** At the Closing, and upon the terms and conditions set forth in the Purchase Agreement and subject to the approval of the Bankruptcy Court pursuant to a sale order (the "Sale Order") to be entered at the hearing approving the proposed Sale of the Acquired Assets, the Debtors shall sell, convey, assign, transfer and deliver to the Buyer, and the Buyer shall purchase, acquire and accept, all of the right, title and interest in the Acquired Assets, free and clear of all Liens, claims and interests, except for certain Assumed Liabilities including, *inter alia,* the Debtors' acquisition of substantially all of the assets of Digital Domain Production, Inc. and its subsidiaries, including DDMG's computer-generated visual effects for major motion picture studios and advertisers including ongoing projects arising therefrom, a virtual performance business, revenue streams arising from the motion pictures *Titanic* and *Enders' Game,* certain real property leases, equipment, raw materials and other work-in-process, all of DDMG's intellectual property (with the exception of certain patents), permits, business records, surety accounts, accounts and notes receivable (including with respect to the motion picture *Jack the Giant Killer*), rights of set-off, and goodwill and other intangible assets, all pursuant to and in accordance with the terms of the Purchase Agreement. The sale shall not include certain Excluded Assets, including certain patents and causes of action.

      **c.**    **Contracts to be Assumed and Assigned.** Certain contracts to be assumed by the applicable Debtor and assigned to the Buyer relating to the Acquired Assets to be acquired by the Buyer as described in the Purchase Agreement, including any Assumed Executory Contracts that may be assumed and assigned after the Closing Date.

      **d.**    **Assumed Liabilities.** The Buyer shall assume certain Assumed Liabilities, as set forth in Section 1.3 of the Purchase Agreement. The Buyer shall also pay certain post-closing costs of maintaining and preserving assets of the Debtors that remain subject to its potential purchase rights.

      **e.**    **Closing.** The closing of the transactions under the Purchase Agreement (the "Closing") shall take place in accordance with the conditions set forth in Section 3.1 of the Purchase Agreement. The Sale Order will seek relief from the automatic 14 day stay period imposed under Bankruptcy Rule 6004(h).

      **f.**    **Representations and Warranties.** The Purchase Agreement contains standard representations and warranties of the parties including as set forth in Articles 4 and 5 of the Purchase Agreement.

      **g.**    **Successor Liability.** The Sale Order shall provide that the Buyer shall not be liable for any Claims against the Debtors or any of its predecessors or affiliates, and the Buyer

shall not have successor or vicarious liabilities of any kind or character, including under any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger, mere continuation or substantial continuity, whether known or unknown as of the Closing Date.

## Basis for Relief

**G.    Approval of the Sale**

37.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

38.    The sale of a debtor's property should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for doing so. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996), *citing Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Titusville Country Club*, 128 B.R. 396 (W.D. Pa. 1991); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991). The *Delaware & Hudson Railway* court rejected the pre-Code "emergency" or "compelling circumstances" standard, finding the "sound business purpose" standard applicable and, discussing the requirements of that test under *McClung* and *Lionel*, observing:

> A non-exhaustive list of factors to consider in determining if there is a sound business purpose for the sale include: the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the

amount of proceeds to be obtained from the sale versus appraised
values of the property; and whether the asset is decreasing or
increasing in value.

124 B.R. at 176.

39.     The *Delaware & Hudson Railway* court further held that "[o]nce a court is
satisfied that there is a sound business reason or an emergency justifying the pre-confirmation
sale, the court must also determine that the trustee has provided the interested parties with
adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser is
proceeding in good faith." *Id.*

40.     The Debtors have proposed the Sale of the Acquired Assets after thorough
consideration of all viable alternatives, and have concluded that the Sale is supported by a
number of sound business reasons.

41.     For the reasons noted above, the immediate Sale of the Acquired Assets is
supported by sound business reasons and is in the best interests of the Debtors and their estates.
Accordingly, the Debtors request approval under Bankruptcy Code section 363(b) of the Sale to
the Buyer.

### The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of Liens, Claims, and Interests

42.     Section 363(f) of the Bankruptcy Code provides:

The trustee may sell property under subsection (b) or (c) of this
section free and clear of any interest in such property of an entity
other than the estate, only if –

(1) applicable nonbankruptcy law permits sale of such property
free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in a bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

43.    Section 363(f) of the Bankruptcy Code provides for the sale of property "free and clear of any interests." The term "any interest," as used in section 363(f), is not defined anywhere in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 259 (3d Cir. 2000). In *Folger Adam*, the Third Circuit specifically addressed the scope of the term "any interest." 209 F.3d at 258. The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only *in rem* interests in property," the trend in modern cases is towards "a broader interpretation which includes other obligations that may flow from ownership of the property." *Id. at 258, citing 3 Collier on Bankruptcy 363.06*[1]. As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger Adam*, the scope of 11 U.S.C. § 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in *Folger Adam* stated that *Leckie* held that the debtors "could sell their assets under §363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

44.    Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Sale of the Acquired Assets free

and clear of the Interests (other than Assumed Liabilities). *See Citicorp Homeowners Services, Inc. v. Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988). The Debtors submit that each Interest satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such Interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto. The Debtors accordingly request authority to convey the Acquired Assets to the Buyer, free and clear of all Interests except for the Assumed Liabilities, with such Interests to attach to the proceeds of the Sale with the same validity (or invalidity), priority and perfection as existed immediately prior to the Sale. Payment of sale proceeds shall be applied pursuant to the Interim DIP Order at Closing.

45.     The Debtors are informed and believe that their senior secured lenders either have consented or will consent to the Sale. *See* 11 U.S.C. § 365(f)(2). Accordingly, this Court should approve the Sale of the Acquired Assets to the Buyer free and clear of Interests under Bankruptcy Code section 363(f) (except for Assumed Liabilities), and any potential claimants should be compelled to look exclusively to the proceeds of the Sale for satisfaction of their claims.

**H.    Good Faith Under Section 363(m) of the Bankruptcy Code**

46.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the

appeal, unless such authorization and such sale or lease were
stayed pending appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith", the Third Circuit

in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986) has held that:

> [t]he requirement that a purchaser act in good faith . . . speaks to
> the integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a purchaser's good
> faith status at a judicial sale involves fraud, collusion between the
> purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

47.    The Purchase Agreement was a negotiated, arm's-length transaction, in

which the Buyer has acted in good faith and in compliance with the *Abbotts Dairies* standards.

The Debtors thus request that the Court find that the Buyer has purchased the Acquired Assets in

good faith within the meaning of section 363(m) of the Bankruptcy Code.

## I.    Authorization of Assumption and Assignment of Assumed Executory Contracts

48.    As required by the Purchase Agreement, the Debtors request approval of

the assumption and assignment of the Assumed Executory Contracts to the Buyer upon the

Closing of the transactions contemplated under the Purchase Agreement.

49.    At the Closing, the Debtors intend to assume and assign to the Buyer

certain of the executory contracts and unexpired leases identified as the Assumed Executory

Contracts under the Purchase Agreement, as set forth in the Purchase Agreement.  In addition,

the Purchase Agreement provides for the potential assumption and assignment of additional

Assumed Executory Contracts after the Closing.

50.    The Debtors will serve the Sale Motion and the proposed cure notice,
substantially the form of Exhibit D to the Bid Procedures Motion (the "Cure Notices") on each
counterparty to an Assumed Executory Contract. The Cure Notice will identify the amounts, if
any, that the Debtors believe are owed to each counterparty to an Assumed Executory Contract
in order to cure any defaults that exist under such contract (the "Cure Costs"). If a contract or
lease is assumed and assigned pursuant to the Bankruptcy Court's order approving same, then
unless the affected counterparty properly files and serves an objection to the Cure Costs
contained in the Cure Notice, the counterparty will receive at the time of the Closing (or as soon
as reasonably practicable thereafter), the Cure Costs as set forth in the Cure Notice, with
payment made pursuant to the terms of the Purchase Agreement. If an objection is filed by a
counterparty to an Assumed Executory Contract, the Debtors propose that such objection must
set forth a specific default in any executory contract or unexpired lease and claim a specific
monetary amount that differs from the amount (if any) specified by the Debtors in the Cure
Notice or, alternatively, state why the counterparty believes any Cure Cost is owing.

51.    Pursuant to the terms of the Purchase Agreement, the Buyer shall be
exclusively responsible for payment of Cure Costs with respect to any Assumed Executory
Contract under the Purchase Agreement. The Buyer shall be responsible for satisfying any
requirements regarding adequate assurances of future performance that may be imposed under
section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any
Assumed Executory Contracts. The Debtors propose that the Court make its determinations
concerning adequate assurance of future performance under the Assumed Executory Contracts

pursuant to 11 U.S.C. § 365(b) at the Sale Hearing for those contracts to be assumed/assigned at Closing.

52.    Except to the extent otherwise provided in the Purchase Agreement, subject to the payment of any Cure Costs and any applicable Assumed Liabilities, the assignee of an Assumed Executory Contracts will not be subject to any liability to the assigned contract counterparty that accrued or arose before the closing date of the Sale of the Acquired Assets and the Debtors shall be relieved of all liability accruing or arising thereafter pursuant to 11 U.S.C. § 365(k).

53.    If any counterparty objects for any reason to the assumption and assignment of an Assumed Executory Contract, the Debtors propose that the counterparty must file any such objection by no later than (i) three (3) days prior to the Sale Hearing or (ii) the date otherwise specified in the Cure Notice (or, alternatively, the date set forth in the motion to assume such Assumed Executory Contract if such contract is to be assumed and assigned after the Sale Hearing).

54.    The Debtors further request that the Sale Order provide that the Assumed Executory Contracts will be assigned to, and remain in full force and effect for the benefit of the Buyer, notwithstanding any provisions in the Assumed Executory Contracts, including those described in sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code, that prohibit such assignment.

55.    Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –

> (A)    the trustee assumes such contract or lease in accordance
> with the provisions of this section; and
>
> (B)    adequate assurance of future performance by the assignee
> of such contract or lease is provided, whether or not there has been
> a default in such contract or lease.

11 U.S.C. § 365(f)(2). Under section 365(a), a debtor, "subject to the court's approval, may

assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or

executory contract of a debtor, providing that:

> (b)(1)  If there has been a default in an executory contract or
> unexpired lease of the debtor, the trustee may not assume such
> contract or lease unless, at the time of assumption of such contract
> or lease, the trustee --
>
> (A) cures, or provides adequate assurance that the trustee will
> promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee
> will promptly compensate, a party other than the debtor to such
> contract or lease, for any actual pecuniary loss to such party
> resulting from such default; and
>
> (C) provides adequate assurance of future performance under such
> contract or lease.

11 U.S.C. § 365(b)(1).

56.    Although section 365 of the Bankruptcy Code does not set forth standards

for courts to apply in determining whether to approve a debtor in possession's decision to

assume an executory contract, courts have consistently applied a "business judgment" test when

reviewing such a decision. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St.

Paul & Pacific Railroad Co.*, 318 U.S. 523, 550 (1953); *Matter of Talco, Inc.*, 558 F.2d 1369,

1173 (10th Cir. 1977). A debtor satisfies the "business judgment" test when it determines, in

good faith, that assumption of an executory contract will benefit the estate and the unsecured

creditors. *In re FCX, Inc.*, 60 B.R. 405, 411 (Bankr. E.D. N.Y. 1986). The assumption and

assignment of the Assumed Executory Contracts, or any of them, set forth in the Purchase

Agreement, will be a necessary part of the deal that the Debtors have struck with the Buyer and,

as stated above, will benefit the Debtors' estates.

57.    As set forth above, with respect to Assumed Executory Contracts to be

assumed and assigned pursuant to the Sale, the Debtors will send the Cure Notices, as entered by

the Court, to all counterparties to the Assumed Executory Contracts (the "Counterparties"). The

Cure Notices serve to notify such Counterparties of the potential assumption by applicable

Debtors and assignment to the Buyer of the Assumed Executory Contracts. The Cure Notices set

forth the "cure" amounts owing on each of the Assumed Executory Contracts according to the

Debtors' books and records.

58.    The Counterparties will have sufficient opportunity to file an objection to

the proposed cure amounts set forth in the Cure Notices. To the extent no objection is filed with

regard to a particular cure amount, such cure amount shall be binding on the applicable contract

or lease Counterparty. The payment of the cure amounts specified in the Cure Notices (or a

different amount either agreed to by the Debtors, the Buyer, and the Counterparties or resolved

by the Court as a result of a timely-filed objection filed by a contract or lease Counterparty) will

be in full and final satisfaction of all obligations to cure defaults and compensate the

Counterparties for any pecuniary losses under such contracts or leases pursuant to section

365(b)(1) of the Bankruptcy Code, unless the Debtors determine that a particular lease or

contract is not truly executory, and does not need to be cured to transfer the Acquired Assets to the Buyer.

59.      As set forth in the Purchase Agreement, the Buyer (or the Successful Bidder), is responsible for providing evidence of "adequate assurances of future performance" to the extent required in connection with the assumption and assignment of any Assumed Executory Contracts.  The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989).  *See also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985).  If necessary, the Buyer or the Successful Bidder shall provide evidence of its ability to provide adequate assurance to Counterparties.

## Notice

60.      Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known:  (i) the United States Trustee for the District of Delaware; and (ii) counsel to the DIP Lenders and the Senior Notes Agent.  As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered with respect to the Motion as required by Del. Bankr. LR

9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

62. The Debtors submit that the notice that it has provided and intends to provide of this Sale Motion and the Sale Hearing is reasonable and appropriate and should be approved by this Court as adequate and sufficient notice.

62. The Debtors request, pursuant to Bankruptcy Rules 6004(g) and 6006(d), that the order approving this Sale Motion become effective immediately upon its entry.

### Conclusion

63. The Debtors' proposed Sale of the Acquired Assets as described in this Sale Motion, including the assumption and assignment of the Assumed Executory Contracts, is supported by sound business reasons, as set forth herein.  The Sale is proper, necessary and serves the best interests of the Debtors, their estates and creditors and all parties in interest.  The Debtors thus request that the Court approve the proposed Sale of the Acquired Assets free and clear of all interests, liens, claims, and encumbrances including successor liabilities, but excluding Assumed Liabilities, as requested, including, without limitation, the assumption and assignment of the Assumed Executory Contracts, to the Buyer.

### No Prior Request

64. No prior request for the relief sought in this Sale Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court: (i) grant this Sale Motion and authorize the Sale of the Acquired Assets to the Buyer and approve the proposed Purchase Agreement in substantially the form attached to this Sale Motion, pursuant to the proposed order submitted herewith; (ii) approve the assumption and assignment of the Assumed Executory Contracts in accordance with the Purchase Agreement; (iii) approve the form and manner of notice of this Sale Motion, and of the proposed Sale and assumptions and assignments; and (iv) grant such other and further relief as is just and proper.

Dated: September 11 , 2012

PACHULSKI STANG ZIEHL & JONES LLP

Debra I. Grassgreen (CA Bar No. 169978)
Robert J. Feinstein (NY Bar No. RF-2836)
Timothy P. Cairns (DE Bar No. 4228)
Maria A. Bove
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email: dgrassgreen@pszjlaw.com
       rfeinstein@pszjlaw.com
       tcairns@pszjlaw.com
       mbove@pszjlaw.com

[Proposed] Counsel to the Debtors and Debtors in Possession