IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>DIGITAL DOMAIN MEDIA GROUP, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No.: 12-12568 (___)<br><br>(Joint Administration Requested) |

### MOTION OF DEBTORS FOR AN ORDER
### (A) APPROVING PROCEDURES FOR SALE OF ASSETS; (B) SCHEDULING AUCTION AND HEARING TO CONSIDER APPROVAL OF SALE AND ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (C) APPROVING FORMS OF NOTICE; AND (D) GRANTING RELATED RELIEF

The above captioned debtors and debtors in possession (collectively, the "Debtors"), hereby file this Motion (the "Bid Procedures Motion") with this Court for entry of an order (the "Bid Procedures Order") (a) approving bid procedures and certain overbid protections with respect to the sale of certain of the Debtors' assets to VFX Holdings, LLC (the "Buyer"), including the acquisition of substantially all of the assets of Debtor Digital Domain Media Group, Inc. ("DDMG") and its subsidiaries, the Debtors' rights to receive amounts owed to them from the motion pictures *Titanic* and *Ender's Game*, as well as the other assets set forth in the Purchase Agreement (the "Assets"), all as set forth in that certain *Asset Purchase Agreement*, dated as of September 10, 2012 (the "Purchase Agreement"), executed by and between DDMG

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal or foreign taxpayer identification number, if any, are as follows: D2 Software, Inc. (5602); DDH Land Holdings, LLC; DDH Land Holdings II, LLC; Digital Domain (8392); Digital Domain Institute, Inc. (6275); Digital Domain International, Inc. (9344); Digital Domain Media Group, Inc. (9505); Digital Domain Productions, Inc. (5757); Digital Domain Productions (Vancouver) Ltd. (6450); Digital Domain Stereo Group, Inc. (4526); Digital Domain Tactical, Inc. (6809); Mothership Media, Inc. (2113); Tradition Studios, Inc. (4883); Tembo Productions, Inc. (7634). The Debtors' mailing address is 10250 SW Village Parkway, Port St. Lucie, Florida 34987.

and certain of its subsidiaries, on the one hand, and the Buyer and Searchlight Capital, L.P.,

solely with respect to Article 14 of the Purchase Agreement, on the other hand.; (b) scheduling

an auction and a hearing to consider approval of the sale of the Assets, including the assumption

and assignment of certain executory contracts and unexpired leases in connection therewith (the

"Sale Hearing"); (c) approving certain break-up fee and expense reimbursement provisions; (d)

approving forms of notice; and (e) granting related relief.  A copy of the Purchase Agreement is

attached hereto as **Exhibit A**.  In support of this Bid Procedures Motion, the Debtors respectfully

state as follows:

### Jurisdiction

1.       This Court has jurisdiction over this Bid Procedures Motion pursuant to 28

U.S.C. §§ 157 and 1334.  This proceeding is a core proceeding within the meaning of 28 U.S.C.

§§ 157(b)(2)(A), (M), (N) and (O).

2.       Venue of these proceedings and this Bid Procedures Motion is proper in

this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.       The statutory predicates for the relief sought herein are sections 105, 363,

365, 1107 and 1108 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"),

Rules 2002(a)(2), 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Rules 2002-1(b) and 9006-1 of the Local Rules of Bankruptcy Practice

and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules").

## The Need for the Immediate Sale of the Assets

4.    The Debtors acknowledge (and are prepared to put on testimony and provide evidence at a hearing) that the proposed sale procedures they are asking this Court to approve contemplate a very quick sale of the Assets to be sold.  However, as set forth below, the Debtors believe that under the unique circumstances of this case, the immediate approval of these sale procedures is the only way to save nearly 700 jobs in the United States and Canada and preserve the value of their business.

5.    The Debtors' Florida studio was shut down prepetition.  The Debtors' remaining business -- headquartered in California and Vancouver, Canada -- provide digital content services to a small number of motion picture studios to whom the Debtors deliver special effects of feature films, commercials, and other productions.  As set forth in the Katzenstein Declaration, the Debtors' provision of digital content production services for feature films comprises the largest component of their business and is responsible for approximately 80% of the Debtors' revenues.

6.    The film studios with whom the Debtors currently have arrangements (collectively, the "Studios") are dependent upon the Debtors to provide continuous work on ongoing films that cost tens and sometimes hundreds of millions of dollars to produce prior to carefully selected release dates, such that any actual or threatened interruption to the delivery of work product by the Debtors – such as by virtue of the Debtors' ongoing severe liquidity problems – would have potentially devastating and certainly very costly financial impact.  As a result of the Debtors' well publicized financial setbacks, a number of Studios for whom the

Debtors are currently providing digital production services (under, in some cases, at-will arrangements) have made repeated demands that the Debtors provide them with <u>immediate</u> assurances of the Debtors' financial ability to perform on these arrangements.  Given the costs and disruption associated with a cessation of the Debtors' business operations, as set forth in the Katzenstein Declaration, if immediate assurance that the Debtors can fulfill their obligations throughout the production schedule for the films is not provided, there is a material risk that the Studios will immediately pull their work from the Debtors and find alternative digital production suppliers in order to ensure that their films and other projects are not interrupted.  This dynamic is the predicate for the urgent nature of the relief requested.  A more protracted sale process and the attendant uncertainty about the future of the Debtors' business would run the material risk that the value of the Debtors' business would be eroded, if not completely destroyed, if Studios re-sourced their work to other providers absent immediate demonstration that the Debtors' business will be carried on by a well-capitalized purchaser.

7.      Also contributing to the urgency of the situation, the Debtors' secured lenders (collectively, the "<u>Initial Senior Noteholders</u>") have indicated that they will not continue to fund the Debtors' business other than for a short period of time in chapter 11 in order to bridge the proposed sale, based on the same risk of erosion in value that would stem from the Studios' pull-out if they were not made comfortable immediately about the continuity of work on their films and other projects.

8.      Thus, approval of the proposed sale procedures is essential to avoid the risk of losing the Studios' confidence and business and the re-sourcing of their projects to digital

content competitors. The Debtors are aware that certain of their competitors are actively

soliciting the Debtors' clients for projects on which the Debtors are currently working. In short,

the only way to avoid the loss of the Debtors' enterprise value and preserve over 700 jobs is to

foster the sale of the Debtors' assets immediately to a credit-worthy new owner and to complete

the Debtors' obligations on these Studio projects. Notwithstanding the abbreviated sale

timetable these circumstances permit, the Debtors have concluded that the only way to avoid a

disastrous outcome is to effectuate the sale of the Assets to the Buyer, subject to higher and

better offers, in a highly expedited sale process.

        9.     The Buyer is an established and well-known player in a small, tight-knit

and highly competitive industry and has long standing relationships with the Studios. As a result

of these connections, the Buyer is particularly well-positioned to address any concerns about the

Debtors' ability to fulfill their responsibilities under their current arrangements. Indeed, several

current senior members of the Buyer have preexisting and extensive relationships with key

executives at the same Studios with whom the Debtors conduct business. Thus, the Debtors have

been advised that if the Studios know that this Buyer will immediately acquire the Debtors'

assets, they will likely be persuaded that the Debtors will have the wherewithal to timely provide

the necessary production services to the Studios. As noted above, all of the Studios have already

raised serious concerns about the Debtors' financial viability and their ability to complete the

requirements under the existing contracts. The Studios will not delay the completion of the films

and the projects on which the Debtors are currently working to wait several weeks to see if the

Debtors will be able to consummate a sale on a more standard time frame. To do so would

prevent the Studios from opening these films on their planned release dates. Rather, the Studios will likely immediately attempt to terminate their arrangements with the Debtors and line up alternative suppliers in order to avoid any risks or delays with respect to the completion of the projects on which the Debtors are presently providing services.

10.     The loss of existing and future projects for the Studios would effectively end the Debtors' ability to continue operations because they would be forced to immediately shut down their operations, resulting in the loss of substantially all of Debtors' revenues and approximately 700 jobs. The only way for the Debtors to continue their operations and to maintain the commitment of the Studios to continue to do business with the Debtors is to approve the immediate sale of the Assets to the Buyer.

### Background

11.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and a motion to procedurally consolidate their chapter 11 cases (the "Chapter 11 Cases") for administrative purposes only. The Debtors are continuing to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner and no official committee of creditors has been appointed in these Chapter 11 Cases.

### Business Operations

12.     DDMG leverages its expertise in digital visual effects ("VFX") and computer-generated ("CG") animation across a group of interrelated businesses. At its

foundation is Digital Domain Productions, Inc. ("DDP"), an award-winning digital production company founded in 1993. DDP, as a leading provider of visuals, has contributed to more than ninety (90) major motion pictures, including *Titanic*, the *Transformers* series, *Pirates of the Caribbean: At World's End*, and *TRON: Legacy*. Mothership Media, Inc. ("Mothership"), a DDP subsidiary, focuses on creating advertising, entertainment, and branded content, from concept to completion, across multiple media platforms, and recently created the virtual likeness of rapper Tupac Shakur at the Coachella Valley Music Festival.

13.    As part of its prepetition initiative to refocus its resources on its core business in California and Vancouver, on September 7, 2012, the Company began the cessation of its Port St. Lucie operations by reducing virtually its entire Port St. Lucie workforce, retaining approximately 20 employees.[2] The Digital Domain Institute ("DDI"), based in West Palm Beach, continues to operate.

14.    The Company and its employees have been recognized with numerous film industry awards and nominations, including seven awards issued by the Academy of Motion Picture Arts and Sciences -- three Academy Awards® for *Best Visual Effects* and four awards for *Scientific and Technical Achievement*. The Company also participates as a co-producer in major productions and is currently co-producing the upcoming live-action sci-fi feature film *Ender's Game*, as well as virtual likenesses for Elvis Presley that will be jointly owned by CORE Media Group and DDMG. The Company also holds several patents with respect to the conversion of two-dimensional (2D) imagery to three-dimensional (3D) imagery. Prior to the Petition Date,

---

[2]  In addition, on September 7, 2012, John C. Textor resigned from his positions as Chief Executive Officer and Chairman of the Board of Directors of DDMG and from all other positions as officer and director of DDMG's subsidiaries.

the Company also applied its CG expertise to convert existing and newly made films from 2D to 3D, and to produce an original, family-friendly animated feature film at its subsidiary Tradition Studios, Inc. ("Tradition Studios").

15.    DDI, the Company's education subsidiary, has a public-private partnership with The Florida State University College of Motion Picture Arts ("FSU").

16.    DDP operates out of Los Angeles, San Francisco, and Vancouver and DDI operates its educational institute in West Palm Beach. DDMG has a global VFX production partnership in India and China and arrangements that may lead to establishing studios in Abu Dhabi.

## Corporate Structure

17.    Digital Domain, DDP, and D2 Software, Inc. ("D2 Software") are incorporated under the laws of the State of Delaware. DDMG, DDI, DDH Land Holdings, LLC, DDH Land Holdings II, LLC, Digital Domain Stereo Group, Inc. ("DDSG"), Digital Domain International, Inc., Digital Domain Tactical, Inc., and Tradition Studios are incorporated under the laws of the State of Florida. Mothership is incorporated under the laws of the State of California. Digital Domain Productions (Vancouver) Ltd. ("DDP Vancouver") is organized under the laws of British Columbia, Canada. A chart setting forth the Debtors' corporate structure is attached as Exhibit A to this declaration.

18.    As indicated on Exhibit A, DDMG is the direct parent of nine (9) wholly-owned subsidiaries. DDMG's indirect subsidiaries, Mothership, D2 Software, Digital Domain Productions (Sydney) Pty Ltd. (a non-debtor), and DDP Vancouver are wholly owned by DDP,

which itself is wholly owned by Digital Domain.  DDMG owns an 86.9% interest in DDP.  The

remaining 13.1% interest in Digital Domain is owned by various minority shareholders.

**Domestic Business Operations**

19.     Prior to the Petition Date, the Company consisted of three core business

segments:  (i) digital production; (ii) animated feature film production; and (iii) education.  On

September 7, 2012, with the termination of substantially all employees who worked at Tradition

Studios, the Debtors effectively exited the business of producing original animated feature films.

**B.     Digital Production**

20.     The Company is one of the leading digital production companies, offering

its clients innovative, end-to-end solutions across multiple media platforms spanning the entire

content production process from idea generation and pre-production to design, directing, live-

action production, and post-production.  The Company has two key digital production business

units: DDP -- VFX for feature films and advertising; and Mothership -- digital advertising and

marketing solutions.  Until September 7, 2012, with the termination of substantially all its

employees who worked at Tradition Studios, DDSG engaged in the creation and conversion of

3D content.

a.     **Digital Domain Productions**

21.     DDP provides digital content production services for feature films and

commercials and currently represents the largest component of the Company's business.

Through DDP, the Company is one of the largest end-to-end providers of digital content

production services in the entertainment industry.  DDP also runs a leading-edge virtual

production studio which combines virtual cinematography, award-winning facial animation and capture, Simulcam, and one of the largest motion capture sound stages in the world. Services of the studio are available not only to Digital Domain feature film, advertising and videogame clients, but to outside projects as well.

22.     In the feature film realm, DDP typically is hired by a major motion picture studio, often at the recommendation of a producer or director, to provide digital effects for a film project in the development stage.  DDP's revenues from a large feature film project range in size from several million dollars to more than $70 million, and such projects can take from as short as three months to more than two years to complete.  In the advertising realm, DDP typically is hired by an advertising production company, advertising agency, brand directly, videogame developer or videogame distributor, to provide digital visual effects for advertising and videogame projects.

23.     Recently, the Company has leveraged its role as a provider of visual effects for live-action feature film projects of major film studios and leading filmmakers to co-produce *Ender's Game*, a large-scale live-action feature film. The Company invested in the film's overall production budget and is also creating digital visual effects for the film.

b.     **Mothership**

24.     Mothership is the Company's digital advertising and marketing business, founded in 2010, which provides end-to-end creative services focused on the development, creation, production and implementation of marketing solutions for brand advertisers, advertising agency clients, videogame developers, videogame distributors and entertainment companies.

Mothership's in-house talent and creative teams include directors, designers, writers, strategists, digital artists and technologists. Mothership creates content across multiple media platforms, referred to as "cross-platform" advertising, which includes television, online, print, mobile, and other forms of interactive media. It is currently working with CORE Media to create and co-own virtual likenesses of Elvis Presley, and created the "virtual Tupac" performance for Dr. Dre that garnered worldwide attention for this completely new form of entertainment.

> c.  **Digital Domain Stereo Group**

> 25.   The Company formed DDSG in November 2010 to acquire the business of In-Three, Inc., the pioneer of proprietary Dimensionalization® solutions for the conversion of 2D content into high quality 3D stereo imagery, including the patents and proprietary technology related thereto. The Company's Dimensionalization® solutions were used in 3D work on *Transformers: Dark of the Moon*, *The Smurfs*, *Alice in Wonderland*, and *G-Force*. The Company's cessation of its Port St. Lucie operations includes those of DDSG, but as of the Petition Date the Company continues to provide limited 2D to 3D conversion capabilities to studios as part of its operations in California.

**C.  Animation**

> a.  **Tradition Studios**

> 26.   The Company created Tradition Studios, a feature film animation studio, to focus on the development of original full-length, family-oriented CG animated feature films. As described above, immediately prior to the Petition Date, the Company began the cessation of its Port St. Lucie operations, including those of Tradition Studios.

D.    **Education**

    a.    **Digital Domain Institute**

       27.    In October 2010, the Company founded DDI, a for-profit post-secondary educational institution, in partnership with FSU.  In April 2011, the Company entered into agreements with FSU establishing a first-of-its-kind public-private education partnership whereby DDI graduates will receive fully-accredited four-year Bachelor of Fine Arts degrees from FSU.  Working closely with FSU's College of Motion Picture Arts and the Florida Department of Education, the Company designed a curriculum for DDI that is intended to produce workforce-ready graduates possessing both traditional motion picture arts and state-of-the-art technical animation and VFX skills.  DDI commenced the first classes for its Digital Arts Essential Skills Program in the first calendar quarter of 2012.

       28.    To assist with the establishment of DDI, in December 2010, the City of West Palm Beach granted the Company (i) title to approximately 2.5 acres of land for DDI's headquarters and primary campus facility (the "DDI Campus"), conditioned on development of the property, and (ii) a $10 million cash grant (discussed more fully below).  Located on the primary thoroughfare into downtown West Palm Beach, the DDI Campus is intended to house (i) FSU's new degree program in Animation and Digital Arts, (ii) a working digital production facility, (iii) FSU's Torchlight Program (which focuses on post-production film marketing), and (iv) FSU's "applied digital media research center," which will pursue government and industry funded digital media research.  DDI recently entered into a lease for temporary space adjacent to

the DDI Campus to temporarily house FSU's Torchlight Program and DDI's first class of students.

## International Operations

### A.    China - Digital Domain-Galloping Horse Studio Joint Venture

29.    On March 30, 2012, DDMG entered into a joint venture agreement with Beijing Galloping Horse Film Co., Ltd. ("GH"), pursuant to which DDMG and GH have agreed to form a joint venture company for the purpose of creating, owning and operating a VFX studio to be located in China (the "China Studio").

30.    Pursuant to the joint venture agreement, GH is to fund construction of the China Studio, in an amount not to exceed $50,000,000, and DDMG is to (i) grant to the joint venture an exclusive, royalty-free license to use the Company's VFX intellectual property rights and (ii) design and supervise the build-out of the China Studio.

### B.    India and Abu Dhabi - Joint Marketing VFX Services Agreement

31.    On July 8, 2011, DDP entered into a three-year joint marketing agreement (the "Joint Marketing Agreement") with RelianceMediaWorks Limited ("RMW"), a film and entertainment services company headquartered in Mumbai, India, pursuant to which RMW is responsible for creating and staffing studio facilities in both Mumbai and London for use by DDP.

32.    On August 1, 2012, RMW and DDP revised the Joint Marketing Agreement to include a contract for RMW to train Indian VFX professionals to staff the new production studio that DDMG is developing in Abu Dhabi.  Additionally, under the revised Joint

Marketing Agreement, RMW licensed DDMG's technology patents covering 2D-to-3D

conversion for $3.2 million.

### C.     Vancouver Operations

33.     In January 2010, DDP Vancouver opened a 30,000 sq. ft. digital

production studio in Vancouver, British Columbia, which is integrated with the Company's Los

Angeles-based production facility.

### Relief Requested

34.     Pursuant to this Bid Procedures Motion, the Debtors request that the

Court, among other things:

a.     approve the proposed bid procedures (the "Bid Procedures"), including the

overbid provisions and the procedures in connection with the Auction (as defined below),

attached hereto as Exhibit B;

b.     approve the Buyer's status as the stalking horse purchaser and approve (i) the

requested break-up fee in the amount of $375,000 (or approximately 2.5% of the proposed

$15,000,000 purchase price (the "Break-Up Fee")) pursuant to the terms of the Purchase

Agreement, and (ii) the requested expense reimbursement of up to $375,000 (the "Expense

Reimbursement" and, together with the Break-Up Fee, the "Bid Protections") pursuant to the

terms of the Purchase Agreement;[3]

---

[3] The Buyer and certain Lender Parties (as such term is defined in the Bid Procedures) have reached an agreement in
principle (subject to definitive documentation) under which such Lending Parties have agreed that, in the event
the Buyer is entitled to payment of any Bid Protections in accordance with the Purchase Agreement and the Bid
Procedures Order, such Lender Parties shall collectively pay to the Buyer the aggregate amount of $750,000 (such
payments being in addition to the proceeds of the Sale to another Bidder that Buyer will receive on account of its
Bid Protections), which amount shall serve to defray the substantial cost that the Buyer has incurred in negotiating
and documenting the Purchase Agreement and related documents on an expedited basis.

c.      establish a date for holding the auction (the "Auction");

d.      schedule the Sale Hearing to approve the sale transaction(s) to the Buyer or to such other party proposing the highest and best offer for the Assets (the "Successful Bidder") and establishing deadlines for objections and responses to the relief requested in the Sale Motion;

e.      approve the procedures set forth herein for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (the "Cure Procedures"); and

f.      approve the form and manner of notice to be served upon certain parties, including: (i) the notice of the Sale Motion, the Bid Procedures, the Auction, and the Sale Hearing, substantially in the form attached hereto as Exhibit C (the "Sale and Bid Procedures Notice"), to be served on all known creditors of the Debtors; and (iii) the *Notice to Counterparties to Executory Contracts and Unexpired Leases That May Be Assumed and Assigned* to parties holding executory contracts or unexpired leases to be assumed and assigned to the Buyer pursuant to the Purchase Agreement, in substantially the form attached hereto as **Exhibit D** (the "Cure Notice").

## Bid Procedures

35.      The Debtors propose to sell the Assets in accordance with the Bid Procedures.  Capitalized terms not defined herein have the meanings ascribed to such terms in the Bid Procedures.  The Debtors believe that the consummation of the Sale to the Buyer or to a successful overbidder, in accordance with the Bid Procedures, will provide their creditors and

other stakeholders with the best possible opportunity for maximizing value through a sale as a going concern.

### Approval of the Bid Protections Is Appropriate

36.    As indicated above, the Debtors hereby request that the Court approve the Bid Protections and Bid Procedures, as is customary in similar circumstances.  To compensate the Buyer for serving as the stalking horse bidder whose bid will be subject to higher or better offers, the Debtors seek approval of the Bid Protections in accordance with the terms of the Purchase Agreement.  The Debtors and the Buyer believe that the amounts of the Break-Up Fee and Expense Reimbursement are reasonable, given the benefits to the Debtors' estates of having a "stalking horse" bidder by virtue of the definitive asset purchase agreement with the Buyer, and the risk to the Buyer that a third-party offer may ultimately be accepted, and that approval of the Break-Up Fee and Expense Reimbursement under the terms of the Purchase Agreement are necessary to preserve and enhance the value of the Debtors' estates.  The Debtors believe that the agreement to pay the Bid Protections on the terms of the Purchase Agreement is necessary to induce the Buyer to enter into the transactions encompassed by the Purchase Agreement and thus to enable the Debtors to obtain the highest and best possible price for the Assets.

37.    The Bid Protections and the Bid Procedures are reasonably calculated to encourage a buyer to submit a final bid within the range of reasonably anticipated values.  The Buyer will be the stalking horse bidder and the Bid Protections and Bid Procedures will encourage competitive bidding, and will perhaps leading to further competition and the establishment of a baseline against which higher or otherwise better offers can be measured.

38.     Bidding incentives encourage a potential purchaser to invest the requisite time, money and effort to negotiate with the Debtors and perform the necessary due diligence attendant to the acquisition of the Debtors' assets, despite the inherent risks and uncertainties of the chapter 11 process. Historically, bankruptcy courts have approved bidding incentives similar to the Break-Up Fee and the Expense Reimbursement, under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).

39.     The Third Circuit has established standards for determining the appropriateness of bidding incentives in the bankruptcy context. In *Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999), the court held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Bankruptcy Code § 503(b) govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some benefit to the Debtors' estates. *See id.* at 533.

40.     The *O'Brien* court identified at least two instances in which bidding incentives may provide benefit to an estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second,

where the availability of bidding incentives induces a bidder to research the value a debtor's

assets and submit a bid that serves as a minimum or floor bid on which other bidders can rely,

"the bidder may have provided a benefit to the estate by increasing the likelihood that the price at

which the debtor is sold will reflect its true worth." *Id.*

42.    Whether evaluated under the "business judgment rule" or the Third

Circuit's "administrative expense" standard, the Break-Up Fee and Expense Reimbursement pass

muster.  The Purchase Agreement and the Debtors' agreement to pay the Break-Up Fee and

Expense Reimbursement pursuant to the terms thereunder are the product of good faith, arm's-

length negotiations between the Debtors and the Buyer.  The Break-Up Fee and Expense

Reimbursement are fair and reasonable in amount, and are reasonably intended to compensate

for the risk to the Buyer of being used as a stalking horse bidder.

42.    Further, the Break-Up Fee and Expense Reimbursement have already

encouraged competitive bidding in that the Buyer would not have entered into the Purchase

Agreement without these provisions.  The Break-Up Fee and Expense Reimbursement thus have

"induc[ed] a bid that otherwise would not have been made and without which bidding would [be]

limited." *O'Brien*, 181 F.3d at 537.  Similarly, the Buyer's offer provides a minimum bid on

which other bidders can rely, thereby "increasing the likelihood that the price at which the

[Property will be] sold will reflect [its] true worth." *Id.*

43.    Finally, the Bid Procedures are fair and reasonable procedures reasonably

intended to encourage competitive bidding, and the Break-Up Fee and the Expense

Reimbursement will permit the Debtors to insist that competing bids for the Assets, made in

accordance with the Bid Procedures, be materially higher or otherwise better than the Purchase

Agreement (or competing agreement), which is a clear benefit to the Debtors' estates.

44.    Furthermore, the Break-Up Fee and Expense Reimbursement, which at

maximum would total $750,000 of the Purchase Price under the Purchase Agreement, are within

the spectrum of termination fees approved by bankruptcy courts in chapter 11 cases. *See e.g., In*

*re Global Motorsport Group, Inc., et al.*, (Case No. 08-10192 (KJC) (Bankr. D. Del. February

14, 2008) (Court approved a break-up fee of approximately 4%, or $500,000 in connection with

sale); *In re Global Home Products*, Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006)

(Court approved a break-up fee of 3.3%, or $700,000, in connection with sale); *In re Ameriserve*,

Case No. 00-0358 (PJW) (Bankr. D. Del., September 27, 2000) (Court approved a break-up fee

of 3.64%, or $4,000,000, in connection with $110,000,000 sale); *In re Montgomery Ward*

*Holding Corp.*, et al., Case No. 97-1409 (PJW) (Bankr. D. Del., June 15, 1998) (Court approved

termination fee of 2.7%, or $3,000,000, in connection with $110,000,000 sale of real estate

assets); *In re Medlab, Inc.*, Case No, 97-1893 (PJW) (Bankr. D. Del. April 28, 1998) (Court

approved termination fee of 3.12%, or $250,000, in connection with $8,000,000 sale

transaction); *In re Anchor Container Corp. et al.*, Case Nos. 96-1434 and 96-1516 (PJW) (Bankr.

D. Del. Dec. 20, 1996) (Court approved termination fee of 2.43%, or $8,000,000, in connection

with $327,900,000 sale of substantially all of debtors' assets); *In re FoxMeyer Corp. et al.*, Case

No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr. D. Del., Oct. 9, 1996) (Court approved

termination fee of 7.47%, or $6,500,000, in connection with $87,000,000 sale of substantially all

of debtors' assets); *In re Edison Bros. Stores. Inc. et al.*, Case No. 95-1354 (PJW) (Bankr. D.

Del., Dec. 29, 1995) (Court approved termination fee of 3.5%, or $600,000, in connection with $17,000,000 sale of debtors' entertainment division); *In re NetEffect, Inc.*, Case No. 08-12008 (KJC) (Bankr. D. Del., Sept. 11, 2008) (Court approved break-up fee of 3%, or $240,000.00 in connection sale of debtor's assets for purchase price of $8,000,000); *In re Champion Enterprises, et al.*, Case No. 09-14019 (KG) (Bankr. D. Del., Feb. 8, 2010) (Court approved break-up fee of less than credit bid or $3,000,000.00 in connection with sale of debtor's assets for purchase price of approximately $80,000,000); *In re Filene's Basement, Inc., et al.*, Case No. 09-11525 (MFW) (Bankr. D. Del., May 15, 2009) (Court approved break-up fee and expense reimbursement of 3.68%, or $810,000 in connection with sale of debtor's assets for purchase price of $22,000,000); *In re Western Nonwovens, Inc.*, et al., Case No. 08-11435 (PJW) (Bankr. D. Del., July 28, 2009) (Court approved break-up fee and expense reimbursement or $250,000 in connection with sale of debtor's assets for purchase price of $4,000,000 to $6,500,000 purchase price); and *In re Point Blank Solutions, Inc., et al.*, Case No. 10-11255 (PJW) (Bankr. D. Del, Oct. 5, 2011) (Court approved break-up and expense reimbursement of 3.75% or $750,000 in connection with sale of debtor's assets for purchase price of $20,000,000).

### Procedures for the Assumption and Assignment of Assumed Executory Contracts

45.     As noted above, the Debtors may seek to assume and assign certain specified executory contracts and unexpired leases to be identified on Schedule 1.1(a) of the Purchase Agreement (the "Assumed Executory Contracts") as of the Closing as well the potential assumption and assignment of certain Assumed Executory Contracts after the Closing.[4]

---

[4] The inclusion of any agreement in the list of Assumed Executory Contracts does not constitute an admission by the Debtors that such agreement actually constitutes an executory contract or unexpired lease under section 365 of

For those Assumed Executory Contracts to be assumed and assigned at the Closing, the Successful Bidder may remove any executory contracts or unexpired leases from the list of Assumed Executory Contracts up until the Closing.  Pursuant to the written notice of the Buyer to the Sellers, which notice may be given from time to time, but not later than the 30th day after the Closing, each lease or contract designated as a "Designated Remaining Lease" or a "Designated Remaining Contract" and set forth, respectively, on Schedule 1.6(b) and 1.6(c) of the Purchase Agreement shall either be assumed by the applicable Debtor and assigned to the Buyer or, alternatively, not transferred to the Buyer and retained by the applicable Debtor.

46.    The Cure Notice referenced above shall identify the amounts, if any, that the Debtors believe are owed to each counterparty to an Assumed Executory Contract in order to cure any defaults that exist under such contract (the "Cure Amounts").  If a contract or lease is to be assumed and assigned pursuant to the Sale Order, then unless the counterparty to such contract or lease properly and timely files and serves an objection to the Cure Amounts contained in the Cure Notice, such counterparty shall receive at the time of the closing of the sale (or as soon as reasonably practicable thereafter), the Cure Amounts as set forth in the Cure Notice, if any, with payment to be made pursuant to the terms of the Purchase Agreement or such other agreement approved by the Bankruptcy Court at the Sale Hearing, as executed and delivered at the Closing.  If an objection is timely filed by a counterparty to an Assumed Executory Contract, the Debtors propose that such objection must set forth a specific default in

---

the Bankruptcy Code, and the Debtors expressly reserves the right to challenge the status of any agreement included in the list of Assumed Executory Contracts up until the time of the Sale Hearing.

the relevant executory contract or unexpired lease and claim a specific monetary amount that differs from the amount, if any, specified by the Debtors in the Cure Notice.

47.     If any counterparty objects for any reason to the assumption and assignment of an Assumed Executory Contract, the Debtors propose that the counterparty must file the objection by no later than (i) 4:00 p.m. prevailing Eastern time at least three (3) days before the date of the Sale Hearing, or (ii) the date otherwise specified in the Cure Notice if such contract is to be assumed and assigned after the Closing); *provided, however,* that any counterparty may raise at the Sale Hearing an objection to the assumption and assignment of its relevant Assumed Executory Contract solely with respect to the Successful Bidder's ability to provide adequate assurance of future performance under the Assumed Executory Contract.

48.     The Successful Bidder shall be responsible for satisfying any requirements regarding adequate assurance of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Executory Contract, as provided in the motion requesting Court approval of the Sale.  The Debtors propose that the Court make its determinations concerning adequate assurance of future performance under the Assumed Executory Contracts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing.  Cure Amounts disputed by any counterparty shall be resolved by the Court at the Sale Hearing (or at such later date for any Assumed Executory Contracts to be assumed and assigned after the Closing).

49.     Except to the extent otherwise provided in the Purchase Agreement with the Successful Bidder, the assignee of the Assumed Executory Contracts shall not be subject to

any liability to the assigned contract counterparty or lessor that accrued or arose before the

Closing date of the Sale of the Assets and the Debtors shall be relieved of all liability accruing or

arising thereafter pursuant to section 365(k) of the Bankruptcy Code.

## Sale Hearing

50.     At the Sale Hearing, pursuant to a separate motion to be filed concurrently

with this Bid Procedures Motion (the "Sale Motion"), the Debtors will seek entry of an order (the

"Sale Order"), *inter alia*, approving the Sale of the Assets to the Successful Bidder, free and

clear of all liens, claims and encumbrances pursuant to Bankruptcy Code section 363(b) (other

than permitted liens), with all liens, claims and encumbrances to attach to the proceeds of the

Sale with the same validity and in the same order of priority as they attached to the Assets prior

to the Sale, including the assumption by the applicable Debtors and assignment to the Successful

Bidder of the Assumed Executory Contracts pursuant to Bankruptcy Code section 365.  The

Debtors will present additional evidence, as necessary, at the Sale Hearing and submit that the

Sale is fair, reasonable and in the best interest of their estates.

## Notice of Sale Hearing

51.     The Debtors request that the Court approve the Sale and Bid Procedures

Notice, which the Debtors will serve on (i) the Office of the United States Trustee; (ii) counsel to

any committee of unsecured creditors that may be appointed; (iii) all parties known to be

asserting a lien on any of the Assets; (iv) any entities known to have expressed an interest in

acquiring any of the Assets; (v) counsel to the Buyer; (vi) all of the Debtors' known creditors

and (vii) all other parties that had filed a notice of appearance and demand for service of papers

in these bankruptcy cases under Bankruptcy Rule 9010(b) as of the date of entry of the Bid

Procedures Order.

52.     The Debtors propose to serve the Sale and Bid Procedures Notice within 1

(one) Business Day from the date of entry of an order granting the Bid Procedures Motion (the

"Bid Procedures Order"), by first-class mail, postage prepaid, on the appropriate parties.  The

Sale and Bid Procedures Notice will provide that any party that has not received a copy of the

Sale Motion or the Bid Procedures Order that wishes to obtain a copy of such documents may

make such a request, in writing, to Pachulski Stang Ziehl & Jones LLP, 150 California Street,

15th Floor, San Francisco, California 94111-4500 (Attn:  Debra I. Grassgreen and Joshua M.

Fried).

53.     The Debtors propose to serve the Cure Notice no later than 1 (one)

Business Day after entry of the order granting the Bid Procedures Motion[5] upon all

counterparties to executory contracts and unexpired leases that may be assumed and assigned at

the Sale Hearing as part of a sale of the Assets.

## Closing

54.     The closing of the Sale (the "Closing") shall take place in accordance with

the terms of the Purchase Agreement, or in accordance with the terms of such other agreement

approved by the Bankruptcy Court at the Sale Hearing, all in accordance with the Debtors'

---

[5] The Purchase Agreement also provides for the potential assumption of certain executory contracts and unexpired leases after the Closing.  The Debtors propose that the same Cure Notice be used with respect to any contracts to be assumed and assigned after the Closing on the same notice to be provided to the counterparties whose executory contracts and unexpired leases will be assumed at the Closing.

obligations and subject to the limitations set forth in the Interim DIP Order and DIP Term Sheet (as defined in the Initial DIP Order).[6]

55.    For the reasons set forth above, the Debtors respectfully request approval of: (a) the proposed Break-Up Fee and Expense Reimbursement; (b) the Bid Procedures for the conduct of overbidding, the Auction and selection of the Successful Bidder(s); (c) the Cure Procedures set forth herein for notice to counterparties under executory contracts and leases proposed to be assumed and assigned in connection with the proposed sale, and the determination and payment of Cure Amounts to those counterparties; (d) the scheduling of the Sale Hearing and other matters for which scheduling is requested herein; and (e) such other and related relief sought hereby.

### No Prior Request

56.    No prior request for the relief sought in this Bid Procedures Motion has been made to this or any other court.

### Notice

57.    Notice of this Bid Procedures Motion either has been or will be given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) counsel to any committee of unsecured creditors that may be appointed in these cases; (c) counsel to the Initial Senior Noteholders; and (d) all parties that have filed notices of appearance and requests for notices in the Cases. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

---

[6] The "Interim DIP Order" means that *Interim Order (I) Authorizing Debtors to Obtain Postpetition Financing and Use Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling Final Hearing, and (IV) Granting Certain Related Relief,* as entered by the Bankruptcy Court in these Chapter 11 Cases (the "Interim DIP Order").

**WHEREFORE**, the Debtors respectfully requests that the Court enter an order,

substantially in the form filed contemporaneously with this Bid Procedures Motion, granting the

relief requested herein and such other and further relief as this Court deems appropriate.

Dated:  September  11, 2012            PACHULSKI STANG ZIEHL & JONES LLP

_____
Debra I. Grassgreen (CA Bar No. 169978)
Robert J. Feinstein (NY Bar No. RF-2836)
Timothy P. Cairns (DE Bar No. 4228)
Maria A. Bove
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email: dgrassgreen@pszjlaw.com
         rfeinstein@pszjlaw.com
         tcairns@pszjlaw.com
         mbove@pszjlaw.com

[Proposed] Counsel to the Debtors and Debtors in
Possession