IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>DIGITAL DOMAIN MEDIA GROUP, INC., *et al.*,<br><br>Debtors. [1] | Chapter 11<br><br>Case No.: 12-12568 (BLS)<br><br>(Jointly Administered) |

## MOTION OF DEBTORS FOR ORDER
## (I) APPROVING SEPARATE SALES OF ASSETS FREE
## AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND
## OTHER INTERESTS, (II) ASSUMING AND ASSIGNING CERTAIN EXECUTORY
## CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors"),

hereby move this Court (this "Sale Motion") for entry of an Order (a) approving the separate

sales of the categories of the Debtors' assets (or any portion thereof) described below, free and

clear of all liens, claims, encumbrances and other interests pursuant to section 363 of title 11 of

the United States Code (the "Bankruptcy Code"); (b) assuming and assigning certain executory

contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code; and (c) granting

related relief.

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: D2 Software, Inc. (5602); DDH Land Holdings, LLC; DDH Land Holdings II, LLC; Digital Domain (8392); Digital Domain Institute, Inc. (6275); Digital Domain International, Inc. (9344); Digital Domain Media Group, Inc. (9505); Digital Domain Productions, Inc. (5757); Digital Domain Productions (Vancouver) Ltd.; Digital Domain Stereo Group, Inc. (4526); Digital Domain Tactical, Inc. (6809); Mothership Media, Inc. (2113); Tradition Studios, Inc. (4883); and Tembo Productions, Inc.. The Debtors' corporate headquarters is located at 10250 SW Village Parkway, Port St. Lucie, Florida 34987.

**Introduction**

1.      The Debtors propose to offer for sale[2] their interests in the following

assets:  (1) the Debtors' rights and  interests in the following works: *The Legend of Tembo*, *The*

*Art Project*, *Birds of a Feather*, and *The Lightning Catcher*, and related assets and intellectual

property rights (collectively, the "Tembo Assets"); (2) The Debtors' rights and interests in

Tradition Studios, which is a 115,000 square foot animation studio in Port St. Lucie Florida

("Tradition Studios"); (3) the Debtors' rights and interests in Digital Domain Institute, the

Debtors' for-profit post- secondary educational institution in partnership with Florida State

University (the "DDI "); (4) The Debtors' In-Three intellectual property assets related to the

conversion of two dimensional artwork to three dimensional artwork (the "IP Patents"); (5) all

remaining fixed assets owned by Digital Domain Media Group, Inc. and certain other Debtors

located within the state of Florida, including certain owned property in Port St. Lucie, Florida, as

well as other assets relating to the Debtors' joint ventures and other owned assets (the

"Remaining Assets").  The assets referred to in (1) through (5) of this paragraph are collectively

referred to as the  "Assets."[3]

2.      The Debtors have attached proposed forms of asset purchase agreements

for the sale of the Assets here to as **Exhibits A** and **B** (each, an "Agreement" and together, the

"Agreements").  The Debtors propose to separately sell the Tembo Assets, Tradition Studios,

DDI and the Remaining Assets, either by category or in groups of categories, substantially on the

terms of the proposed Agreement attached hereto as **Exhibit A**.  The Debtors propose to sell the

---

[2] The various categories assets that the Debtors seek to sell are more fully described below.

2

IP Patents substantially on the terms of the proposed Agreement attached hereto as **Exhibit B**, provided however that the Debtors reserve the ability to modify the forms of the proposed Agreements based on negotiations with potential acquirers of the Assets.  The Debtors are in the process of separately marketing each category of Assets to various potential purchasers and propose to conduct separate auctions for each category of Assets in order to obtain the highest and best bids for each Asset group .  The sale will be on an "as is," "where is," and "with all faults" basis.  The Debtors do not presently have a "stalking horse" buyer for any of the Assets.

### Jurisdiction

3.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of the Debtors' chapter 11 case and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The statutory predicates for the relief sought herein are sections 105(a), 363(b), 503(b)(1) and 503(c)(3) of title 11 of the United States Code (the "Bankruptcy Code").

### Background

5.     On September 11, 2012 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or an examiner in these chapter 11 cases.

6.     On September 18, 2012, the Office of the United States Trustee appointed the Committee.

7.    The Debtors and certain of their affiliates (collectively, the "Company") are leading providers of computer-generated imagery, animation and digital visual effects for major motion picture movie studios and advertisers, and also operate, in partnership with Florida State University, an educational institute offering programs in traditional motion picture arts and technical animation and special effects skills.  The Company, its work, and its employees have been recognized with numerous entertainment industry awards and nominations, including seven awards issued by the Academy of Motion Picture Arts and Sciences – three Academy Awards® for Best Visual Effects and four awards for Scientific and Technical Achievement.

8.    The factual background regarding the Debtors, including their current and historical business operations and the events precipitating their chapter 11 filings, is set forth in detail in the *Declaration of Michael Katzenstein in Support of First Day Motions*, filed on September 11, 2012 (the "Petition Date") and incorporated herein by reference.

9.    On the Petition Date, the Debtors filed their *Motion for an Order (I) Approving the Agreement of Sale and Authorizing the Sale of Substantially All of the Debtors' Assets; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests Pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* [Docket No. 16] (the "DDPI Sale Motion").  The DDPI Motion requested, *inter alia*, the sale of substantially all of the assets of Digital Domain Production, Inc. ("DDPI"), as well as the sale of certain assets owned by Digital Domain Media Group ("DDMG"), including, DDMG's computer-generated visual effects for major motion picture

4

studios and advertisers and ongoing projects, certain revenue streams arising from the motion

pictures *Titanic* and *Enders' Game*, and certain real property leases, equipment, executory

contracts and other assets as set forth in the DDPI Sale Motion (collectively, the "DDPI Assets").

Concurrently with the DDPI Sale Motion, the Debtors filed their *Motion an Order (A) Approving*

*Procedures for Sale of Assets (B) Scheduling Auction and Hearing to Consider Approval of Sale*

*and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C)*

*Approving Forms of Notice; and (D) Granting Related Relief* [Docket No. 17] (the "DDPI Bid

Procedures Motion").

       10.     The Court entered an order granting the DDPI Bid Procedures Motion on

September 12, 2012 [Docket No. 56] (the "DDPI Bid Procedures Order") and scheduled a

hearing to consider approval of the DDPI Sale Motion for September 24, 2012.  Pursuant to the

DDPI Bid Procedures Order, the Debtors scheduled an auction to consider higher and better bids

for the sale of the DDPI Assets, which auction took place on September 21, 2012.  After an

auction that spanned more than twelve hours, the Debtors determined that Galloping Horse

America, LLC ("GH") provided the highest and best bid for the DDPI Assets for a purchase

price of $30,200,000 plus payment of certain post closing operating expenses and the assumption

of certain liabilities.  On September 25, 2012, the Court entered an order [Docket No. 223] (the

"DDPI Sale Order") approving the DDPI Sale Motion and the sale of the DDPI Assets to GH.

The sale of the DDPI Assets to GH closed on September 27, 2012.

       11.     Following the closing of the sale of the DDPI Assets to GH, the Debtors

focused on selling their remaining assets, which consist substantially those Assets described

above.[4]  The Debtors' debtor in possession financing facility expires on December 11, 2012.

Therefore, the Debtors have requested approval of the proposed sale and auction procedures set

forth in the *Motion for an Order (A) Approving Procedures for Separate Sales of the Debtors'*

*Assets; (B) Scheduling Auction and Hearing to Consider Approval of Sale and Assumption and*

*assignment of Certain Executory Contracts and Unexpired Leases; (C) Approving Forms of*

*Notice; and (D) Granting Related Relief* (the "Bid Procedures Motion").  The Debtors hereby

request approval of the sales and approval of the various categories of Assets pursuant to

separate sale orders to be entered at a sale hearing to take place December 4, 2012, or as soon as

practicable thereafter, to the extent approved by the Court.  The Debtors are in the process of

marketing the Assets and will continue such marketing efforts pursuant to the timelines outlined

below.  The Debtors believe that this process will yield the highest and best sale prices for the

various categories of Assets in light of the aforementioned time constraints.

### Description of the Assets

12.    The Debtors' Assets that they proposed to sell are as follows[5]:

Tembo Assets

13.    The Tembo Assets consist of all of the Debtors' rights and interests (including

without limitation, all intellectual property rights) with regard to film projects *The Legend of*

---

[4] In addition, the Debtors may seek to sell of certain of their assets through the procedures outlined in their *Motion for the Entry of Order Approving Procedures for the Sale, Transfer and Abandonment of De Minimis Assets* [Docket No. 238] (the "De Minimus Sale Motion"), which assets would be sold pursuant to separate orders entered by the Court.

[5] The Debtors reserve their rights to withdraw this Sale Motion in their absolute discretion with respect any or all of the Assets for sale to the extent they determine that any offers received for any categories assets would not maximize the value of their estates.  In such case, the unsold category or categories of Assets shall remain property of the Debtors' estates and will be sold or disposed of through alternative means including, without limitation, separate sales pursuant to separately noticed sale motions or discrete sales of certain of the Assets pursuant to the De Minimus Sale Motion.

6

*Tembo*, *The Art Project*, *Birds of a Feather*, and *The Lightning Catcher*, including visual,

auditory, and written material (story board, computer images, etc.) developed and to be

developed excluding company software programs and applications.

Digital Domain Institute

14.    DDI is the Debtors' education subsidiary pursuant to a joint undertaking

with Florida State University College of Motion Picture Arts ("FSU").  DDI was founded in

October 2010 as a for profit post secondary educational institution in partnership with FSU

whereby DDI graduates would receive fully-accredited four-year Bachelor of Fine Arts degrees

from FSU.  Working closely with FSU's College of Motion Picture Arts and the Florida

Department of Education, the Company designed a curriculum for DDI that is intended to

produce workforce-ready graduates possessing both traditional motion picture arts and state-of-

the-art technical animation and VFX skills.  DDI commenced the first classes for its Digital Arts

Essential Skills Program in the first calendar quarter of 2012.

15.    To assist with the establishment of DDI, in December 2010, the City of West

Palm Beach granted the Company (i) title to approximately 2.5 acres of land for DDI's

headquarters and primary campus facility (the "DDI Campus"), conditioned on development of

the property, and (ii) a $10 million cash grant (discussed more fully below).  Located on the

primary thoroughfare into downtown West Palm Beach, the DDI Campus is intended to house

(i) FSU's new degree program in Animation and Digital Arts, (ii) a working digital production

facility, (iii) FSU's Torchlight Program (which focuses on post-production film marketing), and

(iv) FSU's "applied digital media research center," which will pursue government and industry

7

funded digital media research.  DDI recently entered into a lease for temporary space adjacent to the DDI Campus to temporarily house DDI's first class of students.

Tradition Studios

16.    The Debtors created Tradition Studios as a feature film animation studio to focus on the development of original full-length, family-oriented animated feature films. Tradition Studios is a purpose-built, 115,000 square foot animation studio in Port St. Lucie, Florida.  The building and a portion of the equipment are subject to capital lease with the City of Port St. Lucie, Florida.  The studio includes equipment and leasehold improvements with book value of $45 million, all of which was purchased in the last 3 years.

IP Patents

17.    The Debtors' six IP Patents, 2 patent applications and Dimensionalist Trademark (summarized in the tables below) are generally directed to the technology of converting two-dimensional image data to three-dimensional image data including systems, methods and processes.  In addition to protecting a wide variety of commonly used conversion tools, the In-Three patents protect delivery methods for and articles storing converted image data.  Each In-Three patent specifies a particular method or system for incorporating a perception of depth to existing two-dimensional images.  The incorporation of the depth feature enables resultant images to be viewed as three-dimensional images.

8

| Patent Number | Overview |
|---|---|
| 6,208,348 | System and method for dimensionalization processing of images in consideration of a predetermined image projection format |
| 6,515,659 | Method and system for creating realistic smooth three-dimensional depth contours from two-dimensional images |
| 6,686,926 | Image processing system and method for converting two-dimensional images into three-dimensional images |
| 7,102,633 | Method for conforming objects to a common depth perspective for converting two-dimensional images into three-dimensional images |
| 7,116,323 | Method of hidden surface reconstruction for creating accurate three-dimensional images converted from two-dimensional images |
| 7,116,324 | Method for minimizing visual artifacts converting two-dimensional motion pictures into three-dimensional motion pictures |

Patent Applications

| Patent Number | Overview |
|---|---|
| 20110043540 | A system and method for region classification of two-dimensional images for 2D-to-3D conversion of images to create stereoscopic images filed March 23, 2007. |
| 20090322860 | A system and method for model fitting and registration of objects for 2D-to-3D conversion of images to create stereoscopic images.  Filed November 17, 2006. |

Dimensionalist Trademark

| Overview |
|---|
| Used to trademark performing image processing services employing hardware and/or software to convert two-dimensional images into three-dimensional images, applied for by In-three Inc. on September 23, 2002. |

Remaining Assets

18.    The Debtors Remaining Assets consist primarily of assets owned or used by DDMG within the State of Florida, including an owned four acre parcel of real property in Port St. Lucie, Florida located at 10250 Southwest Village Parkway, Port Saint Lucie, FL; the Debtors' owned personal property, including all owned computer equipment, personal property and equipment that was not previously sold pursuant to the DDPI Sale Order located at Tradition Studios or at the DDI Facilities in Florida; the Debtors' joint venture agreement with

9

RelianceMediaWorks Limited ("RMW") to train Indian VFX professionals to staff a new production studio in Abu Dhabi, as well as other intellectual property assets.

<u>**Assumption and Assignment of Assumed Executory Contracts**</u>

19.    In accordance with the Agreements, and subject to, and at the time of, the closing of the sale of the Assets, the Debtors seek to assume and assign (to the extent applicable) to the purchaser of each category of Assets certain executory contracts and unexpired leases (collectively, the "<u>Assumed Executory Contracts</u>").

20.    The Debtors intend to serve this Sale Motion and the cure notice (the "<u>Cure Notice</u>"), substantially in the form approved by the Court pursuant the order (the "<u>Bid Procedures Order</u>") granting the Bid Procedures Motion, upon each counterparty to the Assumed Executory Contracts (each a "<u>Counterparty</u>").  Pursuant to the Bid Procedures Order, the Cure Notice shall state the date, time and place of the Sale Hearing as well as the date by which any objection to the assumption and assignment of Assumed Executory Contracts must be filed and served.  The Cure Notice also shall identify the amount, if any, that the Debtors believe is owed to each Counterparty to an Assumed Executory Contract in order to cure any defaults that exist under such contract (the "<u>Cure Amounts</u>").

<u>**Relief Requested**</u>

21.    By this Sale Motion, the Debtors request that this Court, among other things, (a) authorize the sale of each category of Assets to the proposed purchasers pursuant to the terms of the agreement governing the sales for each of the categories of Assets, free and clear of all liens, claims, encumbrances or other interests (including, without limitation, the DIP Liens

10

as defined in the Applicable DIP Order, and except for Assumed Liabilities under the express

terms of the Agreement) pursuant to sections 363(b), (f) and (m) and 365 of the Bankruptcy

Code, with such liens, claims, rights, interests and encumbrances (collectively, the "Interests") to

attach to the sale proceeds of the Assets with the same validity (or invalidity), force, priority,

effect and perfection as existed immediately prior to such sale; and (b) approve the assumption

and assignment of the Assumed Executory Contracts under section 365 of the Bankruptcy Code,

subject to, and at the time of, the closing under each of the Agreements.  Pursuant to Del. Bankr.

L.R. 6004-1(b)(ii), the Debtors' proposed order granting the relief requested herein (the "Sale

Order")[6] accompanies this Sale Motion.

### Basis for Relief

22.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after

notice and a hearing, may use, sell or lease, other than in the ordinary course of business,

property of the estate . . . ."  11 U.S.C. § 363(b)(1).  Section 105(a) provides in relevant part that

"[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry

out the provisions of this title."  11 U.S.C. § 105(a).

23.     A sale of the debtor's assets should be authorized pursuant to section 363

of the Bankruptcy Code if a sound business justification exists for doing so.  *See, e.g., Meyers v.*

*Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In*

*re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Pennsylvania, Inc.*,

788 F.2d 143 (3d Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir.

---

[6] The DIP Lenders have reserved all rights with respect to the final form of order.

11

1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Titusville Country Club*, 128 B.R.

396 (W.D. Pa. 1991); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991).

The *Delaware & Hudson Railway* court rejected the pre-Code "emergency" or "compelling

circumstances" standard, finding the "sound business purpose" standard applicable and,

discussing the requirements of that test under *McClung* and *Lionel*, observing:

> A non-exhaustive list of factors to consider in determining if there
> is a sound business purpose for the sale include:  the proportionate
> value of the asset to the estate as a whole; the amount of elapsed
> time since the filing; the likelihood that a plan of reorganization
> will be proposed and confirmed in the near future; the effect of the
> proposed disposition of the future plan of reorganization; the
> amount of proceeds to be obtained from the sale versus appraised
> values of the assets; and whether the asset is decreasing or
> increasing in value.

124 B.R. at 176.

> 24.     The *Delaware & Hudson Railway* court further held that "[o]nce a court is

satisfied that there is a sound business reason or an emergency justifying the pre-confirmation

sale, the court must also determine that the trustee has provided the interested parties with

adequate and reasonable notice, that the sale price is fair and reasonable and that the Successful

Bidder is proceeding in good faith." *Id.*

> 25.     The Debtors have proposed the sale of the Assets after thorough

consideration of all viable alternatives, having concluded that the sale is supported by a number

of sound business reasons.  The Debtors have limited debtor in possession funding to fund their

cases, which funding expires on December 11, 2012.  Thus, the Debtors must commence and

conclude the sale process for the Assets during this time frame.

26.     The Debtors believe that a sale has the potential to maximize value for all constituents.  The alternative to a sale is either a liquidation of the Debtors' assets, which result is likely to yield less value to creditors than the proposed sale, or no sale at all and the abandonment of the Assets.  Hence, the Debtors have determined that the proposed sale would provide the best and most efficient means for providing the highest return to the Debtors' creditors, during the limited time that the Debtors may operate, through a robust and aggressive sale process that would culminate and conclude at the Sale Hearing proposed to take place on December 4, 2012.

27.     As noted above, the Debtors are actively marketing the potential sale of the Assets and intend to continue these marketing efforts in order to obtain the highest and best offer for each category of Assets.  As a result of such marketing efforts and the proposed bid procedures, the Debtors believe that the purchasers' offers for the categories of Assets will be fully tested by the market and will constitute fair and reasonable consideration for the Assets.

28.     Based on the foregoing, the sale of the Assets is justified by sound business reasons and is in the best interests of the Debtors and their estates.  Accordingly, pursuant to section 363(b) of the Bankruptcy Code, the Debtors request approval of the sale to any Successful Bidder (or Back-Up Bidder) as set forth herein.

**The Asset Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of Liens, Claims, and Interests**

29.     Section 363(f) of the Bankruptcy Code provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –

13

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such Assets;

(4) such interest is in a bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

30.    As quoted above, section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests." The term "any interest," as used in section 363(f), is not defined anywhere in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 259 (3d Cir. 2000).

31.    In *Folger Adam*, the Third Circuit specifically addressed the scope of the term "any interest." 209 F.3d at 258. The court observed that while some courts have "narrowly interpreted that phrase to mean only *in rem* interests in property," the trend in modern cases is towards "a broader interpretation which includes other obligations that may flow from ownership of the property." *Id.* at 258 (citing 3 Collier on Bankruptcy 363.06[1]).

32.    As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger Adam*, the scope of 11 U.S.C. § 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in *Folger Adam* stated that *Leckie* held that the debtors "could sell their assets under §363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

14

33.    Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Assets free and clear of all Interests, except with respect to any Interests that may constitute assumed liabilities (the "Assumed Liabilities") under the Agreements.  *See Citicorp Homeowners Servs., Inc. v. Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988).

34.    The Debtors submit that each of the Interests that is not an Assumed Liability satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such Interest will be adequately protected by either being paid in full at the time of closing of the various sales under the Agreements, or by having it attach to the net proceeds of the sale, subject to any claims and defenses the Debtors may possess with respect thereto.  The Debtors propose to sell or transfer the Assets in a commercially reasonable manner that will maximize value, and expect the value of the proceeds from such sale to fairly reflect the value of the Assets.  The Debtors accordingly request authority to convey the Assets to the purchasers thereof, free and clear of all Interests (except for the Interests that are Assumed Liabilities under the express terms of the Agreement), with such Interests to attach to the proceeds of the sale, with the same validity (or invalidity), priority and perfection as existed immediately prior to the sale.

35.    The Debtors anticipate that their secured lenders will affirmatively consent to the sale of their collateral (which will satisfy 11 U.S.C. § 365(f)(2)).

**Good Faith Under Section 363(m) of the Bankruptcy Code**

36.    Section 363(m) of the Bankruptcy Code provides:

15

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

37.    While the Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986), has stated:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

38.    Here, the Debtors intend to make an appropriate showing at the Sale Hearing that the Agreement with any purchaser is the result of a negotiated, arm's-length transaction, in which such bidder at all times acted in good faith under the standard set forth in *Abbotts Dairies*. The Debtors will request that the Court find that the proposed purchaser of each of the Assets will be purchasing such Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

**Authorization of Assumption and Assignment of the Assumed Executory Contracts**

39.    As required by each Agreement, and in order to enhance the value to the Debtors' estates, the Debtors request approval of the assumption and assignment of the Assumed Executory Contracts to the various purchasers of the Assets subject to, and at the time of, the Closing of the transactions contemplated under each of the Agreements.

16

40.    The Assumed Executory Contracts are those contracts or leases that are to be assumed by the Debtors and assigned to any purchaser as part of the sale transactions under the Agreements.  The Debtors request that the Sale Order provide that the Assumed Executory Contracts will be assigned to, and remain in full force and effect for the benefit of the purchasers of the Assets, notwithstanding any provisions in the Assumed Executory Contracts that prohibit such assignment, including those described in sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code.

41.    Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

The trustee may assign an executory contract or unexpired lease of the debtor only if –

(A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

42.    Under section 365(a) of the Bankruptcy Code, a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

(b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee --

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

43.     Although section 365 of the Bankruptcy Code does not set forth standards for courts to apply in determining whether to approve a debtor in possession's decision to assume an executory contract, it is well established that the decision to assume or reject an executory contract or unexpired lease is a matter within the "business judgment" of the debtor. *See In re Taylor*, 913 F.2d 102 (3d Cir. 1990); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36 (3d Cir. 1989). Accordingly, assumption or rejection of any executory contract is appropriate where the assumption or rejection would benefit the estate. *Sharon Steel*, 872 F.2d at 40.

44.     The assumption and assignment of the Assumed Executory Contracts may be a necessary part of the Agreement and, as stated above, will benefit the Debtors' estates.

45.     The Debtors will send the Cure Notices to all Counterparties in accordance with the Bid Procedures Order, notifying such Counterparties of the potential assumption by the Debtors and assignment to each of the purchasers of the Assumed Executory Contracts at the Sale Hearing. The Cure Notices set forth the "cure" amounts, if any, owing on each of the Assumed Executory Contracts, according to the Debtors' books and records.

46.     Counterparties to the Assumed Executory Contracts will have sufficient opportunity to file an objection to the proposed cure amounts set forth in the Cure Notices. To

18

the extent no objection is filed with regard to a particular cure amount, such cure amount shall be

binding on the applicable contract or lease counterparty.  The payment of the cure amounts

specified in the Cure Notices (or a different amount either agreed to by the Debtors or resolved

by the Court as a result of a timely-filed objection filed by a contract or lease counterparty) will

be in full and final satisfaction of all obligations to cure defaults and compensate the

counterparties for any pecuniary losses under such contracts or leases pursuant to section

365(b)(1) of the Bankruptcy Code, unless the Debtors determine that a particular lease or

contract is not truly executory, and does not need to be cured to transfer the Assets to the

Successful Bidder or, alternatively, the Successful Bidder subsequently elects not to have any

Assumed Executory Contract assumed or assigned to it prior to the Closing.

47.    The purchasers of each of the categories of the Assets will each be solely

responsible for providing evidence of "adequate assurance of future performance" to the extent

required in connection with the assumption and assignment of any Assumed Executory Contract.

The meaning of "adequate assurance of future performance" for the purpose of the assumption of

executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code

depends on the facts and circumstances of each case, but should be given "practical, pragmatic

construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538

(Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985)

(adequate assurance of future performance does not mean an absolute assurance that debtor will

thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill.

1985).  If necessary, the purchasers of each of the categories of Assets will provide evidence of

19

their ability to provide adequate assurance to Counterparties to the Assumed Executory Contracts at the Sale Hearing.

## Notice

48.     The Debtors have served, or will serve, this Sale Motion and the Notice of Sale Motion on:  (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) counsel to the DIP Lenders; (iii) counsel to the DIP Agent and Senior Notes Agent; (vi) proposed counsel for the Committee; and (vii) those parties who have requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

49.     The Debtors have served, or will serve, the Notice of Auction and Sale Hearing, as proposed in the Bid Procedures Motion, on the Debtors' known creditors.

50.     The Debtors submit that the notice of this Sale Motion is reasonable and appropriate and should be approved by this Court as adequate and sufficient notice.

51.     The Debtors request, pursuant to Bankruptcy Rules 6004(g) and 6006(d), that the order approving this Sale Motion become effective immediately upon its entry.

### Conclusion

52.     The Debtors' proposed sale of the Assets as described in this Sale Motion, including the assumption and assignment of the Assumed Executory Contracts, is supported by sound business reasons, as set forth herein.  The proposed sale is proper, necessary and serves the best interests of the Debtors, their estates, their creditors and all parties in interest.  The Debtors thus request that the Court approve the proposed sale of the Assets free and clear of all interests, liens, claims, and encumbrances including successor liabilities (including, without limitation, the DIP Liens as defined in the Applicable DIP Order, but excluding Assumed Liabilities under the express terms of the Agreement), as requested, including, without limitation, the assumption and assignment of the Assumed Executory Contracts, to the Successful Bidder or Back-Up Bidder.

### No Prior Request

53.     No prior request for the relief sought in this Sale Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Sale Motion and authorize the sale of the categories of the Assets to the purchasers of each such category of Assets; (ii) approve the assumption and assignment of the Assumed Executory Contracts in accordance with the Agreement and the Sale Procedures Order entered by the Court; and (iii) grant such other and further relief as is just and proper.

Dated:  October 16, 2012

PACHULSKI STANG ZIEHL & JONES LLP

Debra I. Grassgreen (CA Bar No. 169978)
Robert J. Feinstein (NY Bar No. RF-2836)
Timothy P. Cairns (DE Bar No. 4228)
Maria A. Bove
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email: dgrassgreen@pszjlaw.com
       rfeinstein@pszjlaw.com
       tcairns@pszjlaw.com
       mbove@pszjlaw.com

[Proposed] Counsel to the Debtors and Debtors in Possession

DOCS_SF:81510.4 00000-001