IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re **DDMG Estate**, *et al*., Debtors. | ) Chapter 11 ) ) Case No.: 12-12568 (BLS) ) ) **Doc. Ref. Nos. 290 and 291** ) |

**LIMITED OBJECTION AND RESERVATION OF RIGHTS OF
THE DISNEY ENTITIES TO THE DEBTORS' MOTIONS TO APPROVE
SALE PROCEDURES AND SEPARATE SALES OF ASSETS**

Walt Disney Studios Motion Picture Production ("**Disney Studios**") and certain of its affiliates (the "**Disney Entities**") hereby object and reserve all of their rights and remedies (the "**Limited Objection**") to (1) Debtors' Motion for an Order (A) Approving Procedures for Separate Sales of Assets, (B) Scheduling Auction and Hearing to Consider Approval of Sale and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (C) Approving Forms of Notice, and (D) Granting Related Relief [Docket No. 290] (the "**Sale Procedures Motion**"); and (2) Debtors' Motion for Order (I) Approving Separate Sales of Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (II) Assuming and Assigning Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief [Docket No. 291] (the "**Sale Motion**"). In support of this Limited Objection, the Disney Entities respectfully represent as follows:

**I.    BACKGROUND**

1. On September 11, 2012 (the "**Petition Date**"), Debtors filed their voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"). Debtors thereafter sold substantially all of their California and Vancouver assets (the "**Asset Sale**") to Galloping Horse America, LLC (the "**Asset Buyer**") in accordance with an Asset Purchase Agreement between the Asset Buyer and Debtors, dated as of September 24, 2012. The Disney Entities filed a limited objection regarding certain agreements included in the

Asset Sale, which was resolved consensually with Debtors and the Asset Buyer. The Asset Sale closed on September 27, 2012, subject to a sale order that included protective language for the Disney Entities' rights under these agreements.

2. Pursuant to the pending Sale Procedures Motion and Sale Motion, Debtors have now requested approval of sale procedures and authority to sell, among other things, the intellectual property assets originally held by In Three, Inc. ("**In Three**") (an entity acquired prepetition by Debtors) related to the conversion of two dimensional artwork to three dimensional artwork (the "**In Three Patents**") in a separate sale (the "**Patent Sale**") to a buyer who has not yet been identified (the "**Patent Buyer**").

3. The Disney Entities are parties to a number of agreements with Debtors or In Three as their predecessor in interest that are potentially affected by the Patent Sale, including, but not limited to: (1) an agreement dated as of April 18, 2008 (the "**G-Force Agreement**") between Acceleration Productions, Inc. and In Three in connection with the *G-Force* motion picture; (2) an agreement dated as of August 14, 2009 (the "**Alice in Wonderland Agreement**") between Bandersnatch Productions, Inc. and In Three in connection with the *Alice in Wonderland* motion picture; and (3) certain agreements entered into in 2008 and 2009 between Grid Productions, Inc. and Digital Domain Productions, Inc. ("**DDP**") in connection with the *TRON: Legacy* motion picture (the "**TRON Agreements**," and collectively with the G-Force Agreement and the Alice in Wonderland Agreement, the "**Production Agreements**").[1] Pursuant to the Production Agreements, Debtors agreed to provide those certain visual special effects ("**VFX**") services requested by Disney for the motion pictures covered thereby (collectively, the "**Works**").

4. The Production Agreements all grant non-exclusive, fully paid, royalty-free licenses to the Disney Entities to use all or any portion of the intellectual property of In Three or

---

[1] The Production Agreements all contain confidentiality clauses and certain confidential commercially sensitive information, and therefore are not attached to this Limited Objection. Debtors should already have copies of the Production Agreements, but the Disney Entities are willing to submit the Production Agreements under seal, at the appropriate time, if requested to do so.

DDP that has been incorporated into the Works, for the purpose of distributing, displaying, or otherwise exploiting the Works (collectively, the "**Limited Licenses**").  The Production Agreements also include substantially similar covenants by In Three or DDP not to challenge in any forum the Disney Entities' rights to exploit the Works and not to thwart, hinder, or subvert the Disney Entities' use of the Limited Licenses (collectively, the "covenant not to sue rights" or "**CNTS Rights**").

5. The G-Force Agreement includes an additional provision granting the Disney Entities the right to an unlimited, non-exclusive, perpetual worldwide license to use the In Three Patents in exchange for a fee to be negotiated between the parties in good faith on a most-favored-nation basis (the "**In Three Patent Rights**").  In Three or its successor was required to grant the license (the "**In Three Patent License**") within thirty days of a request by the Disney Entities for the In Three Patent License.  Section 16(b) of the G-Force Agreement provides:

> Producer or any of its Affiliates [the Disney Entities]… may, in its sole discretion, request from Company a license under the Company IP [the In Three Patents].  Within thirty (30) days of receiving such request, Company shall grant to such entity a non-exclusive, transferable (but only to an Affiliate), non-sublicensable, irrevocable, perpetual, worldwide license to make, have made, use, sell, offer for sale, and import any product and perform any method under the Company IP at a fee to be negotiated by the parties in good faith in accordance with then-current industry standards, provided that such fee shall not exceed the lowest license fee provided by Company to any third party. . . . [I]n the event that Company seeks to sell, assign or transfer any of the Company IP, or its interest in any of the Company IP to a third party, Company shall provide prompt written notice to Producer not less than sixty (60) days prior to the completion of such sale, assignment, or transfer, and Producer or its Affiliates may thereafter obtain a license under the same terms set forth herein.  Other than as stated herein, the foregoing shall not be deemed to restrict or prohibit Company from selling, assigning or otherwise transferring the Company IP.

The only material term of the In Three Patent License not specified in this provision was the amount of the royalty fee.  However, the requirement that "such fee shall not exceed the lowest license fee provided by Company to any third party" (the "most-favored-nation" or "**MFN Clause**") effectively established that missing term.  As other unlimited, non-exclusive, perpetual worldwide licenses in the In Three Patents have been granted to other parties on a royalty-free

basis (such as Prime Focus World and Industrial Light and Magic, as discussed in greater detail below), the Disney Entities were entitled to the In Three Patent License on the same royalty-free terms. Thus, the fee did not need to be negotiated; the In Three License was required to be royalty-free.

6. As provided in Section 16(b), any sale or transfer of the In Three Patents remains subject to the Disney Entities' In Three Patent Rights and any In Three Patent License granted thereunder.

7. Section 16(a) of the G-Force Agreement also includes CNTS Rights.

8. Pursuant to Section 16(d), the Disney Entities' IP Patent Rights and CNTS Rights both expressly survive the expiration or termination of the G-Force Agreement. Pursuant to Section 19, the G-Force Agreement is binding upon In Three's successors and assignees.

9. After DDP acquired In Three and the In Three Patents in November 2010, the Disney Entities decided that they wanted to exercise their In Three Patent Rights and receive the In Three Patent License to which they were entitled. Declaration of Robert Faulkner (the "**Faulkner Declaration**") ¶ 2, filed contemporaneously with this Limited Objection. Commencing in December 2011, in-house counsel at Disney Studios and DDP began discussions regarding DDP's obligation under the G-Force Agreement, as In Three's assignee, to grant the In Three Patent License. Faulkner Declaration ¶ 3. Even though the G-Force Agreement is binding by its express terms on any successor in interest, DDP took the position that it had purchased only In Three's assets, and disputed that it was bound by the licensing obligations and CNTS Rights provided in the G-Force Agreement. Id.

10. To resolve this dispute, in January 2012, DDP's General Counsel acknowledged in a conversation with Disney Studios' Principal Counsel that, without conceding Disney's contention that DDP was obligated to do so, DDP intended to honor the "spirit" of the G-Force Agreement in granting the In Three Patent License and honoring the CNTS Rights. Faulkner Declaration ¶ 4. DDP also later acknowledged that it would grant Disney the In Three Patent License on a royalty-free basis, which would have been required anyway by operation of the

MFN Clause, under the circumstances. Id. However, DDP was only willing to end this dispute once Disney Studios agreed to discuss the possibility of retaining DDP for the VFX work on the motion picture *Maleficent*. Id. On this basis, the parties proceeded with further discussions regarding the agreement memorializing the In Three Patent License (the "**License Agreement**"), including negotiations between Paul Shurgot of Disney Studios and John Textor, then the CEO of DDP. Id. Ultimately, and notwithstanding the fact that it was not entitled to extract such additional consideration because the G-Force Agreement bound DDP to grant the In Three Patent License on a royalty-free basis, the Disney Entities paid DDP approximately $3.8 million prior to the Petition Date on account of the *Maleficent* project; *i.e.*, revenues resulting in large part from DDP's commitment to settle the dispute and grant the In Three Patent License. Id.

11. As the product of the negotiations between Disney and DDP, on May 18, 2012, Disney Studios sent a draft form of the License Agreement to DDP for review and comment. Faulkner Declaration ¶ 6; a true and correct copy of the May 18, 2012 email correspondence between Disney Studios and DDP is attached as Exhibit A to the Faulkner Declaration. Taken together with the discussions and negotiations between the parties, the transmittal of the draft License Agreement was, at the latest, Disney Studios' formal request for the In Three License (the "**Request**").

12. Prior to the Petition Date and after the *Maleficent* project was underway, Disney Studios and Debtors exchanged drafts and comments to memorialize the License Agreement, the substantive terms having already been specified by the G-Force Agreement in light of the effect of the MFN Clause. Faulkner Declaration ¶ 7; Exhibit B. The Disney Entities were informed and believed that Debtors had previously granted a non-exclusive, royalty free license in the In Three Patents to, among others, Prime Focus World, and that In Three had granted a royalty free license to Industrial Light and Magic. Id. Although all material terms were already established by operation of Section 16(b) of the G-Force Agreement, the License Agreement was not itself executed before the Petition Date. Id.

13. The Disney Entities contend that, notwithstanding DDP's failure to execute the License Agreement before filing this Case, the grant of the In Three Patent License was effective on the 31st day after the Request, namely, on June 19, 2012, almost three months before the Petition Date, as no particular form of documentation is required to effectuate a grant of a patent license under applicable nonbankruptcy patent law. The Disney Entities do not oppose the proposed sale of the In Three Patents, provided that their Limited Licenses, the CNTS Rights, the In Three Patent License, and the In Three Patent Rights to continue to use the In Three Patents are preserved in the orders entered in connection with the Sale Procedures Motion and the Sale Motion. The Disney Entities reserve all rights to submit a further response to the Sale Motion.

## II. ARGUMENT

14. Pursuant to Bankruptcy Code § 365(n), the Disney Entities are entitled to retain all of their rights pursuant to the Limited Licenses, the CNTS Rights, the In Three Patent License, and the In Three Patent Rights to continue to use the In Three Patents and to treat the Request for the License Agreement as a license granted on a royalty-free basis, regardless of whether the In Three Patents are sold or transferred and regardless of whether the Production Agreements are assumed, assigned, rejected or otherwise deemed terminated.

### A. THE LIMITED LICENSES ARE PROTECTED BY §365(n)

15. Section 365(n) gives a party with intellectual property rights granted in a rejected contract the right to retain its rights as they existed as of the petition date. The Limited Licenses squarely fall into this protected category and provide the Disney Entities with unambiguous, non-exclusive licenses to use incorporated intellectual property to exploit the Works. For example, Section 7(b) of the G-Force Agreement provides that:

> To the extent any Company Technology is incorporated into (or is necessary for the use or other exploitation of) the Work or any element thereof at the time of final delivery of the Work (the "Incorporated Company Technology"), Company hereby grants to Producer and its "Affiliates" (as defined below) a perpetual, irrevocable, fully paid-up, royalty-free, worldwide right and license to reproduce, distribute, display, perform, modify and otherwise use and exploit (including by means of making derivative works of

the Incorporated Company Technology as embedded in the Work) all or any portion of the Incorporated Company Technology in connection with displaying, developing, enhancing, marketing, distributing or providing, maintaining, supporting, or otherwise using or exploiting the Work.

Section 6(b) of the Alice in Wonderland Agreement contains this same language, and section 5(b of each of the Tron Agreements contains similar language:

> To the extent any Company IP is incorporated into (or is necessary for the use or other exploitation of) the Work or any element thereof at the time of final delivery of the Work (the "Incorporated Company Technology"), Company hereby grants to Producer and its "Affiliates" (as defined below) a perpetual, irrevocable, fully paid-up, royalty-free, worldwide right and license to reproduce, modify and otherwise use and exploit (including by means of making derivative works of the Company IP as embedded in the Work) all or any portion of such incorporated Company IP in connection with developing, enhancing, marketing, distributing or providing, maintaining, supporting, or otherwise using or exploiting the Work or any products and services incorporating the Work in any form or media (now known or hereafter devised).

Such licenses are standard in the industry, and without them, the Disney Entities would be severely restricted in their ability to display or distribute the Works without risking an infringement challenge. Presumably, every other producer who has incorporated some element of the In Three Patents in its motion pictures or other works has also been granted similar limited licenses. Such limited licenses should be recognized and protected by any order approving the Sale Procedures Motion (the "**Sale Procedures Order**") and the Patent Sale (the "**Sale Order**"). The Sale Order should provide that the Patent Sale is subject to, not "free and clear" of, the Limited Licenses and other similar limited licenses.

### B. THE CNTS RIGHTS ARE ALSO PROTECTED BY §365(n)

16. All of the Production Agreements include CNTS Rights in substantially similar form protecting the Disney Entities from potentially unauthorized use of the In Three Patents by a third party supplier. For example, Section 16(a) of the G-Force Agreement provides:

> Company and its Affiliates agree that they will not pursue any claim or cause of action or otherwise assert any Company IP (as defined below) [the In Three Patents] against Producer, its Affiliates or any of their respective customers, agents and distributors (collectively, the "Producer Parties") based on work for any of the Producer Parties by a third party vendor. Such agreement does not restrict Company's right to pursue a claim or cause of action against a third party for services performed by such third party for the

> Producer Parties; provided, however, Company and its Affiliates agree that they will not pursue any claim or cause of action or otherwise assert any Company IP against such third party entity which might interrupt such third party entity's services to or on behalf of the Producer Parties.

The Alice in Wonderland Agreement (at section 6(a)) and Tron Agreements (at section 7(a)) similarly provide:

> Company further hereby agrees that it will not seek (1) to challenge, through the courts, administrative governmental bodies, private organizations, or in any manner the rights of Producer to exploit the Work by any means whatsoever, or (2) to thwart, hinder or subvert the intent of the grants and conveyances to Producer herein and/or the collection by Producer of any proceeds relating to the rights conveyed hereunder.

These kinds of provisions are standard in the industry. Presumably, every other producer who has incorporated some element of the In Three Patents in its motion pictures or other works has also been granted similar covenants not to sue.

17. Pursuant to applicable patent law, such covenants not to sue are generally deemed equivalent to non-exclusive licenses, and therefore are similarly subject to protection under § 365(n). The United States Court of Appeals for the Federal Circuit (which exercises exclusive jurisdiction over patent appeals) and its predecessors have consistently held that "a nonexclusive patent license is equivalent to a covenant not to sue." TransCore, LP v. Elec. Transaction Consultants Corp., 563 F.3d 1271, 1275 (Fed. Cir. 2009). Because a patent is not an affirmative right to make, use, or sell anything, but instead a limited right to exclude others from making, using or selling the thing patented, "a patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee." Id. (quoting Spindelfabrik Suessen–Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, 829 F.2d 1075, 1081 (Fed. Cir. 1987)); see also U.S. Philips Corp. v. Int'l Trade Comm'n, 424 F.3d 1179, 1189 (Fed. Cir. 2005) ("A nonexclusive patent license is simply a promise not to sue for infringement."); Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir. 2004) ("This license is, in essence, a licensor's covenant not to sue the licensee.").

18.     The District of Delaware recently followed this established line of patent authority to hold that a covenant not to sue was equivalent to a non-exclusive license that could be retained by election under § 365(n).  See In re Spansion Inc., 2011 WL 3268084 (D. Del. July 28, 2011), appeal docketed, No. 1:10-CV-00252 (3d Cir. Aug. 25, 2011).  Prior to filing for bankruptcy, Spansion litigated a patent infringement action against Apple Computer before the International Trade Commission.  The parties entered into a settlement agreement that provided "Spansion is willing to dismiss the ITC action against Apple, and will not re-file the ITC action or another action related to one or more of the same patents against Apple, in consideration for" Apple's agreement to keep Spansion as a supplier for current products and consider it for future products.  Id. at *1-2.  After executing the settlement agreement and before dismissing the ITC action, Spansion commenced a Chapter 11 case.  In July 2009, Bankruptcy Judge Carey granted Spansion's motion to reject the settlement agreement so it could continue to sue Apple.  Id. at *2.  Apple moved pursuant to § 365(n) to retain its rights under the covenant not to sue, which the Bankruptcy Court denied.  On appeal, District Judge Kugler concluded that a covenant not to sue is a license because "the Federal Circuit has 'on numerous occasions explained that a non-exclusive patent license is equivalent to a covenant not to sue.'"  Id. at *6 (quoting TransCore, 563 F.3d at 1275).  The District Court explained that no "special language is required to create a patent license" and that the settlement agreement's "clear language demonstrates that the parties entered into a valid contract by exchanging promises to act or refrain from acting."  Id.[2]

19.     The CNTS Rights and similar rights granted by DDP and its predecessors should be recognized and protected by the Sale Procedures Order and the Sale Order.  Both Orders should expressly provide that the Patent Sale will be subject to, not "free and clear" of, the CNTS Rights.

---

[2] Spansion is currently appealing the District Court decision.  The docket indicates that oral argument, if necessary, is calendared for November 2012.

### C. THE IN THREE PATENT LICENSE AND IN THREE PATENT RIGHTS ARE ALSO ENTITLED TO PROTECTION UNDER § 365(n)

20.     More than three months before the Petition Date (at the latest), the Disney Entities invoked the In Three Patent Rights in their Request for the granting of the In Three Patent License.  Under principles of patent law and the terms of the G-Force Agreement, the In Three Patent License has effectively been granted, and is thus a patent license entitled to the protection of §365(n).  To the extent that the In Three Patent License were to be deemed not yet granted, the In Three Patent Rights are nevertheless sufficiently of the same character as the CNTS Rights and the Limited Licenses as to entitle them to the protections of §365(n).

21.     Pursuant to Section 16(b) of the G-Force Agreement, the terms of the grant of the license embodied in the In Three Patent Rights were fully specified therein.  The grant became fully effective 30 days after the Request, subject only to determination of the amount of the royalty fees on a most-favored-nation basis.  Intervening licenses had been granted on a royalty-free basis, so that one remaining term was already determined by operation of the MFN Clause at the time of the May 18, 2012 Request.  Notwithstanding the fact that Disney provided additional consideration for the In Three Patent License in the form of the new work on *Maleficent*, because the G-Force Agreement bound DDP to grant the In Three Patent License, the royalty-free license was thus effective on June 19, 2012.

22.     The execution of the License Agreement was not required to effectuate that grant under the circumstances.  As held in Spansion, no "special language is required to create a patent license" and that settlement agreement's "clear language demonstrates that the parties entered into a valid contract by exchanging promises to act or refrain from acting."  Spansion at *7; see also, e.g., De Forest Radio Tel. Co. v. United States, 273 U.S. 236, 241 (1927) ("No formal granting of a [patent] license is necessary in order to give it effect.  Any language used by the owner of the patent, or any conduct on his part exhibited to another from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license . . . .");  .  Under the circumstances here, execution

of the formal License Agreement would have merely served to memorialize, in conventional form, the terms of the In Three Patent License to avoid any later disputes.

23. The Request should be treated as having given rise to a valid, non-exclusive license pursuant to the terms set forth in Section 16(b) of the G-Force Agreement, in light of the MFN Clause. Upon the Disney Entities' exercise of their right to request the In Three Patent License, DDP as In Three's successor was required to grant the IP Patent License within thirty days, having no discretion apart from negotiating the license fee in good faith but bound by the MFN Clause here. No further action by DDP was required under the circumstances to make the license effective, although formal documentation was fully negotiated by the parties prepetition.

24. As a matter of California contract law, which governs the interpretation of the G-Force Agreement, once the Request was made, DDP should be held to be bound to grant the In Three Patent License, and that license should now be deemed given. An option is considered a unilateral contract that binds the optionor (In Three/DDP) on the exercise of the option by the optionee (the Disney Entities). Stated differently, an option is an irrevocable offer that the optionee can convert into a binding bilateral contract by acceptance of the offer, *i.e.*, exercise of the option. The optionor has a binding duty to keep the option open on the making of the option contract. The optionee has no duty until, and unless, it exercises the option. See Palo Alto Town & Country Village v. BBTC Co., 521 P.2d 1097, 1102-03 (Cal. 1974) (real property lease included option to extend term that was effective upon written notice; as an option is an irrevocable offer which the optionee can convert into a binding bilateral contract by acceptance of the offer, tenant's notice of acceptance by ordinary mail was held to be valid exercise of option, binding landlord to the extended term). Here the Disney Entities' Request bound Debtors to grant the IP Patent License, which grant was effective 30 days thereafter, 115 days before the Petition Date.

25. The In Three Patent License and, alternatively, should the license itself not be deemed to have been granted, the In Three Patent Rights, granted by DDP and its predecessors should be recognized and protected by the Sale Procedures Order and the Sale Order. Both

Orders should expressly provide that the Patent Sale will be subject to, not "free and clear" of, the In Three Patent License and/or the In Three Patent Rights.

## CONCLUSION

Based on the foregoing, the Disney Entities respectfully object on a limited basis to the Sale Procedures Motion and on a limited and preliminary basis to the Sale Motion, and reserve all rights with respect to both motions. The Disney Entities respectfully request that (a) the order approving the Sale Procedures Motion expressly provide that nothing therein shall be deemed adversely to affect the Disney Entities' Limited Licenses, CNTS Rights, In Three Patent License, and In Three Patent Rights in any manner, and (b) any order approving the Sale Motion expressly provide that that the Patent Sale is subject to the Disney Entities' Limited Licenses, CNTS Rights, In Three Patent License, and In Three Patent Rights, as rights protected under § 365(n).

Dated: October 30, 2012

POTTER ANDERSON & CORROON LLP

/s/ R. Stephen McNeill
Theresa V. Brown-Edwards (DE Bar No.4225)
R. Stephen McNeill (DE Bar No. 5710)
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000

And

ARNOLD & PORTER LLP
Lisa Hill Fenning (California SBN 89238)
Harry E. Garner (California SBN 254942)
777 South Figueroa Street, 44th Floor
Los Angeles, CA  90017
Telephone: (213) 243-4000

**ATTORNEYS FOR
THE DISNEY ENTITIES**