# Exhibit 2

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| **DDMG Estate, _et al._,** | ) Case No.: 12-12568 (BLS) |
| | ) |
| Debtors. | ) **Doc. Ref. Nos. 290 and 291** |
| | ) |

**DECLARATION OF ROBERT FAULKNER IN SUPPORT OF
LIMITED OBJECTION AND RESERVATION OF RIGHTS OF
THE DISNEY ENTITIES TO THE DEBTORS' MOTIONS TO APPROVE
SALE PROCEDURES AND SEPARATE SALES OF ASSETS**

I, Robert Faulkner, declare as follows:

1.      I am Principal Counsel at Walt Disney Studios Motion Picture Production ("**Disney Studios**"). I submit this declaration in support of the limited objection (the "**Limited Objection**") filed contemporaneously herewith by Disney Studios and certain of its affiliates (the "**Disney Entities**," as defined in the Limited Objection) regarding (1) Debtors' Motion for an Order (A) Approving Procedures for Separate Sales of Assets, (B) Scheduling Auction and Hearing to Consider Approval of Sale and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (C) Approving Forms of Notice, and (D) Granting Related Relief [Docket No. 290] (the "**Sale Procedures Motion**"); and (2) Debtors' Motion for Order (I) Approving Separate Sales of Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (II) Assuming and Assigning Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief [Docket No. 291] (the "**Sale Motion**"). I am familiar with the Disney Entities' business relationship with Debtors and the transactions described in the Limited Objection, including, but not limited to, the Production Agreements. Except as indicated herein, all facts set forth in this Declaration are based on my personal knowledge. If I were called to testify, I could and would testify competently to the facts set forth herein. Unless stated otherwise, all capitalized terms used herein have the same meaning as ascribed to them in the Limited Objection.

2.      After DDP acquired In Three and the In Three Patents in November 2010, the Disney Entities decided that they wanted to exercise their In Three Patent Rights and receive the In Three Patent License to which they were entitled.

3.      Commencing in December 2011, as in-house counsel at Disney Studios, I engaged DDP in discussions regarding DDP's obligation under the G-Force Agreement, as In Three's assignee, to grant the In Three Patent License. Even though the G-Force Agreement is binding by its express terms on any successor in interest, DDP took the position that it had purchased only In Three's assets, and disputed that it was bound by the licensing obligations and CNTS Rights provided in the G-Force Agreement.

4.      To resolve this dispute, in January 2012, DDP's General Counsel acknowledged in a conversation with me that, without conceding Disney's contention that DDP was obligated to do so, DDP intended to honor the "spirit" of the G-Force Agreement in granting the In Three Patent License and honoring the CNTS Rights. DDP also later acknowledged that it would grant Disney the In Three Patent License on a royalty-free basis, which would have been required anyway by operation of the MFN Clause, under the circumstances. However, DDP was only willing to end this dispute once Disney Studios agreed to discuss the possibility of retaining DDP for the VFX work on the motion picture *Maleficent*. On this basis, the parties proceeded with further discussions regarding the agreement memorializing the In Three Patent License (the "**License Agreement**") including negotiations between Paul Shurgot of Disney Studios and John Textor, then the CEO of DDP.

5.      Ultimately, and notwithstanding the fact that it was not entitled to extract such additional consideration because the G-Force Agreement bound DDP to grant the In Three Patent License on a royalty-free basis, the Disney Entities paid DDP approximately $3.8 million prior to the Petition Date on account of the *Maleficent* project; *i.e.*, revenues resulting in large part from DDP's commitment to settle the dispute and grant the In Three Patent License.

6.      As the product of the negotiations between Disney and DDP, I was directed to prepare and transmit to DDP a draft form of the License Agreement, and on May 18, 2012, I sent

this draft agreement to DDP for review and comment. A true and correct copy of the May 18, 2012 email correspondence from myself to DDP is attached hereto as Exhibit A.

7.          Prior to the Petition Date and after the *Maleficent* project was underway, Disney Studios and Debtors exchanged drafts and comments to memorialize the License Agreement, the substantive terms having already been specified by the G-Force Agreement in light of the effect of the MFN Clause. A true and correct copy of correspondence received from DDP regarding the draft License Agreement is attached hereto as Exhibit B. The Disney Entities were informed and believed that Debtors had previously granted a non-exclusive, royalty free license in the In Three Patents to, among others, Prime Focus World, and that In Three had granted a royalty free license to Industrial Light and Magic. Although all material terms were already established by operation of Section 16(b) of the G-Force Agreement, the License Agreement was not itself executed before the Petition Date.

I declare under penalty of perjury that the foregoing is true and correct and that this

Declaration was executed in Los Angeles, California on October 30, 2012.

Robert Faulkner
Principal Counsel
Walt Disney Studios Motion Picture Production

## EXHIBIT A

**MAY 18, 2012 TRANSMITTAL OF LICENSE AGREEMENT TO DDP**

| | |
|---|---|
| **From:** | Faulkner, Robert P. [Robert.P.Faulkner@disney.com] |
| **Sent:** | Friday, May 18, 2012 12:01 PM |
| **To:** | Ed Lunsford; Joseph Gabriel |
| **Cc:** | Shurgot, Paul; Chen, Alexander C. - Legal; Edmonds, Lori N |
| **Subject:** | Digital Domain: License Proposal / License Agreement v.1 |
| **Attachments:** | Digital Domain License v.1.pdf |

Hi Ed and Joe,

Per the recent discussions between John Textor and Paul Shurgot, I have attached a proposed license agreement for your consideration. I am simultaneously circulating the agreement to others, and so reserve their right to make additional changes and corrections.

Best wishes,
Bob


Robert P. Faulkner
Principal Counsel
Walt Disney Studios Motion Picture Production
500 S. Buena Vista St., R.O.D. 179
Burbank, CA 91521-1296
Tel: 818.560.7946
Fax: 818.843-3235

*This e-mail message is confidential, intended only for the named recipient(s) above and may contain information that is privileged, attorney work product or exempt from disclosure under applicable law. If you have received this message in error, or are not the named recipient(s), please immediately notify the sender at 818.560.7946 and delete this e-mail message from your computer. Thank you.*

## LICENSE AGREEMENT

This License Agreement ("Agreement") is being entered into as of May __, 2012 ("Effective Date"), by and between **DIGITAL DOMAIN PRODUCTIONS, INC.** ("Licensor") at 300 Rose Avenue, Venice, CA 90291, and **THE WALT DISNEY COMPANY**, a Delaware company, at 500 South Buena Vista St., Burbank, California 91521 ("Licensee"). Licensor and Licensee are referred to individually as a "party," and collectively as "parties."

WHEREAS, the parties desire to resolve all issues regarding the Licensed Patents (as defined below) without any admission of fault or liability.

NOW, THEREFORE, in consideration of the above promises and mutual covenants hereinafter contained, the parties agree as follows:

## ARTICLE 1: DEFINITIONS

**Section 1.1**    "**Affiliate**" means any entity directly or indirectly controlling or controlled by or in common control with a party, where "control" is defined as the direct or indirect ownership of at least 50% of the equity or beneficial interests of such entity or the right to vote for or appoint a majority of the board of directors or other governing body of such entity.

**Section 1.2**    "**Licensed Patents**" means (i) all patents and patent applications owned, controlled, sub-licensable, or enforceable by Licensor Releasors (as defined below), including, but not limited to, U.S. Patent Nos. 6,208,348, 6,515,659, 6,686,926, 7,102,633, 7,116,323, 7,116,324, and all patents, rights to inventions and pending and future applications for patents under U.S. law or regulation or of any foreign country with respect to the patentable inventions from which such patents arise; and (ii) any patents or patent applications claiming priority to the patents or patent applications described in (i), including any continuations, divisionals, continuations-in-part, renewals, extensions, reexaminations or reissues of the patents or patent applications described in (i), including any foreign counterparts of such patents, together with all priority rights and counterpart applications under any existing or future international patent conventions, agreements or treaties.

**Section 1.3**    "**Licensed Products**" any products, services, methods, apparatuses, or systems made, used, sold or otherwise distributed or performed by or for Licensee and its Affiliates (including all activities performed at Licensee or Affiliate facilities).

## ARTICLE 2: LICENSE, RELEASE, AND COVENANT NOT TO SUE

**Section 2.1**    **Licenses**.    Licensor on its own behalf and on behalf of each of its affiliates and subsidiaries and each of their respective representatives, heirs, successors, assigns, licensees, agents and employees, and all persons acting by, through, under or in concert with any of them (the "Licensor Releasors") hereby grants to Licensee and its Affiliates a non-exclusive, irrevocable, perpetual, worldwide, fully paid-up, non-royalty bearing license to make, have made, use, import, have imported on their behalf, sell, offer for sale, and to otherwise commercially exploit and distribute any invention claimed, directly or indirectly, in the Licensed Patents. For the avoidance of doubt, the parties acknowledge and agree that the licenses granted in this Section 2.1 extend to legal entities that become Affiliates of Licensee after the Effective Date of this Agreement. The licenses granted in this Section 2.1 extend to (a) third parties to the extent necessary for such third parties to provide (i) services or perform work on behalf of Licensee and its Affiliates with respect to the Licensed Products and/or (ii) the third party's products to the extent those products are incorporated or part of a Licensed Product; (b) direct or indirect customers or end-users of the Licensed Products to the extent necessary to implement or use the

Licensed Products; or (c) to third parties to the extent such third parties have rights under the doctrine of exhaustion. The licenses set forth in this Agreement run with the Licensed Patents, and shall be enforceable against all future owners of any of the rights in the Licensed Patents. For the avoidance of doubt, this section 2.1 and the licenses granted hereunder shall not extend to any products or services of third parties beyond which is specified in this Section 2.1.

**Section 2.2    Licensor Release of Licensee.** Licensor Releasors hereby release, acquit and discharge Licensee and its current or former Affiliates (including without limitation its parents and subsidiaries) and their respective officers, directors, employees, stockholders, agents, attorneys, successors, assigns, direct and indirect customers and distributors and dealers, officers, directors, managers, members, employees and all individuals or entities acting by, through, under or in concert with them ("Licensee Releasees") from (i) any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of actions, suits, rights, demands, losses, debts, costs and expenses (including fees of attorneys and other professionals) of any nature whatsoever in law, equity or otherwise, known or unknown, suspected or unsuspected, fixed or contingent (collectively, "Claims"), which the Licensor Releasors had or now have or claim to have, or which Licensor Releasors at any time hereafter may have or claim to have against Licensee Releasees, or any of them, arising out of or related to the Licensed Patents and any and all past, present, and future claims or allegations of infringement, inducement to infringe, contributory infringement, damages, enhanced damages, and attorneys fees, that in any way relate to or arise out of any products or services used or distributed by or for Licensee Releasees as of the Effective Date of this Agreement; and (ii) the conduct of settlement negotiations. Licensor Releasors also hereby release the entities that perform work or provide services on behalf of Licensee Releasees to the extent such work or services are provided in connection with the Licensed Products.

**Section 2.3    Covenant Not to Sue.** Licensor on its own behalf and on behalf of each of the Licensor Releasors hereby covenants not to sue Licensee or any of the Licensee Releasees for any Claims released under Section 2.2 above. Licensor on its own behalf and on behalf of each of the Licensor Releasors also hereby covenants not to sue the entities or persons subject to the release in Section 2.2, above, including customers and those that perform work or provide services on behalf of Licensee Releasees to the extent such work or services are provided in connection with the Licensed Products. For the avoidance of doubt, Licensor on its own behalf and on behalf of each of the Licensor Releasors agrees not to assert any claims against Licensee Releasees under the Licensed Patents for any claims of direct, indirect or contributory infringement, provided, however, Licensor reserves the right to assert claims against any third party end-user that is a direct infringer of the Licensed Patents other than with respect to the Licensed Products.

**Section 2.4    Releases.** Licensor hereby expressly waives any rights it may have under California Civil Code Section 1542 (or any other similar law in any jurisdiction) which provides: **"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."**

**Section 2.5    Licensee Release of Licensor.** Licensee releases Licensor from liability which the Licensee has or claims to have, or which the Licensee at any time hereafter may have or claim to have against Licensor arising from the conduct of the settlement negotiations (except for representations or obligations expressly included in this Agreement).

## ARTICLE 3: ASSIGNMENT

**Section 3.1**     **Spin-offs.** If an Affiliate of Licensee ceases to be an Affiliate as the result of a sale of an equity interest or through the sale of substantially all the assets related to the Affiliate's business operations ("Spun-off Entity"), any license granted in this Agreement shall continue to apply to the Spun-off Entity.

**Section 3.2**     **Licensor Assignment.** In the event of an assignment by Licensor in connection with a change of control, the acquiring party is obligated to fulfill any and all obligations of its predecessor in interest hereunder.

## ARTICLE 4: REPRESENTATION AND WARRANTIES

**Section 4.1**     **Licensor's Representations.** Licensor represents and warrants that: (i) Licensor has the full right and authority to grant to Licensee (a) the licenses and rights granted herein and (b) the releases granted herein; (ii) Licensor exclusively owns all right, title and interest in and to the Licensed Patents; (iii) Licensor has not entered and shall not enter into any other agreements which would interfere with the rights, privileges and immunities granted herein by Licensor during the full term of this Agreement; (iv) the person executing this Agreement on behalf of Licensor has the full right and authority to enter into this Agreement on Licensor's behalf; (v) Licensor is not aware of any third party that has asserted a right in the Licensed Patents; and (vi) Licensor presently owns no patents or patent applications other than the Licensed Patents.

**Section 4.2**     **Licensee's Representations.** Licensee represents and warrants that the person executing this Agreement on behalf of Licensee has the full right and authority to enter into this Agreement on Licensee's behalf.

**Section 4.3**     **No Warranties.** Nothing contained in this Agreement shall be construed as: (i) a warranty or representation by either party that any manufacture, sale, use or other disposition of products by the other party has been or will be free from infringement of any patents; (ii) an agreement by either party to bring or prosecute actions or suits against third parties for infringement, or conferring any right to the other party to bring or prosecute actions or suits against third parties for infringement; (iii) conferring any right to the other party to use in advertising, publicity, or otherwise, any trademark, trade name or names of either party, or any contraction, abbreviation or simulation thereof without the prior written consent of the other party; or (iv) conferring by implication, estoppel or otherwise, upon either party, any right (including a license) under other patents except for the rights expressly granted hereunder.

## ARTICLE 5: CONFIDENTIALITY AND PROMOTION

**Section 5.1**     **Confidentiality.** Licensor agrees that it will not disclose the existence or terms of this Agreement to any third party, except: (a) with the prior written consent of Licensee; (b) to any governmental body having jurisdiction and specifically requiring such disclosure; (c) in response to a valid subpoena or as required during the course of litigation and subject to a protective order under a designation of "Outside Attorneys Eyes Only" or higher confidentiality designation, provided that Licensor, prior to any disclosure under this section, shall provide written notice to Licensee with sufficient time prior to the date that such disclosure is to occur so that Licensee has reasonable time to oppose or move to quash the subpoena or otherwise object to the production; (d) for the purposes of disclosure in connection with the Securities and Exchange Act of 1934, as amended, the Securities Act of 1933, as amended, and any other reports filed with the Securities and Exchange Commission, or any other filings, reports or disclosures that may be required under applicable laws or regulation; (e) to Licensor's accountants, legal counsel, tax advisors and other financial and legal advisors, subject to obligations of

confidentiality and/or privilege at least as stringent as those contained herein; or (f) to a counterparty in connection with a proposed merger, acquisition, financing or similar transaction, provided it is disclosed with obligations of confidentiality at least as stringent as those contained herein.

   **Section 5.2  No Promotion.** Licensor shall acquire no right to use, and shall not use, the Licensee's names, including without limitation "Disney", "Pixar", "ESPN" or any of their Affiliates (either alone or in conjunction with or as a part of any other word or name) or any fanciful characters or designs of The Walt Disney Company or any of its Affiliates: (i) in any advertising, publicity, promotion; (ii) nor to express or to imply any endorsement of or that any products make use of the Licensed Patents; (iii) nor to use any of said names, characters, or of The Walt Disney Company or its Affiliates designs in any other manner (whether or not similar to uses prohibited by (i) and (ii) above). The provisions of this section shall survive expiration or termination of this Agreement.

<h3 style="text-align:center">ARTICLE 6: MISCELLANEOUS</h3>

   **Section 6.1  Licensor Indemnification.** Licensor shall defend and indemnify Licensee and its Affiliates, and each of their respective officers, directors, agents, employees, shareholders, attorneys and assigns of each, and hold them harmless against any and all liabilities, damages, losses, expenses of any nature (including without limitation, the fees of attorneys and other professionals), and costs arising from or relating to any third party claims, actions, proceedings or demands arising from or relating to any breach or alleged breach of any of Licensor's representations and warranties.

   **Section 6.2  Governing Law and Jurisdiction.** This Agreement and matters connected with the performance thereof shall be construed, interpreted, applied and governed in all respects in accordance with the laws of the State of California, without reference to its conflict of laws principles. The parties agree (a) that all disputes and litigation regarding this Agreement, its construction and matters connected with its performance be subject to the exclusive jurisdiction of the state and federal courts in Los Angeles, California (the "Court"), and (b) to submit any disputes, matters of interpretation, or enforcement actions arising with respect to the subject matter of this Agreement exclusively to the Court. The parties hereby waive any challenge to the jurisdiction or venue of the Court over these matters.

   **Section 6.3  Severability.** If any provision of this Agreement is held to be illegal or unenforceable, such provision shall be limited or eliminated to the minimum extent necessary so that the remainder of this Agreement will continue in full force and effect and be enforceable. The parties agree to negotiate in good faith an enforceable substitute provision for any invalid or unenforceable provision that most nearly achieves the intent of such provision.

   **Section 6.4  No Waiver.** The failure of any party to enforce at any time any provision of this Agreement shall in no way be construed as a waiver of such provision, nor in any way affect the validity of this Agreement or any part thereof, or the right of any party to later enforce each and every such provision. No waiver of any breach of this Agreement shall be held to be a waiver of any other or subsequent breach.

   **Section 6.5  Entire Agreement.** This Agreement constitutes the entire understanding and agreement of the parties pertaining to the matters set forth herein, and supersedes any and all letters of intent, prior agreements, proposals, understandings, negotiations, and discussions of the parties. This Agreement may not be amended, modified, released, discharged or otherwise terminated, in whole or in part, except by an instrument in writing, signed by the parties hereto.

**Section 6.6      Construction; Language.** Both parties have contributed to or had the opportunity to contribute to the language in this Agreement. Accordingly, any rule of construction to the effect that ambiguities are to be resolved against the drafting party or one party or the other will not be applied in the construction or interpretation of this Agreement.

**Section 6.7      Counterparts.** This Agreement may be executed in counterparts or duplicate originals, both of which shall be regarded as one and the same instrument, and which shall be the official and governing version in the interpretation of this Agreement. This Agreement may be executed by facsimile signatures or other electronic means and such signatures shall be deemed to bind each party as if they were original signatures.

**Section 6.8      Notice.** All notices required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given when (a) delivered by hand, courier, or express mail service (with written confirmation of receipt), or (b) delivered by registered or certified first class mail, return receipt requested, at the address set forth below (or to such other person or address as a party may, from time to time, designate by written notice):

For Licensor:

For Licensee:
      The Walt Disney Company
      General Counsel
      500 S. Buena Vista St.
      Burbank, CA 91521

with a copy to:
      The Walt Disney Company
      Chief Patent Counsel
      500 S. Buena Vista St.
      Burbank, CA 91521

**Section 6.9      Denial of Liability.** The parties acknowledge that they are entering into this Agreement to resolve disputed claims, that nothing herein shall be construed to be an admission of liability, and that each party expressly denies any liability to the other party.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the Effective Date.

**DIGITAL DOMAIN PRODUCTIONS, INC.**

By: _____
Name:
Title:

**The Walt Disney Company**

By: _____
Name:
Title:

**EXHIBIT B**

**CORRESPONDENCE BETWEEN DISNEY STUDIOS AND DDP
REGARDING DRAFT LICENSE AGREEMENT**

**From:** Joseph Gabriel [mailto:jgabriel@d2.com]
**Sent:** Monday, August 27, 2012 1:38 PM
**To:** Faulkner, Robert P.
**Cc:** Edmonds, Lori N; Darin K. Grant; Ed Lunsford
**Subject:** RE: Digital Domain: License Proposal / License Agreement v.1

Bob:

Attached are my handwritten comments to the License Agreement.  In addition to these comments (and the broader issues related to other Disney/DD matters that we discussed during our call), we have the following:

1.       As an additional recital, please add:

"WHEREAS, Licensor's affiliates and Licensee are concurrently discussing business opportunities that they believe could be of mutual benefit to Licensor, Licensor's affiliates and Licensee and would allow the parties to resolve any disputed claims between them."

2.       At the end of section 5.1, as we discussed during our call last week, please add the following exception to the confidentiality provision:

"except that Licensor may make statements about the existence of this agreement to third parties in a manner substantially consistent with the form press statement attached as Appendix A to this Agreement."

3.       I should be able to deliver the proposed press statement to you later today or tomorrow morning.

I am concurrently discussing these comments with others at DD and must reserve further right to comment.

Thanks.

1

Joe

**From:** Joseph Gabriel
**Sent:** Monday, August 27, 2012 11:31 AM
**To:** Faulkner, Robert P.
**Cc:** Edmonds, Lori N; Darin K. Grant
**Subject:** RE: Digital Domain: License Proposal / License Agreement v.1

Bob,

We can get you at the least the first two items today and the third item shortly thereafter.

Thanks for making this a priority.

Joe

**From:** Faulkner, Robert P. [mailto:Robert.P.Faulkner@disney.com]
**Sent:** Monday, August 27, 2012 11:01 AM
**To:** Joseph Gabriel
**Cc:** Edmonds, Lori N
**Subject:** RE: Digital Domain: License Proposal / License Agreement v.1

Hi Joe,

We really need ASAP"

- Any remaining comments on the agreement;
- The proposed press statement; and
- Any proposed changes to the IMD Agreement(s).

When do you think we will see them?

Thanks,
Bob


Robert P. Faulkner
Principal Counsel
Walt Disney Studios Motion Picture Production
500 S. Buena Vista St., R.O.D. 179
Burbank, CA 91521-1296
Tel: 818.560.7946
Fax: 818.843-3235

*This e-mail message is confidential, intended only for the named recipient(s) above and may contain information that is privileged, attorney work product or exempt from disclosure under applicable law. If you have received this message in error, or are not the named recipient(s), please immediately notify the sender at 818.560.7946 and delete this e-mail message from your computer. Thank you.*


**From:** Faulkner, Robert P.
**Sent:** Wednesday, August 15, 2012 4:45 PM

**To:** Joseph Gabriel
**Cc:** Edmonds, Lori N
**Subject:** FW: Digital Domain: License Proposal / License Agreement v.1

Here you go.


Robert P. Faulkner
Principal Counsel
Walt Disney Studios Motion Picture Production
500 S. Buena Vista St., R.O.D. 179
Burbank, CA 91521-1296
Tel: 818.560.7946
Fax: 818.843-3235

*This e-mail message is confidential, intended only for the named recipient(s) above and may contain information that is privileged, attorney work product or exempt from disclosure under applicable law. If you have received this message in error, or are not the named recipient(s), please immediately notify the sender at 818.560.7946 and delete this e-mail message from your computer. Thank you.*

---

**From:** Faulkner, Robert P.
**Sent:** Friday, May 18, 2012 12:01 PM
**To:** 'Ed Lunsford'; 'Joseph Gabriel'
**Cc:** Shurgot, Paul; Chen, Alexander C.; Edmonds, Lori N
**Subject:** Digital Domain: License Proposal / License Agreement v.1

Hi Ed and Joe,

Per the recent discussions between John Textor and Paul Shurgot, I have attached a proposed license agreement for your consideration. I am simultaneously circulating the agreement to others, and so reserve their right to make additional changes and corrections.

Best wishes,
Bob


Robert P. Faulkner
Principal Counsel
Walt Disney Studios Motion Picture Production
500 S. Buena Vista St., R.O.D. 179
Burbank, CA 91521-1296
Tel: 818.560.7946
Fax: 818.843-3235

*This e-mail message is confidential, intended only for the named recipient(s) above and may contain information that is privileged, attorney work product or exempt from disclosure under applicable law. If you have received this message in error, or are not the named recipient(s), please immediately notify the sender at 818.560.7946 and delete this e-mail message from your computer. Thank you.*

LICENSE AGREEMENT

*[handwritten: Media Group, Inc. and Disital Domain Stereo Groups, Inc. August]*

This License Agreement ("Agreement") is being entered into as of May __, 2012 ("Effective Date"), by and between **DIGITAL DOMAIN** ~~PRODUCTIONS, INC.~~ ("Licensor") at ~~300 Rose Avenue, Venice, CA 90291,~~ and **THE WALT DISNEY COMPANY**, a Delaware ~~company, at 500 South Buena Vista St.,~~ Burbank, California 91521 ("Licensee"). Licensor and Licensee are referred to individually as a "party," and collectively as "parties." *[handwritten: Collectively,]*

*[handwritten left margin: 10250 SW Village rkway, 2nd st. ncie, FL 34987]*

WHEREAS, the parties desire to resolve all issues regarding the Licensed Patents (as defined below) without any admission of fault or liability.

NOW, THEREFORE, in consideration of the above promises and mutual covenants hereinafter contained, the parties agree as follows:

## ARTICLE 1:  DEFINITIONS

**Section 1.1**  "**Affiliate**" means any entity directly or indirectly controlling or controlled by or in common control with a party, where "control" is defined as the direct or indirect ownership of at least 50% of the equity or beneficial interests of such entity or the right to vote for or appoint a majority of the board of directors or other governing body of such entity.

**Section 1.2**  "**Licensed Patents**" means (i) ~~all~~ patents ~~and patent applications owned, controlled, sub-licensable, or enforceable by Licensor Releasors (as defined below), including, but not limited to,~~ *[handwritten: the identified as]* U.S. Patent Nos. 6,208,348, 6,515,659, 6,686,926, 7,102,633, 7,116,323, 7,116,324, and all patents, rights to inventions and pending and future applications for patents under U.S. law or regulation or of any foreign country with respect to the patentable inventions from which such patents arise; and (ii) any patents or patent applications claiming priority to the patents or patent applications described in (i), including any continuations, divisionals, continuations-in-part, renewals, extensions, reexaminations or reissues of the patents or patent applications described in (i), including any foreign counterparts of such patents, together with all priority rights and counterpart applications under any existing or future international patent conventions, agreements or treaties.

**Section 1.3**  "**Licensed Products**" any products, services, methods, apparatuses, or systems made, used, sold or otherwise distributed or performed by or for Licensee and its Affiliates (including all activities performed at Licensee or Affiliate facilities).

## ARTICLE 2:  LICENSE, RELEASE, AND COVENANT NOT TO SUE

**Section 2.1**  **Licenses**.  Licensor on its own behalf and on behalf of each of its affiliates and subsidiaries and each of their respective representatives, heirs, successors, assigns, licensees, agents and employees, and all persons acting by, through, under or in concert with any of them (the "Licensor Releasors") hereby grants to Licensee and its Affiliates a non-exclusive, irrevocable, perpetual, worldwide, fully paid-up, non-royalty bearing license to make, have made, use, import, have imported on their behalf, sell, offer for sale, and to otherwise commercially exploit and distribute any invention claimed, directly or indirectly, in the Licensed Patents.  For the avoidance of doubt, the parties acknowledge and agree that the licenses granted in this Section 2.1 extend to legal entities that become Affiliates of Licensee after the Effective Date of this Agreement. The licenses granted in this Section 2.1 extend to ~~(a) third parties to the extent necessary for such third parties to provide (i) services or perform work on behalf of Licensee and its Affiliates with respect to the Licensed Products and/or (ii) the third party's products to the extent those products are incorporated or part of a Licensed Product; (b)~~ direct or indirect customers or end-users of the Licensed Products to the extent necessary to implement or use the

Licensed Products; or (b) to third parties to the extent such third parties have rights under the doctrine of exhaustion. The licenses set forth in this Agreement run with the Licensed Patents, and shall be enforceable against all future owners of any of the rights in the Licensed Patents. For the avoidance of doubt, this section 2.1 and the licenses granted hereunder shall not extend to any products or services of third parties beyond which is specified in this Section 2.1. *that are not related to Licensed Products or are otherwise*

     **Section 2.2**   **Licensor Release of Licensee.** Licensor Releasors hereby release, acquit and discharge Licensee and its current or former Affiliates (including without limitation its parents and subsidiaries) and their respective officers, directors, employees, stockholders, agents, attorneys, successors, assigns, direct and indirect customers and distributors and dealers, officers, directors, managers, members, employees and all individuals or entities acting by, through, under or in concert with them ("Licensee Releasees") from (i) any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of actions, suits, rights, demands, losses, debts, costs and expenses (including fees of attorneys and other professionals) of any nature whatsoever in law, equity or otherwise, known or unknown, suspected or unsuspected, fixed or contingent (collectively, "Claims"), which the Licensor Releasors had or now have or claim to have, or which Licensor Releasors at any time hereafter may have or claim to have against Licensee Releasees, or any of them, arising out of or related to the Licensed Patents ~~and any and all past, present, and future claims or~~ *in connection* ~~allegations of infringement, inducement to infringe, contributory infringement, damages, enhanced~~ *with* ~~damages, and attorneys fees, that in any way relate to or arise out of any products or services used or~~ *Licensed* ~~distributed by or for Licensee Releasees~~ as of the Effective Date of this Agreement; and (ii) the conduct *Products* of settlement negotiations. Licensor Releasors also hereby release the entities that perform work or provide services on behalf of Licensee Releasees to the extent such work or services are provided in connection with the Licensed Products.

*the Licensed Patents in connection with Licensed Products*

     **Section 2.3**   **Covenant Not to Sue.** Licensor on its own behalf and on behalf of each of the Licensor Releasors hereby covenants not to sue Licensee or any of the Licensee Releasees for any Claims released under Section 2.2 above. Licensor on its own behalf and on behalf of each of the Licensor Releasors also hereby covenants not to sue the entities or persons subject to the release in Section 2.2, above, including customers and those that perform work or provide services on behalf of Licensee Releasees to the extent such work or services are provided in connection with the Licensed Products. For the avoidance of doubt, Licensor on its own behalf and on behalf of each of the Licensor Releasors agrees not to assert any claims against Licensee Releasees under the Licensed Patents for any claims of direct, indirect or contributory infringement, provided, however, Licensor reserves the right to assert claims against any third party end-user that is a direct infringer of the Licensed Patents other than with respect to the Licensed Products.

     **Section 2.4**   **Releases.** Licensor hereby expressly waives any rights it may have under California Civil Code Section 1542 (or any other similar law in any jurisdiction) which provides: **"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."**

     **Section 2.5**   **Licensee Release of Licensor.** Licensee releases Licensor from liability which the Licensee has or claims to have, or which the Licensee at any time hereafter may have or claim to have against Licensor arising from the conduct of the settlement negotiations (except for representations or obligations expressly included in this Agreement).

## ARTICLE 3: ASSIGNMENT

**Section 3.1    Spin-offs.**  If an Affiliate of Licensee ceases to be an Affiliate as the result of a sale of an equity interest or through the sale of substantially all the assets related to the Affiliate's business operations ("Spun-off Entity"), any license granted in this Agreement shall continue to apply to the Spun-off Entity~, *but only with respect to Licensed Products created or manufactured prior to the sale the equity interest or substantially all of the assets of the Spun-off Entity, and not to any new Affiliates of the off Spun-off Entity after consummation of the Spin-off.*

**Section 3.2    Licensor Assignment.**  In the event of an assignment by Licensor in connection with a change of control, the acquiring party is obligated to fulfill any and all obligations of its predecessor in interest hereunder.

## ARTICLE 4: REPRESENTATION AND WARRANTIES

**Section 4.1    Licensor's Representations.**  Licensor represents and warrants that: (i) Licensor has the full right and authority to grant to Licensee (a) the licenses and rights granted herein and (b) the releases granted herein; (ii) Licensor exclusively owns all right, title and interest in and to the Licensed Patents; (iii) Licensor has not entered and shall not enter into any other agreements which would interfere with the rights, privileges and immunities granted herein by Licensor during the full term of this Agreement; (iv) the person executing this Agreement on behalf of Licensor has the full right and authority to enter into this Agreement on Licensor's behalf; (v) Licensor is not aware of any third party that has asserted a right in the Licensed Patents; and (vi) Licensor presently owns no patents or patent applications other than the Licensed Patents.

**Section 4.2    Licensee's Representations.**  Licensee represents and warrants that the person executing this Agreement on Licensee's behalf has the full right and authority to enter into this Agreement on Licensee's behalf. *[ insert similar no conflict warranty as in Section 4.1 (iii)]*

**Section 4.3    No Warranties.**  Nothing contained in this Agreement shall be construed as: (i) a warranty or representation by either party that any manufacture, sale, use or other disposition of products by the other party has been or will be free from infringement of any patents; (ii) an agreement by either party to bring or prosecute actions or suits against third parties for infringement, or conferring any right to the other party to bring or prosecute actions or suits against third parties for infringement; (iii) conferring any right to the other party to use in advertising, publicity, or otherwise, any trademark, trade name or names of either party, or any contraction, abbreviation or simulation thereof without the prior written consent of the other party;  or (iv) conferring by implication, estoppel or otherwise, upon either party, any right (including a license) under other patents except for the rights expressly granted hereunder.

## ARTICLE 5: CONFIDENTIALITY AND PROMOTION

**Section 5.1    Confidentiality.**  Licensor agrees that it will not disclose the existence or terms of this Agreement to any third party, except: (a) with the prior written consent of Licensee; (b) to any governmental body having jurisdiction and specifically requiring such disclosure; (c) in response to a valid subpoena or as required during the course of litigation and subject to a protective order under a designation of "Outside Attorneys Eyes Only" or higher confidentiality designation, provided that Licensor, prior to any disclosure under this section, shall provide written notice to Licensee with sufficient time prior to the date that such disclosure is to occur so that Licensee has reasonable time to oppose or move to quash the subpoena or otherwise object to the production; (d) for the purposes of disclosure in connection with the Securities and Exchange Act of 1934, as amended, the Securities Act of 1933, as amended, and any other reports filed with the Securities and Exchange Commission, or any other filings, reports or disclosures that may be required under applicable laws or regulation; (e) to Licensor's accountants, legal counsel, tax advisors and other financial and legal advisors, subject to obligations of

confidentiality and/or privilege at least as stringent as those contained herein; or (f) to a counterparty in connection with a proposed merger, acquisition, financing or similar transaction, provided it is disclosed with obligations of confidentiality at least as stringent as those contained herein. [ *insert exception for agreed press statement* ]

Section 5.2    **No Promotion.**  Licensor shall acquire no right to use, and shall not use, the Licensee's names, including without limitation "Disney", "Pixar", "ESPN" or any of their Affiliates (either alone or in conjunction with or as a part of any other word or name) or any fanciful characters or designs of The Walt Disney Company or any of its Affiliates:  (i) in any advertising, publicity, promotion; (ii) nor to express or to imply any endorsement of or that any products make use of the Licensed Patents; (iii) nor to use any of said names, characters, or of The Walt Disney Company or its Affiliates designs in any other manner (whether or not similar to uses prohibited by (i) and (ii) above).  The provisions of this section shall survive expiration or termination of this Agreement. *except to the extent permitted in the agreed press statement.*

### ARTICLE 6: MISCELLANEOUS

Section 6.1    **Licensor Indemnification.**   Licensor shall defend and indemnify Licensee and its Affiliates, and each of their respective officers, directors, agents, employees, shareholders, attorneys and assigns of each, and hold them harmless against any and all liabilities, damages, losses, expenses of any nature (including without limitation, the fees of attorneys and other professionals), and costs arising from or relating to any third party claims, actions, proceedings or demands arising from or relating to any breach or alleged breach of any of Licensor's representations and warranties. *corresponding Licensee Indemnification*

Section 6.2    **Governing Law and Jurisdiction.**   This Agreement and matters connected with the performance thereof shall be construed, interpreted, applied and governed in all respects in accordance with the laws of the State of California, without reference to its conflict of laws principles. The parties agree (a) that all disputes and litigation regarding this Agreement, its construction and matters connected with its performance be subject to the exclusive jurisdiction of the state and federal courts in Los Angeles, California (the "Court"), and (b) to submit any disputes, matters of interpretation, or enforcement actions arising with respect to the subject matter of this Agreement exclusively to the Court. The parties hereby waive any challenge to the jurisdiction or venue of the Court over these matters.

Section 6.3    **Severability.**  If any provision of this Agreement is held to be illegal or unenforceable, such provision shall be limited or eliminated to the minimum extent necessary so that the remainder of this Agreement will continue in full force and effect and be enforceable. The parties agree to negotiate in good faith an enforceable substitute provision for any invalid or unenforceable provision that most nearly achieves the intent of such provision.

Section 6.4    **No Waiver.**   The failure of any party to enforce at any time any provision of this Agreement shall in no way be construed as a waiver of such provision, nor in any way affect the validity of this Agreement or any part thereof, or the right of any party to later enforce each and every such provision. No waiver of any breach of this Agreement shall be held to be a waiver of any other or subsequent breach.

Section 6.5    **Entire Agreement.**  This Agreement constitutes the entire understanding and agreement of the parties pertaining to the matters set forth herein, and supersedes any and all letters of intent, prior agreements, proposals, understandings, negotiations, and discussions of the parties. This Agreement may not be amended, modified, released, discharged or otherwise terminated, in whole or in part, except by an instrument in writing, signed by the parties hereto.

**Section 6.6    Construction; Language.** Both parties have contributed to or had the opportunity to contribute to the language in this Agreement. Accordingly, any rule of construction to the effect that ambiguities are to be resolved against the drafting party or one party or the other will not be applied in the construction or interpretation of this Agreement.

**Section 6.7    Counterparts.** This Agreement may be executed in counterparts or duplicate originals, both of which shall be regarded as one and the same instrument, and which shall be the official and governing version in the interpretation of this Agreement. This Agreement may be executed by facsimile signatures or other electronic means and such signatures shall be deemed to bind each party as if they were original signatures.

**Section 6.8    Notice.** All notices required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given when (a) delivered by hand, courier, or express mail service (with written confirmation of receipt), or (b) delivered by registered or certified first class mail, return receipt requested, at the address set forth below (or to such other person or address as a party may, from time to time, designate by written notice):

For Licensor:

*Digital Domain Media Group, Inc.*
*10250 SW Village Parkway* ← *General Counsel*
*Port St. Lucie, FL 34987*

For Licensee:
The Walt Disney Company
General Counsel
500 S. Buena Vista St.
Burbank, CA 91521

with a copy to:
The Walt Disney Company
Chief Patent Counsel
500 S. Buena Vista St.
Burbank, CA 91521

**Section 6.9    Denial of Liability.** The parties acknowledge that they are entering into this Agreement to resolve disputed claims, that nothing herein shall be construed to be an admission of liability, and that each party expressly denies any liability to the other party.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the Effective Date.

*MEDIA GROUP*
DIGITAL DOMAIN ~~PRODUCTIONS,~~ INC.

By: _____
Name:
Title:

The Walt Disney Company

By: _____
Name:
Title:

*sig block*
*for DDSG*

| | |
|---|---|
| **From:** | Faulkner, Robert P. [Robert.P.Faulkner@disney.com] |
| **Sent:** | Wednesday, September 05, 2012 2:50 PM |
| **To:** | 'Joseph Gabriel' |
| **Cc:** | Chen, Alexander C. - Legal; Edmonds, Lori N |
| **Subject:** | Digital Domain / License Proposal |
| **Attachments:** | Digital Domain license v2.pdf |

Hi Joe,

I've attached a revised draft of the license agreement. We're still reviewing the proposed press statement and your proposals relating to the IMD agreement. I'll keep pushing for an answer on those. Given the time constraints you and I discussed, Alex and I are happy to discuss any remaining issues on the license agreement at your earliest convenience.

I'm simultaneously circulating to others and so reserve their right to make additional changes and corrections.

Best,
Bob


Robert P. Faulkner
Principal Counsel
Walt Disney Studios Motion Picture Production
500 S. Buena Vista St., R.O.D. 179
Burbank, CA 91521-1296
Tel: 818.560.7946
Fax: 818.843-3235

*This e-mail message is confidential, intended only for the named recipient(s) above and may contain information that is privileged, attorney work product or exempt from disclosure under applicable law. If you have received this message in error, or are not the named recipient(s), please immediately notify the sender at 818.560.7946 and delete this e-mail message from your computer. Thank you.*

**LICENSE AGREEMENT**

This License Agreement ("Agreement") is being entered into as of ~~May~~ September-   , 2012 ("Effective Date"), by and between **DIGITAL DOMAIN ~~PRODUCTIONS, INC.~~MEDIA GROUP, Inc. and DIGITAL DOMAIN STEREO GROUP, Inc.** ("Licensor") at ~~300 Rose Avenue, Venice, CA 90291~~10250 SW Village Parkway, Port St. Lucie, FL 34987, and **THE WALT DISNEY COMPANY**, a Delaware company, at 500 South Buena Vista St., Burbank, California 91521 ("Licensee"). Licensor and Licensee are referred to individually as a "party," and collectively as "parties."

WHEREAS, the parties desire to resolve all issues regarding the Licensed Patents (as defined below) without any admission of fault or liability.

WHEREAS, Licensor's affiliates and Licensee are concurrently discussing business opportunities that they believe could be of mutual benefit to Licensor, Licensor's affiliates, and Licensee and would allow the parties to resolve any disputed claims between them.

NOW, THEREFORE, in consideration of the above promises and mutual covenants hereinafter contained, the parties agree as follows:

**ARTICLE 1: DEFINITIONS**

**Section 1.1** "**Affiliate**" means any entity directly or indirectly controlling or controlled by or in common control with a party, where "control" is defined as the direct or indirect ownership of at least 50% of the equity or beneficial interests of such entity or the right to vote for or appoint a majority of the board of directors or other governing body of such entity.

**Section 1.2** "**Licensed Patents**" means (i) all patents and patent applications that were previously owned, controlled, sub-licensable, or enforceable by In Three, Inc. and that are now owned, controlled, sub-licensable, or enforceable by Licensor Releasors (as defined below), including, but not limited to, U.S. Patent Nos. 6,208,348, 6,515,659, 6,686,926, 7,102,633, 7,116,323, 7,116,324, and all patents, rights to inventions and pending and future applications for patents under U.S. law or regulation or of any foreign country with respect to the patentable inventions from which such patents arise; and (ii) any patents or patent applications claiming priority to the patents or patent applications described in (i), including any continuations, divisionals, continuations-in-part, renewals, extensions, reexaminations or reissues of the patents or patent applications described in (i), including any foreign counterparts of such patents, together with all priority rights and counterpart applications under any existing or future international patent conventions, agreements or treaties.

**Section 1.3** "**Licensed Products**" any products, services, methods, apparatuses, or systems made, used, sold or otherwise distributed or performed by or for Licensee and its Affiliates (including all activities performed at Licensee or Affiliate facilities).

**ARTICLE 2: LICENSE, RELEASE, AND COVENANT NOT TO SUE**

**Section 2.1** **Licenses.** Licensor on its own behalf and on behalf of each of its affiliates and subsidiaries and each of their respective representatives, heirs, successors, assigns, licensees, agents and employees, and all persons acting by, through, under or in concert with any of them (the "Licensor Releasors") hereby grants to Licensee and its Affiliates a non-exclusive, irrevocable, perpetual, worldwide, fully paid-up, non-royalty bearing license to make, have made, use, import, have imported on their behalf, sell, offer for sale, and to otherwise commercially exploit and distribute any

invention claimed, directly or indirectly, in the Licensed Patents. For the avoidance of doubt, the parties acknowledge and agree that the licenses granted in this Section 2.1 extend to legal entities that become Affiliates of Licensee after the Effective Date of this Agreement. The licenses granted in this Section 2.1 extend to (a) third parties to the extent necessary for such third parties to provide (i) services or perform work on behalf of Licensee and its Affiliates with respect to the Licensed Products and/or (ii) the third party's products to the extent those products are incorporated or part of a Licensed Product and only for use in the Licensed Products; (b) direct or indirect customers or end-users of the Licensed Products to the extent necessary to implement or use the Licensed Products; or (c) to third parties to the extent such third parties have rights under the doctrine of exhaustion. The licenses set forth in this Agreement run with the Licensed Patents, and shall be enforceable against all future owners of any of the rights in the Licensed Patents. For the avoidance of doubt, this section 2.1 and the licenses granted hereunder shall not extend to any products or services of third parties that are not related to Licensed Products or are otherwise beyond which is specified in this Section 2.1.

**Section 2.2    Licensor Release of Licensee.** Licensor Releasors hereby release, acquit and discharge Licensee and its current or former Affiliates (including without limitation its parents and subsidiaries) and their respective officers, directors, employees, stockholders, agents, attorneys, successors, assigns, direct and indirect customers and distributors and dealers, officers, directors, managers, members, employees and all individuals or entities acting by, through, under or in concert with them ("Licensee Releasees") from (i) any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of actions, suits, rights, demands, losses, debts, costs and expenses (including fees of attorneys and other professionals) of any nature whatsoever in law, equity or otherwise, known or unknown, suspected or unsuspected, fixed or contingent (collectively, "Claims"), which the Licensor Releasors had or now have or claim to have, or which Licensor Releasors at any time hereafter may have or claim to have against Licensee Releasees, or any of them, arising out of or related to the Licensed Patents in connection with the Licensed Products and any and all past, present, and future claims or allegations of infringement, inducement to infringe, contributory infringement, damages, enhanced damages, and attorneys fees, that in any way relate to or arise out of ~~any products or services used or distributed by or for Licensee Releasees as of the Effective Date of this Agreement~~ the Licensed Patents in connection with the Licensed Products; and (ii) the conduct of settlement negotiations. Licensor Releasors also hereby release the entities that perform work or provide services on behalf of Licensee Releasees to the extent such work or services are provided in connection with the Licensed Products.

**Section 2.3    Covenant Not to Sue.** Licensor on its own behalf and on behalf of each of the Licensor Releasors hereby covenants not to sue Licensee or any of the Licensee Releasees for any Claims released under Section 2.2 above. Licensor on its own behalf and on behalf of each of the Licensor Releasors also hereby covenants not to sue the entities or persons subject to the release in Section 2.2, above, including customers and those that perform work or provide services on behalf of Licensee Releasees to the extent such work or services are provided in connection with the Licensed Products. For the avoidance of doubt, Licensor on its own behalf and on behalf of each of the Licensor Releasors agrees not to assert any claims against Licensee Releasees under the Licensed Patents for any claims of direct, indirect or contributory infringement, provided, however, Licensor reserves the right to assert claims against any third party end-user that is a direct infringer of the Licensed Patents other than with respect to the Licensed Products.

**Section 2.4    Releases.** Licensor hereby expressly waives any rights it may have under California Civil Code Section 1542 (or any other similar law in any jurisdiction) which provides: **"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."**

**EXECUTION COPY**

>        **Section 2.5      Licensee Release of Licensor.**  Licensee releases Licensor from liability which the Licensee has or claims to have, or which the Licensee at any time hereafter may have or claim to have against Licensor arising from the conduct of the settlement negotiations (except for representations or obligations expressly included in this Agreement).

## ARTICLE 3:  ASSIGNMENT

>        **Section 3.1      Spin-offs.**  If an Affiliate of Licensee ceases to be an Affiliate as the result of a sale of an equity interest or through the sale of substantially all the assets related to the Affiliate's business operations ("Spun-off Entity"), any license granted in this Agreement shall continue to apply to the Spun-off Entity, but only with respect to Licensed Products created or manufactured prior to the sale of the equity interest or substantially all of the assets of the spun-off entity.

>        **Section 3.2      Licensor Assignment.**  In the event of an assignment by Licensor in connection with a change of control, the acquiring party is obligated to fulfill any and all obligations of its predecessor in interest hereunder.

## ARTICLE 4:  REPRESENTATION AND WARRANTIES

>        **Section 4.1      Licensor's Representations.**  Licensor represents and warrants that: (i) Licensor has the full right and authority to grant to Licensee (a) the licenses and rights granted herein and (b) the releases granted herein; (ii) Licensor exclusively owns all right, title and interest in and to the Licensed Patents; (iii) Licensor has not entered and shall not enter into any other agreements which would interfere with the rights, privileges and immunities granted herein by Licensor during the full term of this Agreement; (iv) the person executing this Agreement on behalf of Licensor has the full right and authority to enter into this Agreement on Licensor's behalf; (v) Licensor is not aware of any third party that has asserted a right in the Licensed Patents; and (vi) Licensor presently owns no patents or patent applications other than the Licensed Patents.

>        **Section 4.2      Licensee's Representations.**  Licensee represents and warrants that: (i) the person executing this Agreement on behalf of Licensee has the full right and authority to enter into this Agreement on Licensee's behalf; and (ii) Licensee has not entered and shall not enter into any other agreements which would interfere with the rights, privileges, and immunities granted by Licensor in Section 2.5 during the full term of this Agreement.

>        **Section 4.3      No Warranties.**  Nothing contained in this Agreement shall be construed as: (i) a warranty or representation by either party that any manufacture, sale, use or other disposition of products by the other party has been or will be free from infringement of any patents; (ii) an agreement by either party to bring or prosecute actions or suits against third parties for infringement, or conferring any right to the other party to bring or prosecute actions or suits against third parties for infringement; (iii) conferring any right to the other party to use in advertising, publicity, or otherwise, any trademark, trade name or names of either party, or any contraction, abbreviation or simulation thereof without the prior written consent of the other party;  or (iv) conferring by implication, estoppel or otherwise, upon either party, any right (including a license) under other patents except for the rights expressly granted hereunder.

## ARTICLE 5:  CONFIDENTIALITY AND PROMOTION

>        **Section 5.1      Confidentiality.**  Licensor agrees that it will not disclose the existence or terms of this Agreement to any third party, except: (a) with the prior written consent of Licensee; (b) to any governmental body having jurisdiction and specifically requiring such disclosure; (c) in response to a valid subpoena or as required during the course of litigation and subject to a protective order under a

designation of "Outside Attorneys Eyes Only" or higher confidentiality designation, provided that Licensor, prior to any disclosure under this section, shall provide written notice to Licensee with sufficient time prior to the date that such disclosure is to occur so that Licensee has reasonable time to oppose or move to quash the subpoena or otherwise object to the production; (d) for the purposes of disclosure in connection with the Securities and Exchange Act of 1934, as amended, the Securities Act of 1933, as amended, and any other reports filed with the Securities and Exchange Commission, or any other filings, reports or disclosures that may be required under applicable laws or regulation; (e) to Licensor's accountants, legal counsel, tax advisors and other financial and legal advisors, subject to obligations of confidentiality and/or privilege at least as stringent as those contained herein; or (f) to a counterparty in connection with a proposed merger, acquisition, financing or similar transaction, provided it is disclosed with obligations of confidentiality at least as stringent as those contained herein, except that Licensor may make statements about the existence of this agreement to third parties in a manner substantially consistent with the form press statement attached as Appendix A to this Agreement.

       **Section 5.2**    **No Promotion**. Licensor shall acquire no right to use, and shall not use, the Licensee's names, including without limitation "Disney", "Pixar", "ESPN" or any of their Affiliates (either alone or in conjunction with or as a part of any other word or name) or any fanciful characters or designs of The Walt Disney Company or any of its Affiliates: (i) in any advertising, publicity, promotion; (ii) nor to express or to imply any endorsement of or that any products make use of the Licensed Patents; (iii) nor to use any of said names, characters, or of The Walt Disney Company or its Affiliates designs in any other manner (whether or not similar to uses prohibited by (i) and (ii) above), except to the extent permitted in the agreed press statement in Appendix A. The provisions of this section shall survive expiration or termination of this Agreement.

## ARTICLE 6: MISCELLANEOUS

       **Section 6.1(a)**    **Licensor Indemnification.**    Licensor shall defend and indemnify Licensee and its Affiliates, and each of their respective officers, directors, agents, employees, shareholders, attorneys and assigns of each, and hold them harmless against any and all liabilities, damages, losses, expenses of any nature (including without limitation, the fees of attorneys and other professionals), and costs arising from or relating to any third party claims, actions, proceedings or demands arising from or relating to any breach or alleged breach of any of Licensor's representations and warranties.

       **Section 6.1(b)**    **Licensee Indemnification.**    Licensee shall defend and indemnify Licensor and its Affiliates, and each of their respective officers, directors, agents, employees, shareholders, attorneys and assigns of each, and hold them harmless against any and all liabilities, damages, losses, expenses of any nature (including without limitation, the fees of attorneys and other professionals), and costs arising from or relating to any third party claims, actions, proceedings or demands arising from or relating to any breach or alleged breach of any of Licensee's representations and warranties.

       **Section 6.2**    **Governing Law and Jurisdiction.**    This Agreement and matters connected with the performance thereof shall be construed, interpreted, applied and governed in all respects in accordance with the laws of the State of California, without reference to its conflict of laws principles. The parties agree (a) that all disputes and litigation regarding this Agreement, its construction and matters connected with its performance be subject to the exclusive jurisdiction of the state and federal courts in Los Angeles, California (the "Court"), and (b) to submit any disputes, matters of interpretation, or enforcement actions arising with respect to the subject matter of this Agreement exclusively to the Court. The parties hereby waive any challenge to the jurisdiction or venue of the Court over these matters.

**EXECUTION COPY**

**Section 6.3    Severability.** If any provision of this Agreement is held to be illegal or unenforceable, such provision shall be limited or eliminated to the minimum extent necessary so that the remainder of this Agreement will continue in full force and effect and be enforceable. The parties agree to negotiate in good faith an enforceable substitute provision for any invalid or unenforceable provision that most nearly achieves the intent of such provision.

**Section 6.4    No Waiver.** The failure of any party to enforce at any time any provision of this Agreement shall in no way be construed as a waiver of such provision, nor in any way affect the validity of this Agreement or any part thereof, or the right of any party to later enforce each and every such provision. No waiver of any breach of this Agreement shall be held to be a waiver of any other or subsequent breach.

**Section 6.5    Entire Agreement.** This Agreement constitutes the entire understanding and agreement of the parties pertaining to the matters set forth herein, and supersedes any and all letters of intent, prior agreements, proposals, understandings, negotiations, and discussions of the parties. This Agreement may not be amended, modified, released, discharged or otherwise terminated, in whole or in part, except by an instrument in writing, signed by the parties hereto.

**Section 6.6    Construction; Language.** Both parties have contributed to or had the opportunity to contribute to the language in this Agreement. Accordingly, any rule of construction to the effect that ambiguities are to be resolved against the drafting party or one party or the other will not be applied in the construction or interpretation of this Agreement.

**Section 6.7    Counterparts.** This Agreement may be executed in counterparts or duplicate originals, both of which shall be regarded as one and the same instrument, and which shall be the official and governing version in the interpretation of this Agreement. This Agreement may be executed by facsimile signatures or other electronic means and such signatures shall be deemed to bind each party as if they were original signatures.

**Section 6.8    Notice.** All notices required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given when (a) delivered by hand, courier, or express mail service (with written confirmation of receipt), or (b) delivered by registered or certified first class mail, return receipt requested, at the address set forth below (or to such other person or address as a party may, from time to time, designate by written notice):

For Licensor:
Digital Domain Media Group, Inc.
General Counsel
10250 SW Village Parkway
Port St. Lucie, FL 34987

For Licensee:
The Walt Disney Company
General Counsel
500 S. Buena Vista St.
Burbank, CA 91521

with a copy to:
The Walt Disney Company
Chief Patent Counsel

**EXECUTION COPY**

*Settlement and License Agreement*                         *Highly Confidential*
Page 6 of 6

500 S. Buena Vista St.
Burbank, CA 91521

**Section 6.9      Denial of Liability.**  The parties acknowledge that they are entering into this Agreement to resolve disputed claims, that nothing herein shall be construed to be an admission of liability, and that each party expressly denies any liability to the other party.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the Effective Date.

**DIGITAL DOMAIN ~~PRODUCTIONS~~MEDIA GROUP, INC.**

By:   _____
Name:
Title:

**DIGITAL DOMAIN STEREO GROUP, Inc.**

By:   _____
Name:
Title:

**The Walt Disney Company**

By:   _____
Name:
Title:

**EXECUTION COPY**